UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL MCINTIRE, *Individually and On Behalf of All Others Similarly Situated*,<br><br>                 Plaintiff,<br><br>    v.<br><br>CHINA MEDIAEXPRESS HOLDINGS, INC.,<br><br>                 Defendant. | Civil Action No. 11-cv-0804 (VM) |
| WALTER RUBIN, *Individually and On Behalf of All Others Similarly Situated*,<br><br>                 Plaintiff,<br><br>    v.<br><br>CHINA MEDIAEXPRESS HOLDINGS, INC. and ZHENG CHENG,<br><br>                 Defendants. | Civil Action No.: 11-cv-0833 (VM) |
| GARY MANDEL, *Individually and On Behalf of All Others Similarly Situated*,<br><br>                 Plaintiff,<br><br>    v.<br><br>CHINA MEDIAEXPRESS HOLDINGS, INC, and ZHENG CHENG,<br><br>                 Defendants. | Civil Action No.: 11-cv-0916 (VM) |
| TUHIN CHAUDHURI, *Individually and On Behalf of All Others Similarly Situated*,<br><br>                 Plaintiff,<br><br>    v.<br><br>CHINA MEDIAEXPRESS HOLDINGS, INC., and ZHENG CHENG,<br><br>                 Defendants. | Civil Action No.: 11-cv-1895 (VM) |

## AMENDED AND CONSOLIDATED COMPLAINT

## I.      NATURE OF THE ACTION

1.      This is a class action against China MediaExpress Holdings, Inc. ("CCME"), its auditors, and certain of its officers alleging violations of the federal securities laws.  Plaintiffs bring this action on behalf of themselves and all other persons or entities that purchased shares of CCME common stock between October 5, 2009, and March 11, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities and Exchange Act of 1934 (the "Exchange Act").

2.      Defendant CCME's unraveling was one of the first and most shocking in the lengthening parade of Chinese reverse-merger frauds uncovered in the past year. Because these companies do not want, and perhaps could not pass, the examination process of the SEC when a private company seeks to issue its initial public offering of stock, they exploit a "loophole" in the system that allows them to buy a publicly traded "shell" company and assume control of that already-registered company – thus by-passing the SEC's rigorous examination process.  Here, Hong Kong Mandefu, a private company based in China, assumed control of "shell company" TM Entertainment and Media, Inc.

3.      Following the reverse merger transaction, and throughout the Class Period, CCME reported outstanding financial results, sending its share price up from less than $8.00 per share prior to the Class Period, up to a high of $22.81 on January 27, 2011.

4.      On January 31, 2011, Citron Research published the first analyst report questioning multiple aspects of CCME's business.  This bad publicity dropped the Company's stock more than 14%, closing at $17.84 per share.  But the bad news was just beginning.  On February 3, 2011, Muddy Waters Research issued a scathing research report highlighting multiple indicia of fraud at CCME.  This bad news caused CCME shares to drop from a close of $16.61 on February 2, 2011 to close at just $11.09 on February 3, 2011 – a decline of $5.52 per share, or more than 33%.

4.      On March 11, 2011, CCME's auditor Deloitte resigned, publicly stating that it had "lost confidence in the representations of management."  On that same day, the NASDAQ

suspended trading in CCME shares.  On March 13, 2011, Defendant Lam, the Company's CFO, resigned.  On March 16, 2011, CCME board member Dorothy Dong resigned, noting "irregularities concerning the bank account balances for CCME's PRC subsidiaries."  On April 7, 2011, another director resigned, causing the Company to fall short of the required number of "independent" directors.

5.      When trading resumed again on May 19, 2011, on the "pink-sheets," CCME shares plummeted 81.8% to close at just $2.16.  CCME shares closed trading at just $0.17 per share on October 20, 2011.  Plaintiffs and the class have lost hundreds of millions of dollars in this fraudulent scheme.

6.      Most shockingly, this enormous fraud took place under the protective umbrella of two accounting firms who conducted CCME's audits, the results of which were presented in CCME's 2009 Form 10-K.  In its 2009 Form 10-K, CCME revealed that it "may have difficulty" in "collecting financial data, preparing financial statements" and other internal control weaknesses and even went so far as to say:  "management does not expect that our disclosure controls or internal controls will prevent all error and all fraud."

7.      Notwithstanding management's clear statement that the audit firms should be on heightened guard in conducting their audits of CCME, both Defendant A.J. Robbins P.C. – a U.S. based accounting firm and Defendant Deloitte Touche Tohmatsu, a "Big Four" accounting firm displayed a reckless disregard for this glaring red flag and failed to perform their audits consistent with Generally Accepted Accounting Standards ("GAAS"), which requires audit procedures that will effectively evaluate evidential matter that supports the results set forth in the financial statements.  Had such tests been performed from the outset, they would have revealed far earlier the massive fraud that instead was uncovered by Citron and Muddy Waters.

7.      After issuing a clean audit opinion which assuaged any investor concerns arising from management's disclosure of internal control weaknesses, Deloitte finally and belatedly investigated CCME and reported its findings to CCME's board on March 3, 2011.  As Deloitte's summary of its investigation results to CCME's board revealed, Deloitte turned up enormous

indicia of fraud, including fake bank slips, evidence that the bank supervisor confirming CCME's bank accounts was an impostor, evidence of fraud at CCME's other bank accounts, unreported bank accounts and loans, a payroll system that was virtually lacking in documentation; two sets of books for CCME's main operating arm (one for the Chinese government, one for other purposes – each containing drastically different financial figures for the same time period), invalid tax invoices and no proper tax records; and, to top it all off, strong evidence that CCME had created fake customers, lied about ways to independently verify its data, and destroyed all evidence that it even ran a business.

8.      If Deloitte or Robbins had done their job as auditors properly, especially in light of management's admitted concern about internal control deficiencies, investors would not have relied on these "clean" audit opinions nor would they have been defrauded of hundreds of millions of dollars.

## II.      JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

11.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.   PARTIES

12.     Lead Plaintiffs the Irrevocable Trust FBO Lansing Davis under agreement dated October 1, 1979, and the Davis Partnership LP (collectively the "Davis Entities"), as set forth in their previously filed certification which is incorporated by reference herein, purchased the common stock of CCME during the Class Period and has been damaged thereby.  Additional Named Plaintiffs Ethan Lamar Pierce, John and Susan Shaffer, and John and Jennifer Haughton (collectively the "CME Investor Group"), as set forth in their previously filed certifications which are incorporated by reference herein, purchased the common stock or options of CCME during the Class Period and have been damaged thereby.

**1.      The CCME Defendants**

13.     Defendant China MediaExpress Holdings, Inc. ("CCME") is a Delaware corporation with its principal place of business at Room 2805, Central Plaza, Wan Chai, Hong Kong.  It purports to operate the largest television advertising network on inner-city and airport express busses in China.  Prior to its delisting, CCME shares were traded on the NASDAQ under the ticker symbol "CCME."

14.     The following officers and directors of CCME (the "Individual Defendants") are also defendants in this action:

(a)     Defendant Zheng Cheng ("Cheng") is the Chief Executive Officer and Chairman of the Board of Directors of CCME.  He is the founder of Hong Kong Mandefu Holding Limited, and is the largest individual shareholder of CCME.

(b)     Defendant Jacky Wai Kei Lam ("Lam") was, during the relevant period, Chief Financial Officer of the Company.  Defendant Lam resigned as Chief Financial Officer of the Company on March 13, 2011.

15.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of CCME, were privy to confidential and proprietary information concerning CCME, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information

concerning CCME, as discussed in detail below.  Because of their positions with CCME, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

16.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of CCME's business.

17.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

18.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the AMEX and the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to CCME's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present

and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of CCME's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of CCME's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme:  (i) deceived the investing public regarding CCME's business, operations and management and the intrinsic value of CCME's securities; (ii) allowed the Individual Defendants to siphon millions of dollars of "dividend" payments from the Company; and (iii) caused Plaintiffs and members of the Class to purchase CCME common stock at artificially inflated prices.

### 2.     The TM Entertainment and Media, Inc. Defendants

20.     Defendant Theodore Green ("Green") is the former Chairman, co-Chief Executive Officer and interim CFO of TM Entertainment and Media, Inc. ("TM"), which, as described below, was the public shell company used to effect CCME's reverse merger scheme to allow the Company to become publicly traded but bypass SEC scrutiny.

21.     Defendant Malcolm Bird ("Bird") is the former co-Chief Executive Officer of TM.

22.     Defendants Green and Bird, as directors of TM, approved the reverse merger transaction, and Defendant Green signed the proxy statement related to the reverse merger transaction.

### 3.     The Auditor Defendants

23.     Defendant Deloitte Touche Tohmatsu in Hong Kong SAR ("DTT") is a Hong Kong entity that is a member of DTTL, a UK company.  DTT provides audit, accounting and other financial consulting services to its clients.  In December of 2009, CCME engaged DTT to serve as its independent auditor, and to render audit opinions upon CCME's 2009 financial

statements.  DTT remained CCME's auditor until its resignation on March 11, 2011, and its audit

opinion was incorporated into CCME's 2009 annual report on Form 10-K and CCME's

registration statement on Form S-3, both of which were filed with the SEC.

24.     Defendant Deloitte Touche Tohmatsu Limited ("DTTL") is a private company

based in the United Kingdom, and is the parent company of DTT.  DTT describes itself as a

"member" of DTT.  DTTL controls DTT and there existed a principal agent relationship between

DTT and DTTL.  DTT was DTTL's agent and DTT was under DTTL's control and acted at

DTTL's direction and within its scope of authority when auditing CCME.

25.     Although disclaimers on DTT's website assert the legal separateness of DTTL

and its members, DTTL's goal, has been to offer a global standard of service that represents the

Deloitte "brand."  According to Deloitte's website, this brand name took effect in 2003.

http://www.deloitte.com/view/en_GX/global/about/overview/history.

26.     To achieve the similarities across Deloitte member firms DTTL promulgates

general professional and ethical standards, auditing procedures, and even the software on which

Deloitte professionals perform audits. Member firms regularly cross check each other's work to

ensure quality, and they cooperate and join together under the direction of a single partner to

provide audit services for international clients. Partners and associates of member firms regularly

transfer among DTT member firms and attend DTTL meetings. *In re Parmalat Sec. Litig.*, 594 F.

Supp. 2d 444, 447 (S.D.N.Y. 2009)

27.     DTTL exercised substantial control over the manner in which the member firms

conducted their professional activities.  *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 452

(S.D.N.Y. 2009).  Currently, according to one member firm's page on the Deloitte website,

members "are ***bound by strict rules*** regarding the establishment and maintenance of the internal

quality control system as prescribed by Deloitte and set out in the Deloitte Practice Manual. The

manual addresses leadership responsibilities for the system of quality control, ethical

requirements, client and engagement acceptance and continuance, and control and monitoring

procedures."  For example, "***The Audit division applies a global set of methodologies, common***

***documentation and processes embodied in the AuditSystem/2 application***.  Guidance on global issues is available on the intranet in a knowledge repository called Deloitte Audit Plus.  This guidance includes a Professional Practice Manual, Guidance Notes, an Accounting Manual and Best Practice Tools.  In addition, the intranet has guidance on various matters including local policies and best practice tools." (emphasis added).

28.     Offering further detail of the extent of Deloitte's oversight and control over member firms, in *In re Parmalat Sec. Litig.*, at 452-453, Judge Kaplan cited to evidence that DTTL had control over the acceptance and rejection of engagements by member firms and required use of the company name.  DTTL's rules prohibited member firms from suing each other and required that one member firm accept client work referred from another member firm.  DTTL could arrange, with the approval of the transferring firm, for the transfer of employees from one member firm to another.  DTTL played also a substantial role in the legal and risk management affairs of member firms.  Member firms generally did not have in-house legal counsel, but relied instead on DTTL's legal staff.  DTTL instructed auditors to refer press inquiries to DTTL and, where lawsuits naming a member firm were threatened or filed, DTTL lawyers reviewed the work papers of that member firm.  In addition, DTTL required member firms to purchase specified levels of insurance coverage.  *Id*. at 452-453.

29.     DTTL set the policies that governed member firms which dictated the specific methodologies to be applied in conducting audits and the particular software and documentation procedures to be used.  It required member firms to sign license agreements pursuant to which they agreed to comply with DTTL's "quality standards, specifications, directions, and procedures" and required a review of each member firm's compliance every three years.  *Id*. at 452.  As one member firm reports on the Deloitte website:  "Any Deloitte audit firm is subject to practice reviews by DTTL at least every three years.  The practice review is carried out by partners or managers who are independent of the audit firm they are reviewing, and is monitored by a DTTL partner who is also independent of the firm being reviewed.  The objectives of the practice review are:

- to obtain reasonable assurance regarding the audit firm's compliance with DTT policies;

- to assess the operating effectiveness of risk management and quality control procedures;

- to assess adherence to professional standards and regulatory and legal requirements;

- to obtain reasonable assurance that the Deloitte audit methodology has been properly implemented;

- to obtain reasonable assurance that the audit firm's system of quality control is appropriately designed, relevant, adequate, operating effectively and complied with in practice.

… Any deficiencies result in remedial action, while potential violations are subject to disciplinary action."

30.    DTTL's Professional Practice Manual states that "differences of opinion between Member Firms . . . should be resolved" by referring such matters "to the Chairman and Chief Executive for resolution." *Id*. at 453.  Everyone at Deloitte is expected to know, understand, and act in a manner consistent with DTTL's Code of Ethics and Professional Conduct; which is reinforced through mandatory "Ethics in Action" training.

31.    DTTL publicly reports revenue and employment numbers publicly that aggregate revenue and employees from all its members.  DTTL publicly holds itself out as the largest private professional services network in the world, based on its aggregate firm revenues and headcount and refers to itself as a global firm.

32.    Defendant Deloitte LLP is a Delaware Corporation with its headquarters in the United States and a member firm of DTTL.  While DTTL headed and controlled the global network of Deloitte member firms, DTTL was, at all relevant times, dominated and controlled by its U.S. member firm and alter ego, Deloitte LLP.  DTTL and Deloitte LLP rotate leadership. For instance, Barry Salzberg is the global CEO of DTTL and a member of the DTTL Board of Directors and Executive Committee.  Directly before this, Salzberg served as Chief Executive Officer of Deloitte LLP (United States) from 2007 to 2011, and as the U.S. Managing Partner

from 2003 to 2007.  During his time as CEO of Deloitte LLP (United States), he was a member of the U.S. Board of Directors, the DTTL Executive committee, the DTTL Board of Directors, and served as the Americas Regional Managing Partner.  Similarly, but in reverse, John Quigley served as CEO of DTTL from 2007 to 2011.  He then switched locations with Barry Salzberg and returned to Deloitte United States, where he is currently a Senior Partner.  Quigley was CEO of Deloitte LLP from 2003 to 2007.

33.     Deloitte LLP also controls DTTL through its control over the organization's financing.  DTTL's main source of funding is Deloitte LLP.  In addition, Deloitte LLP has provided loans to DTTL and guaranteed DTTL's bank financing.  *Id*. at 459 (S.D.N.Y. 2009). DTTL's decision making has also been controlled by Deloitte LLP in major matters.  When what is now DTTL deliberated whether to separate its consulting function from its audit function, what is now Deloitte LLP voted for the proposal before other member firms voiced their agreement.  The DTTL board of directors then conditionally approved the transaction. Following the vote, however, what is now Deloitte LLP changed its mind and concluded that separating Deloitte Consulting from DTTL was too risky.  Apparently without soliciting the opinions of other member firms, DTTL management agreed with Deloitte LLP to withdraw the plan from the board's consideration.  In other words, for one of the most important decisions in the firm's history, Deloitte LLP controlled DTTL.

34.     Finally, Deloitte's "global" headquarters is located in New York and, on Deloitte's web page, it gives Deloitte's "Global Office" contact address as 1633 Broadway, New York, New York 10019-6854.  The web page also instructs that for "contacts at the country level, please select the relevant national practice from the Global Site Selector at the top of this page."  Using the Global Site Selector for America and then New York, 1633 Broadway – Deloitte's "Global Office" – is revealed also to be one of Deloitte LLP's New York Offices.

35.     Defendant A.J. Robbins, P.C. ("Robbins") is a professional corporation with its primary place of business in Colorado.  In 2009, Robbins was engaged by CCME provide audits of the reported financial results of the Company.  Robbins, also provided the consolidated financial statements of Hong Kong Mandefu of December 31, 2008, 2007 and 2006 and for the years then ended included in the Proxy Statement were audited by Robbins, as set forth in their report appearing in the Proxy Statement.  Further, these audited financial results also appeared in the 2010 Form 10-K.  Robbins has been cited twice for violations by the Public Company Accounting Oversight Board (on December 22, 2008, and March 31, 2010).  Robbins continues to be identified on the PCAOB website as a firm that "that **_failed to address quality control criticisms satisfactorily_**."

http://pcaobus.org/Inspections/Reports/Pages/FirmsFailedToAddressQCSatisfactorily.aspx

(emphasis added) (last checked [date]).  Moreover, in the 2010 PCAOB report, Robbins was criticized for "deficiencies of such significance that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."  This is the exact concern that gives rise to this complaint.

## IV.     CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of CCME between October 5, 2009, and March 11, 2011, inclusive, (the "Class Period") and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of CCME, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CCME common stock was actively traded on the NYSE AMEX stock market (through June 2, 2010), and on the NASDAQ from June 3, 2010, through the end of the Class Period.  While the exact number of Class members is unknown to

Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CCME or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

39.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of CCME;

(c)     whether the price of CCME common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

<strong>V.      BACKGROUND ALLEGATIONS REGARDING CCME'S<br>FRAUDULENT SCHEME</strong>

**A.      Chinese "Reverse Merger" Scandals**

42.     Corporate wrongdoing and securities fraud is a consistent and ongoing problem in the United States.  The only thing that changes is the methods employed by greedy stock promoters, corporate officers and complicit or hapless auditors.  The early 2000's brought the "corporate scandals" of Enron, Worldcom, Adelphia, Tyco and numerous other U.S. corporate implosions.  Late 2007 and 2008 brought the uncovering of widespread abuses in the mortgage-backed securities market.  In the past two years, widespread abuses in CCME and other Chinese "Reverse Merger" stocks have unraveled as the latest trend.

43.     The number of China-based companies with their principal place of business in the People's Republic of China (the "PRC") listed on U.S. Exchanges has skyrocketed in the past decade.  The Public Accounting Oversight Board ("PCAOB") has identified 159 reverse mergers by companies primarily based in the PRC between 1/1/07 and 3/31/10.[1]  Not every PRC company that began to trade on a U.S. stock exchange is a fraud, but a substantial number of them are.  In fact, as disclosed in an April 27, 2011, letter from Mary Shapiro (Chairman of the Securities and Exchange Commission) to Congressman McHenry (Chairman of the Subcommittee on TARP, Financial Services, and Bailouts of Public and Private Programs), the SEC had identified no fewer than twenty-four PRC-based companies that had filed Forms 8-K disclosing auditor resignations, accounting problems or both – in just March and April 2011.

44.     The Chairman of the PCAOB, James R. Doty, stated that there are "significant risks associated with audits of operations of U.S. [listed] companies in China.  For example, we are finding through our oversight of U.S. firms that even simple audit maxims, such as

---

[1] Research Note 2011-P1, *Activity Summary and Audit Implications for Reverse Mergers Involving Companies from the China Region:  January 1, 2007, through March 31, 2010*, Public Company Accounting Oversight Board (March 14, 2011).

maintaining the auditor's control over bank confirmations, may not hold given the business culture in China."  Therefore, Doty concluded that "[i]n light of these risks, the PCAOB's inability to inspect the work of registered firms from China is a gaping hole in investor protection."

45.     The reverse merger is the technique *du jour* for fraudulent Chinese companies to bypass the typical registration process that allows the SEC to examine a company prior to it selling shares on U.S. stock exchanges.  In a typical registration process for an initial public offering of stock ("IPO"), a Company submits its registration statement to the SEC's Division of Corporate Finance where it undergoes a rigorous examination process, which often includes detailed questions from SEC about the company's disclosures.  In a reverse merger, however, a private operating company based in the PRC is "acquired" by a previously registered U.S.-based publicly traded "shell company," thereby bypassing the rigorous IPO registration process as described by the WALL STREET JOURNAL:

> In reverse mergers, a foreign company is "bought" by a publicly traded U.S. shell company.  But the foreign company assumes control and gets the shell's U.S. listing without the level of scrutiny that an initial public offering entails.  Though companies from other countries also engage in reverse mergers, such deals are especially common among the Chinese.  The PCAOB says nearly three-quarters of the 215 Chinese companies listing in the U.S. from 2007 to early 2010 did so via reverse merger.[2]

46.     This loophole has allowed numerous unscrupulous foreign companies to avoid SEC scrutiny.  A large number of shady stock promoters in recent years have come from the PRC.  In May 2011, there were 19 stocks in which the NASDAQ had halted trading.  An astonishing 15 of these 19 companies were PRC-based.  Reporters have blamed inadequate auditing procedures by both Chinese and U.S. auditing firms for this disturbing trend.  The WALL STREET JOURNAL revealed in June that the SEC had begun examining accounting and disclosure issues regarding Chinese companies that had engaged in reverse mergers, The investigation specifically targets the work of Chinese auditors:

---

[2] Rappaport, *SEC Probes China Auditors*, WALL STREET JOURNAL (June 3, 2011).

People familiar with the matter say the investigation also includes auditors, which hadn't previously been known.  As part of its inquiry, the SEC has suspended trading on some Chinese companies, questioning their truthfulness about their finances and operations.

The Public Company Accounting Oversight Board, or PCAOB, the government's accounting regulator, said it is investigating some audit firms over whether their audits of Chinese clients are stringent enough.

. . .

"Right now, the auditing and regulation of U.S.-listed Chinese companies isn't working very well," said Paul Gillis, a visiting professor of accounting at Peking University's Guangha School of Management.

…

Since February, about 40 Chinese companies have either acknowledged accounting problems or seen the SEC or U.S. exchanges halt trading in their stocks because of accounting questions.

47.     Michael Rapoport, "SEC Probes China" Auditors, WALL STREET JOURNAL, June 3, 2011.  According to this article, although some auditors say, in response, that they are "intensifying their efforts" and "doing everything they can to perform strong audits," that simply "may raise questions about whether their past efforts were strong enough."  *Id.*

48.     SEC Commissioner Luis A. Aguilar has also spoken out on the subject. In a speech on April 4, 2011, he said that using reverse mergers as a form of "backdoor registration" was a "disturbing trend" in modern capital formation.  He said, "a growing number of them are proving to have significant accounting deficiencies or being vessels of outright fraud."  The "billions in U.S. savings and investment dollars [that] have been entrusted with these companies" are, therefore, at risk.

49.     The above referenced NEW YORK TIMES article, dated May 26, 2011, blamed auditors and inadequate audit procedures for this disturbing trend.  The NEW YORK TIMES revealed that another Chinese corporation, Longtop Financial Technologies, also recently became "worthless" because of allegations of fraud, including fraud relating to Longtop's

purported cash balances in Chinese banks.  DTTL, the same auditor that CCME used to perform

its most recent audits, resigned as Longtop's auditor after the fraud came to light but only after it

had already given "clean audit opinions to Longtop for six consecutive years," according to the

report.

50.     The May 26, 2011, NEW YORK TIMES article also noted that the major auditing

firms in China are not subject to the same type of inspections required of other accounting firms

that audit companies whose securities are traded in the U.S.:

> The Chinese audit firms, while they are affiliated with major
> international audit networks, have never been inspected by the
> Public Company Accounting Oversight Board in the United States.
> The Sarbanes-Oxley Act requires those inspections for accounting
> firms that audit companies whose securities trade in the United
> States, but China has refused to allow inspections.
>
> In a speech at a Baruch College conference earlier this month,
> James R. Doty, chairman of the accounting oversight board, called
> on the major firms to improve preventative global quality controls
> but said that actual inspections were needed.
>
> Two weeks ago, Chinese and American officials meeting in
> Washington said they would try to reach agreement on the
> oversight of accounting firms providing audit services for public
> companies in the two countries, so as to enhance mutual trust.

Floyd Norris, "The Audacity of Chinese Frauds," NEW YORK TIMES, May 26, 2011.

51.     Although it appears that regulators may now be closing the reverse-merger

loophole, it is too late for Plaintiffs and the members of the Class that suffered damages from

their purchases of CCME shares.

**B.      The Formation of CCME**

52.     Knowing or recklessly disregarding that CCME's financial statements and other

disclosures could not withstand SEC scrutiny, Defendants engineered a reverse merger

transaction to "back-door" a public company without facing the full investigation the SEC would

employ in an initial public offering of stock.

1.      **The publicly traded shell company**

53.      The public "shell" company employed by CCME in its reverse merger scheme was TM Entertainment and Media, Inc. ("TM").  TM had its initial public offering of stock on October 17, 2007.  The prospectus related to this offering provided that TM was a newly formed "blank check" company organized for the purpose of effecting a merger or other business combination with a "domestic or foreign operating business in the entertainment, media, digital or communications industries."  The prospectus allowed only two years, until October 17, 2009, to complete such a transaction.  This prospectus specifically stated that "if we are unable to consummate a business combination by such date, our corporate existence will cease by operation of corporate law."  Prior to the reverse merger transaction, there were 12,505,000 outstanding shares of TM, 10,255,000 were sold to the public, and 2,250,000 were issued to initial shareholders (primarily Defendants Green and Bird).

54.      From the date of its IPO through January 2009, TM searched high and low for a merger partner.  In January 2009, TM signed a non-binding letter of intent to acquire Hong Kong Mandefu, a private company based in the PRC.  On September 30, 2009, an amended Share Exchange Agreement between Hong Kong Mandefu and TM was approved by the TM board, including Defendants Green and Bird.

55.      This timing is very important to understanding TM and Defendants Green and Bird's motivations to enter into this transaction and make the transaction appear reasonable in public disclosures and SEC filings.  By this date, it would have been impossible for TM to locate another transaction partner, perform its due diligence and get a transaction approved before the October 17, 2009 deadline, after which the company would automatically dissolve by operation of Delaware corporation law.  If this had happened, Defendants Green and Bird (and the other TM directors) would have been forced to liquidate TM and return $77 million to investors, without receiving any return on their own investments, and losing the potential to profit from large numbers of stock options in TM which they had awarded themselves.  This motivation was described in the proxy statement related to the transaction:

- If the Transaction is not consummated and TM is required to liquidate, the shares of TM Common Stock owned and acquired by TM's directors and officers prior to our IPO will be worthless because they will not be entitled to receive any of the assets held in the Trust Account with respect to these shares. In addition, if the Transaction is not consummated, and TM is forced to liquidate, warrants held by TM's directors and officers will expire with no value. On April 23, 2009, the date TM's board of directors approved the Transaction and the Share Exchange Agreement, our directors and officers owned a total of 2,250,000 shares of TM Common Stock acquired prior to our IPO having a total market value of approximately $17.2 million based on the share price of $7.64 of the TM Common Stock on the last trading day prior to that date. In addition, on April 23, 2009, our directors and officers held warrants exercisable for an aggregate of 2,100,000 shares of TM Common Stock (for which they paid $2,100,000) having a total market value of approximately $0.2 million based on our warrant price of $0.11 per warrant on the last trading day prior to that date.

- Each of Messrs. Green and Bird has agreed, that, if we liquidate prior to the consummation of a business combination, they will be personally liable to ensure that the proceeds of the Trust Account are not reduced by the claims of vendors for services rendered or products sold to us as well as claims of prospective target businesses for fees and expenses of third parties that we have agreed in writing to pay in the event we do not complete a business combination. If the Transaction is consummated, TM's officers and directors will not have to perform such obligations. If the Transaction is not consummated, however, TM's officers and directors could potentially be liable for any claims against the Trust Account by such vendors or prospective target businesses who did not sign waivers. If the Transaction is not consummated, CME and the Sellers will be responsible for their own expenses incurred in connection with the proposed Transaction. Pursuant to the Share Exchange Agreement, CME and the Sellers have waived any claim they may have against the Trust Account.

## 2.    The Private Chinese Operating Company

56.    Hong Kong Mandefu Holding Limited ("Hong Kong Mandefu") was a privately-owned company based in the PRC. Hong Kong Mandefu, through contractual arrangements with Fujian Fenzhong, an entity majority owned by Defendant Cheng, operated (according to the proxy statement) "the largest television advertising network on inter-city express buses in China."

## 3.    Terms of the Reverse Merger Transaction

57.    TM acquired Hong Kong Mandefu in exchange for $10,000,000 in three year, no-interest promissory notes and an aggregate of 20,915,000 shares of TM Common Stock. In

addition, TM paid $150,000 to Hong Kong Mandefu on May 4, 2009, and agreed to issue to the Sellers up to an additional 15,000,000 shares of TM Common Stock pursuant to an earn-out provision in the Share Exchange Agreement based on the adjusted net income of the combined company during the fiscal years ending December 31, 2009, 2010, 2011 and potentially 2012. Furthermore, the Sellers are entitled to receive up to $20,888,888 of the cash proceeds received from the exercise of TM's publicly held warrants to the extent a sufficient number of these warrants are exercised.  Warrants to purchase approximately 3.8 million shares of TM Common Stock would need to be exercised in order to generate sufficient proceeds to pay the full $20.9 million to the Sellers.

## C.  CCME's Purported Business Model Following the Reverse Merger Transaction

58.  Due to PRC regulatory restrictions on foreign investments in the advertising industry in China, CCME operates its advertising business in China through Fujian Fenzhong. CCME's relationships with Fujian Fenzhong and its shareholders are governed by a series of contractual arrangements among Fujian Express, Fujian Fenzhong and its shareholders that allow CCME to effectively control and derive all of the economic benefits from Fujian Fenzhong. Accordingly, the corporate structure of CCME is reflected in the following chart:



59.     The approximately 33.4 million shares of CCME, immediately following the reverse merger transaction, were owned by Defendants Cheng (13,266,684 shares), Green (2,428,000 shares) and Bird (648,000 shares), and a variety of public shareholders.

## VI.     FALSE AND MISLEADING DISCLOSURES MADE DURING THE CLASS PERIOD

**A.     The October 2009 Proxy**

60.     The Class Period commences on October 5, 2009, when CCME (then known as TM Entertainment) filed a proxy statement (the "October 2009 Proxy") on Schedule 14A with the SEC related to its proposed acquisition of Hong Kong Mandefu Holding Limited.  The October 2009 Proxy was signed by Defendant Green in his capacity as Chairman, co-CEO and interim CFO of TM Entertainment.  The October 2009 Proxy made numerous misrepresentations of fact, including that: a) Hong Kong Mandefu had the "largest television advertising network on inner-city express buses in China;" and b) Hong Kong Mandefu had a network of 16,000 inner-city buses, covering four municipalities and seven provinces:

> CME [Hong Kong Mandefu], through contractual arrangements with Fujian Fenzhong, an entity majority owned by CME'S majority shareholder, operates the largest television advertising network on inter-city express buses in China.  All references in this Proxy Statement to "CME's advertising network", "CME's customers", CME's operations in general and similar connotations, refer to Fujian Fenzhong, an entity which is controlled by CME through contractual agreements and which operates the advertising network.  While CME has no direct equity ownership in Fujian Fenzhong, through the contractual agreements CME receives the economic benefits of Fujian Fenzhong's operations. . . CME generates revenues by selling advertising on its network of television displays installed on inter-city express buses in China.

> \*     \*     \*

> As of June 30, 2009, the number of inter-city express buses within CME's network exceeded 16,000 and covered inter-city express bus services originating in eleven regions, including the four municipalities of Beijing, Shanghai, Tianjin and Chongqing and seven economically prosperous provinces, namely Guangdong, Jiangsu, Fujian, Sichuan, Hubei, Anhui and Hebei.

61.     The October 2009 Proxy also disclosed that, after "careful consideration," TM

Entertainment's board of directors (including Defendants Green and Bird), recommended that

shareholders approve the reverse merger transaction:

> **Recommendation of the Board of Directors and Reasons for the Transaction**
>
> After careful consideration, TM's board of directors, by unanimous vote at a meeting on April 23, 2009 and on September 30, 2009, approved and declared advisable the Share Exchange Agreement and the Transaction. Accordingly, our board of directors recommends that TM's stockholders vote "FOR" the Transaction Proposal.

62.     According to the disclosures contained in the October 2009 Proxy, TM

Entertainment's board of directors considered a number of factors in making this

recommendation, including the reported financial results of Hong Kong Mandefu:

> TM's board of directors considered a wide variety of factors in connection with its evaluation of the Transaction. Pali's valuation analysis was one of the factors the board of directors considered, in addition to TM's own due diligence and review of CME's business operations and results. In light of the complexity of those factors, TM's board of directors did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it considered in reaching its decision. In addition, individual members of TM's board of directors may have given different weight to different factors. In reaching its determination, TM's board of directors considered the following factors, among others:
>
> • information with respect to the financial condition, results of operation and business of CME, on both a historical and prospective basis; 2006 — 2008 net revenue and net income CAGR of 269% and 404%, respectively, with a projected 2008 — 2011 net income CAGR of 158%;
>
> • CME's lower price to earnings multiples relative to its public comparables, given its future prospects and those of the industry;
>
> • CME's management team's quality and strength, and proven track record of success; CME's existing management team has grown the business to achieve 2008 net revenue and net income of $63.0 and $26.4 million, respectively, and 35,000 installed TV displays on over 16,000 buses in a short period of time;

*     *     *

- The results of TM's business, financial, accounting, legal and other due diligence review of CME.

            *   *   *

In addition, TM's board of directors relied on a number of standards generally accepted by the financial community in making its decision to enter into the Share Exchange Agreement with CME. In particular, TM's board of directors placed heavy emphasis on the price to earnings multiples of publicly-traded companies that it deemed to be comparable to CME and compared those multiples to the earnings multiple embedded in TM's transaction with CME. In addition, TM's board of directors evaluated enterprise value to revenue multiples, enterprise value to EBITDA (earnings before interest, taxes, depreciation and amortization) multiples and the capital structures of the publicly-traded companies comparable to CME and compared the multiples and capital structures to those in TM's transaction with CME.

The October 2009 Proxy was materially false and misleading for numerous reasons, including: a) it materially overstated reported financial results for Hong Kong Mandefu; and b) it misrepresented the size of Hong Kong Mandefu's advertising network.

63.     On March 23, 2010, CCME announced its 2009 fourth quarter and annual financial results over the Business Wire.  This press release reported outstanding financial results, and touted the "large and growing network" of advertisers using CCME:

China MediaExpress Holdings, Inc.  (NYSE Amex: CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city express buses, today announced financial results for the fourth quarter and year ended December 31, 2009.

Financial Highlights - Fourth Quarter 2009 vs. Fourth Quarter 2008

- Revenue increased by 90.6% to $32.0 million in the fourth quarter of 2009 as compared to $16.8 million in the same quarter of 2008;
- Gross margin for fourth quarter was 68.9%;
- Income from operation increased by 104.7% to $19.5 million in the fourth quarter of 2009 as compared to $9.5 million in the same quarter of 2008; and
- Net income increased by 99.6% to $14.3 million in the fourth quarter of 2009 compared to $7.2 million in the same quarter of 2008.

Financial Highlights - Full Year 2009 vs. Full Year 2008

- Revenue increased 52.3% to $95.9 million in 2009 as compared to $63.0 million in 2008;

- Gross margin for year ended December 31, 2009 was 65.7%;
- Income from operation increased by 61.3% to $56.6 million in 2009 as compared to $35.1 million in 2008;
- Net income increased by 58.2% to $41.7 million in 2009 as compared to $26.4 million in 2008; and
- As of December 31, 2009, the Company had $57.2 million in cash.

Zheng Cheng, CME's Founder and CEO, commented, "2009 has been an exciting and eventful year for our Company. We started the year as a privately-held business and concluded as a publicly owned company trading on the NYSE Amex. Since our inception in 2003, we have been working hard to successfully grow CME to a multi-million dollar company and to become the market leader in the express bus advertising industry in China. 2009 was the best year in our history as we continued the rapid organic growth of our business by: signing new contracts with additional bus operators partners, both in the areas where we have a strong presence and in new areas as well; entering into exclusive agreements with several operators of airport express buses, broadening our revenue sources to further augment our potential revenue growth through providing additional advertising channels to advertisers and new services to passengers such as the broadcast of the embedded advertisements which are displayed during the broadcasting of the content; and exploring a number of avenues to further grow our market share and geographic coverage through possible acquisitions."

Discussing 2009 fourth quarter and year-end results, Mr. Cheng noted, "As expected, our fourth quarter was the strongest quarter of the year. Our revenue for the quarter grew by 22.3%, 67.4% and 70.2% compared to the third, second and first quarters of 2009, respectively. Also net income for the quarter increased by 22.7%, 72.8% and 92.0% compared to the third, second and first quarters of 2009, respectively.

He added, "Our network has grown with the signing of several new agreements with bus operators. As of today, our network includes 49 bus operator partners, up from 46 at the end of November; these agreements run from three to eight years. The total number of buses equipped with our television systems is now over 21,000, increasing approximately by more than 1,000 buses since the end of November."

Mr. Cheng continued, "Our successful platform, the large and growing network of bus operators partners, the wide geographic coverage and our competitive advertising rates, continue to attract a large number of international and national brands to our advertising network. More than 450 advertisers have purchased time on our network either through advertising agents or directly from us. Our growing clientele includes local brand names as well as well-known international and national brands such as Coca Cola, Pepsi, Wahaha, KFC, Siemens, Hitachi, Haier, China Telecom, China Mobile, Nokia, China Post, Procter & Gamble,

> Bank of China, China Constructing Bank and China Pacific Life
> Insurance.

This disclosure was materially false and misleading when made in that: 1) the financial results contained therein were materially false and misleading and not prepared in compliance with GAAP and SEC regulations; 2) the claimed number of busses in the CCME advertising network was materially overstated; and 3) many of the disclosed "clients" were not actually clients of CCME.  Because the market was unaware of the material falsities contained in this press release, CCME shares jumped on this reported good news to close at $14.54 per share on heavy trading volume – an increase of $2.26 per share (18.4%) from the previous day's closing price of $12.28 per share.

64.     On March 31, 2010, CCME filed its annual report on Form 10-K for the year ended December 31, 2009 with the SEC.  This Form 10-K contained the same financial information as previously disclosed in the March 23, 2010 press release, and was materially false and misleading for the same reasons.  This Form 10-K also presented a materially false description of the Company and its customers and future prospects.  Specifically, the Company described its business as follows:

> **Business Summary**
>
> *Overview*
>
> CME, through contractual arrangements with Fujian Fenzhong, an entity majority owned by CME's majority shareholder, operates the largest television advertising network on inter-city express buses in China. All references in this Report to "CME's advertising network", "CME's customers", CME's operations in general and similar connotations, refer to Fujian Fenzhong, an entity which is controlled by CME through contractual agreements and which operates the advertising network. While CME has no direct equity ownership in Fujian Fenzhong, through the contractual agreements CME controls the activities and receives the economic benefits of Fujian Fenzhong's operations.  CME generates revenue by selling advertising on its network of television displays installed on inter-city express buses in China. As of July 31, 2008, CME's advertising network accounted for 81% of all inter-city express buses installed with hard disk drive players, and 55% of all inter-city express buses installed with any type of television display, according to CTR Market Research. CME commenced its advertising services business in November 2003 as one of the first participants in advertising on inter-city

express buses in China. CME believes its early entry into this business has enabled them to achieve an audience reach that is highly attractive to advertisers.

CME's extensive and growing network covers inter-city express bus services originating in China's most prosperous regions. As of December 31, 2009, CME's network covered inter-city express bus services originating in fourteen regions, including the five municipalities of Beijing, Shanghai, Guangzhou, Tianjin and Chongqing and nine economically prosperous provinces, namely Guangdong, Jiangsu, Fujian, Sichuan, Hubei, Anhui, Hebei, Shandong and Shanxi. These fourteen regions in aggregate generated more than half of China's gross domestic product, or GDP, in 2007, according to the National Bureau of Statistics of China. CME's network is capable of reaching a substantial and growing audience. In the first seven months of 2008, a monthly average of 53 million passengers traveled on inter-city express buses within CME's network, representing 57% of all passengers traveling on inter-city express buses installed with television displays in China, according to CTR Market Research.  Many of the cities connected in CME's network are major transportation hubs, which serve as points of transfer for large numbers of leisure, business and other travelers in China to other modes of transportation. CME's network also includes airport buses connecting major cities to airports and tour buses traveling on routes that connect major cities with popular tourist destinations in China. As of December 31, 2009, CME's network covered all of the transportation hubs designated by the Ministry of Transport, and CME expects to further increase this percentage as it continues to expand the geographic coverage of its network. In addition to major transportation hubs, the network also covers small to medium-sized cities in China, some of which rely on highway transportation as the primary transportation option for connection outside these cities.

CME has entered into long-term framework agreements with 45 bus operator partners for terms ranging from five to eight years. Pursuant to these agreements, CME pays the bus operators concession fees for the right to install its displays and automated control systems inside their buses and display entertainment content and advertisements. CME's entertainment content is provided by third parties and advertisements provided by its clients. CME obtains a wide range of free entertainment content from Fujian SouthEastern Television Channel and Hunan Satellite Television each month and purchases a limited amount of copyrighted programs from the Audio and Video Publishing House of Fujian Province. As of December 31, 2009, the number of inter-city express buses within CME's network is 20,161.

In October 2007, CME entered into a five-year cooperation agreement with Transport Television and Audio-Video Center, or TTAVC, an entity affiliated with the Ministry of Transport of the People's Republic of China, to be the sole strategic alliance partner in the establishment of a nationwide in-vehicle television system

- 25 -

that displays copyrighted programs on buses traveling on highways in China. The cooperation agreement also gave CME exclusive rights to display advertisements on the system. In November 2007, TTAVC issued a notice regarding the facilitation of implementation of the system contemplated under the cooperation agreement to municipalities, provinces and transportation enterprises in China. CME believes its status as the sole strategic alliance partner designated by TTAVC and the exclusive rights to display advertisements on the system has facilitated its historical expansion and is expected to continue to provide them with a competitive advantage in the future.

CME believes its network is a highly effective advertising medium. The network is capable of reaching audiences on inter-city express buses while they remain in a comfortable and enclosed environment with minimal distraction. The majority of the inter-city express buses within the network are equipped with leather seats and air-conditioning, providing a comfortable environment which makes the audiences more receptive to the content displayed on CME's network. Inter- city travel in China typically takes a number of hours. Audiences are therefore exposed to the content displayed on its advertising platform for a significantly longer period of time than on shorter-distance travel. In addition, CME's patented automated control systems ensure that the programs and advertisements are displayed continuously throughout the journey.

These representations were materially false and misleading because, among other things, they misrepresented and overstated CCME's advertising network, as well as the scope of its geographic footprint.

65.     The 2009 Form 10-K was further materially false and misleading in that it represented that the Company's clients included significant advertisers such as Coca Cola, Pepsi, Procter & Gamble and other similar respected companies when, in fact, it did not:

CME has grown significantly since it commenced its advertising services business in November 2003. During the year ended December 31, 2009, more than 450 advertisers had purchased advertising time on CME's network either through advertising agents or directly from CME. Some of these clients have purchased advertising time from CME for more than three years, including Hitachi, China Telecom, Toyota, Siemens and China Pacific Life Insurance. CME has attracted several well-known international and national brands to its advertising network, including Coca Cola, Pepsi, Wahaha, KFC, Siemens, Hitachi, Haier, China Telecom, China Mobile, Nokia, China Post, Procter & Gamble, Bank of China, China Constructing Bank and China Pacific Life Insurance. While CME is unable to determine the exact dollar amount paid by these individual advertisers who purchase advertising through third party agencies, CME is able to determine, based on the number of ads run for these advertisers,

that these advertisers comprise a significant portion the advertising on CME's network. For the years ended December 31, 2007, 2008 and 2009, CME generated total net revenue of $25.8 million, $63.0 million and $95.9 million, respectively. During the same periods, CME had net income of $7.0 million, $26.4 million and $41.7 million, respectively.

66.     The 2009 10-K was also false and misleading in that it contained the following

statements about disclosure controls and procedures.

Disclosure Controls and Procedures

Our Chief Executive Officer and Chief Financial Officer evaluated, with the participation of other members of management, the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rule 15d-15(e)), as of the end of the period covered by this Annual Report on Form 10-K. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective.

Although the management of our Company, including the Chief Executive Officer and the Chief Financial Officer, believes that our disclosure controls and internal controls currently provide reasonable assurance that our desired control objectives have been met, management does not expect that our disclosure controls or internal controls will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our Company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions.

67.     These statements were materially false or misleading because management

concluded that the Company's disclosure controls were effective despite the fact that financial

controls were wholly lacking for the Company and the entire Company was, in fact, a fraud.

68.     The 2009 Form 10-K also included a certification pursuant to the Sarbanes-Oxley

Act of 2002 ("SOX"), which was included as Exhibit 31-1 to the 2009 Form 10-K and was

signed by Defendant Cheng as follows:

> I, Zheng Cheng, the Chief Executive Officer of the registrant, certify that:
>
> (1)     I have reviewed this Annual Report on Form 10-K of China MediaExpress Holdings, Inc., for the fiscal year ended December 31, 2009.
>
> (2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> (3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this  report;
>
> (4)     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15a-15(f)) for the registrant and have:
>
>    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during  the period in which this report is being prepared;
>
>    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles:
>
>    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
>    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)       The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. We are in the progress in evaluating the significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 31, 2010

/s/ Zheng Cheng
Name: Zheng Cheng
Title:  Chief Executive Officer

An identical certification was also signed by Defendant Lam, and included as Exhibit 31-2 to the 2009 Form 10-K.

69.       Both of these certifications were materially false and misleading because, among other items, Defendants Cheng and Lam were aware that the 2009 Form 10-K contained untrue statements of material facts, and that the financial statements and other financial information in the 2009 Form 10-K did not fairly present the financial condition of the Company.

70.       The 2009 Form 10-K also contained audit reports from Defendants DTT and prior years' audits by Defendant Robbins.

71.       The DTT audit report disclosed that DTT had "audited the accompanying consolidated balance sheet of China MediaExpress Holdings, Inc. [], its subsidiaries and its variable interest entity (the "Group") as of December 31, 2009 and the related consolidated statements of operations, shareholders' equity and comprehensive income (loss), and cash flows for the year then ended."  The report concluded that CCME's financial statements "present fairly, in all material respects, the financial position of the Group as of December 31, 2009, and the

results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America." This audit report was materially false and misleading in that the reported financial condition of the Company did not comply with GAAP, and DTT did not perform its audit procedures in compliance with Generally Accepted Audit Standards ("GAAS").

72.    The Robbins audit report disclosed that Robbins had audited CCME and its predecessor entity's reported financial results for the years ended December 31, 2008 and December 31, 2007.   The Robbins audit report concluded that these reported financial results "present fairly, in all material respects, the financial position of China MediaExpress Holdings, Inc. as of December 31, 2008 and the results of its operations and its cash flows for the years ended December 31, 2008 and 2007, in conformity with accounting principles generally accepted in the United States of America." This audit report was materially false and misleading in that the reported financial condition of the Company did not comply with GAAP, and Robbins did not perform its audit procedures in compliance with Generally Accepted Audit Standards ("GAAS").

73.    On May 14, 2010, CCME announced "strong" first quarter 2010 financial results over the BUSINESS WIRE:

> HEADLINE: China MediaExpress Holdings, Inc.  Announces Strong First Quarter Financial Results; First Quarter Revenue and Net Income Increased by 137% and 143%, Respectively; Reaffirms 2010 Net Income Guidance
>
> DATELINE: FUJIAN, China
>
> BODY:
>
> China MediaExpress Holdings, Inc.  (NYSE Amex: CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city express buses, today announced financial results for the first quarter ended March 31, 2010.
>
> Financial Highlights - First Quarter 2010 vs. First Quarter 2009
>
> - Revenue increased by 137% to $44.5 million as compared to $18.8 million;
> - Gross margin for first quarter was 60%;

- Income from operations increased by 130% to $24.2 million as compared to $10.5 million;
- Net income increased by 143% to $18.1 million as compared to $7.5 million; and,
- As of March 31, 2010, the Company had more than $114.4 million in cash.

Zheng Cheng, CME's Founder and CEO, commented, "We started 2010 on a very strong note with record revenue and net income. Our revenue and net income for the quarter grew by 39% and 27% respectively when compared to the 2009 fourth quarter. Basic and diluted earnings per share in the first quarter of 2010 was $0.28 and $0.27, respectively (after a one-time charge of $9,242,000 related to a deemed dividend on the issuance of our convertible preferred stock in the first quarter); excluding this deemed dividend, the income attributable to holders of common shares (non-GAAP net income) would be $18,142,000 and the basic and diluted earnings per share would have been $0.58 and $0.54, respectively."

Mr. Cheng added, "Growth was attributable to several factors including: an increase in advertising time sold, higher average advertising rates, the expansion of our geographic coverage and client base, and a higher proportion of direct versus agency sales. In addition, since the third quarter of 2009, we started to generate revenue from embedded advertisements which are displayed during the broadcast of the entertainment content. More importantly, in the first quarter of 2010, we implemented premium advertising rates for airport express buses compared to inter-city bus advertising rates. The revenue generated from the airport express buses for the three months ended March 31, 2010 was approximately $7.0 million. At the end of the first quarter, our network of airport express buses covered Beijing, Fuzhou, Guangzhou and Qingdao."

Mr. Cheng continued, "Our network continues to grow through new agreements with bus operators and currently includes 49 bus operator partners, up from 46 at the end of 2009. The number of buses equipped with our television systems is now over 21,500. The growing network has attracted more than 450 advertisers either through advertising agencies or directly from us. Our clientele includes Hitachi, China Telecom, Toyota, Siemens and China Pacific Life Insurance, which have purchased advertising time from CME for more than three years; and many other well-known international and national brands including Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance."

Mr. Cheng added, "We continue to explore and implement opportunities to expand our business by providing clients with additional advertising channels and passengers with new services. Encouraged by the success of embedded and airport express bus advertising, we are working on several outdoor media

opportunities such as the establishing of stationary advertising media at inter-city express bus terminals to complement our core business and are offering new services to advertisers and passengers. We continue to pursue more direct advertising clients and expect that by year-end 2010, 35% of our revenue mix will be generated by direct advertising clients."

Jacky Lam, CME's Chief Financial Officer stated, "As of March 31, 2010, we had more than $114 million in cash as compared to $57.2 million at the end of 2009. In the first quarter of 2010, CME generated approximately $12.9 million in cash from operating activities. In addition, during the first quarter we completed two important transactions which increase our cash position: a $30 million private investment from Starr International Company, Inc., and the exercise and redemption of our publicly traded warrants, where we received gross proceeds of approximately $47.6 million. We also paid out approximately $20.9 million for the warrants and settled $10 million in outstanding promissory notes to the original shareholders of Hong Kong Mandefu Holding Limited as a part of the original share exchange."

Mr. Lam added, "As a result, we have sufficient resources to fund our business expansion plans, including internal growth initiatives as well as potential acquisitions."

74.     This press release was materially false and misleading when it was released in that: a) the financial information contained therein was false and misleading and not prepared in compliance with GAAP; b) it misrepresented the size of the Company's advertising network; and c) claimed that CCME had clients that it did not really have.

75.     Also on May 14, 2010, the Company filed its quarterly report for the first quarter of 2010 on Form 10-Q (the "Q1 2010 Form 10-Q") with the SEC, containing financial results for the three months ended March 31, 2010.  The Q1 2010 Form 10-Q was signed and certified by Defendant Cheng, and stated, in part:

*Net revenues*.  CME's sales, net of business tax and related surcharges increased to $44.5million for the three months ended March 31, 2010 from. $18.8 million for the three months ended March 31, 2009.  The increase was primarily attributable to the increased total amount of advertising time that CME sold, an increase in average rates per second, increase in CME's advertising base, expansion of the geographic coverage of CME' s network, increase in the portion of the direct sales to the advertisers, additional revenue generated from the embedded advertisement which was displayed during the broadcasting of the content for the three months ended March 31, 2010. In addition, CME started to separate out the airport express buses from the original inter-cities buses and sold the timeslots and the embedded advertisement

separately to the advertisers and agencies in the first quarter of 2010. For the three months ended March 31, 2010, CME covers Beijing, Fuzhou, Guangzhou, Qingdao airports in the PRC. The charge rates for these airport express buses route were higher than those inter-cities buses, which partially contributes to the increase in CME's sales. The net revenue generated from the airport express buses for the three months ended March 31,2010 was approximately $7.0 million.

*Concession fees.* Concession fees charged by inter-city express bus operators increased to $14.3 million for the three months ended March 31, 2010 from $5.3 million for the three months ended March 31, 2009. The increase was attributable to the increase in the concession fees payable to the group of bus operators participating in CMB's network through the execution of long-term framework agreements for the three months ended March 31, 2010, an increase in the number of inter-city express buses carrying CME's network as a result of the increase in number of buses operators that signed contracts with CME and the amortization of lump sum prepayment to the media company in order to obtain the operating right of some buses route.

*Gross profit.* As a result of the foregoing, CME's gross profit increased to $26.6 million for the three months ended March 31, 2010 from $11.6 million for the three months ended March 31, 2009. CME's gross profit margin for the three months ended March 31, 2010 was 59.7% compared to the gross profit margin of 62.0% for the three months ended March 31, 2009.

*Net income.* As a result of the foregoing, CME's net income increased by 143% to $18.1 million for the three months ended March31, 2010 from $7.5 million for the three months ended March31, 2009. CME's net profit margin increased to 40.7% for the three months ended March 31, 2010 from 39.7% for the three months ended March 31, 2009, primarily attributable to an increase in gross profit in the three months ended March 31,2010.

\*   \*   \*

CME has attracted several well-known international and national brands to its advertising network, including Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China, and China Pacific Life Insurance.

The Q1 2010 Form 10-Q was materially false and misleading in that, among other things, a) the financial information contained therein was false and misleading and not prepared in compliance with GAAP; b) it misrepresented the size of the Company's advertising network; and c) it claimed clients that were not actually clients of the Company.

- 33 -

76.     On June 3, 2010, CCME shares ceased trading on the AMEX, and began trading on the NASDAQ.

77.     On August 13, 2010, CCME issued a press release over the BUSINESS WIRE announcing "record" financial results for the second quarter of 2010, which ended June30, 2010:

> HEADLINE: China MediaExpress Holdings, Inc.  Announces Record Second Quarter Financial Results;
>
> Second Quarter Revenue and Net Income Increased by 180% and 244%, Respectively
>
> DATELINE: FUJIAN, China
>
> BODY:
>
> China MediaExpress Holdings, Inc.  (NASDAQ GS: CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announced financial results for the three and six month period ended June 30, 2010.
>
> Second Quarter 2010 vs. Second Quarter 2009
>
> - Revenue increased by 180% to $53.5 million as compared to $19.1 million;
> - Gross margin for the current second quarter was 79% as compared to 62%
> - Income from operations increased by 245% to $38.3 million as compared to $11.1 million; and
> - Net income increased by 244% to $28.5 million or $0.80 per diluted share as compared to $8.3 million or $0.40 per diluted share.
>
> First Half 2010 vs. First Half 2009
>
> - Revenue increased by 159% to $98.0 million as compared to $37.9 million;
> - Gross margin for the current first half period was 70% as compared to 62%;
> - Income from operations increased by 189% to $62.5 million as compared to $21.6 million;
> - Net income increased by 196% to $46.6 million or $1.07 per diluted share as compared to $15.7 million or $0.75 per diluted share; and
> - As of June 30, 2010, the Company had more than $139 million in cash.
>
> Zheng Cheng, CME's Founder and CEO, commented, "We are very pleased with the record first half results and continuous growth of our business. Our revenue and net income for the first half of 2010 grew by 159% and 196% respectively when compared

to the same period of 2009, but more importantly has already surpassed revenue and net income reported for 2009 as a whole. The increase was attributable to several factors including: total amount of advertising time sold; higher average CPM rates; and expansion of our advertising base and geographic coverage. Furthermore, since the third quarter of last year we started to generate additional revenue from the embedded advertisement displayed during the broadcast of the entertainment content and in addition to the revenues generated by the airport express buses, a business which we entered in early 2010. In the beginning of the year, we made the important decision to implement premium advertising rates for airport express buses compared to inter-city bus advertising rates. As a result of these premium advertising rates, we were able to generate $20.1 million of additional revenue for the first half of 2010 (out of which $7 million were generated in the first quarter), as compared to the same period of 2009, when this business was non-existing. Our network today covers the airports of Beijing, Fuzhou, Guangzhou and Qingdao."

Mr. Cheng continued, "From January 2010 to now, we have grown our network by approximately 3,000 express buses to more than 23,200 express buses and we have long-term contracts in place, ranging from three to eight years with 61 bus operators."

Mr. Cheng noted, "Our clientele continues to grow and includes prestigious clients such as Hitachi, China Telecom, Toyota, Siemens, China Pacific Life Insurance (all of which have purchased advertising time from CME for more than three years), Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance. In 2010, our clientele was expanded to include prestigious names such as Wrigley, Bank of Communication and Callreta D."

This press release was materially false and misleading in that, among other things, a) the financial information contained therein was false and misleading and not prepared in compliance with GAAP; b) it misrepresented the size of the Company's advertising network; and c) it claimed clients that were not actually clients of the Company.

78.     Also on August 13, 2010, the Company filed a Form 10-Q with the SEC announcing its financial results for the period ended June30, 2010 (the "Q2 2010 Form 10-Q"). The Q2 2010 Form 10-Q was signed and certified by Defendant Cheng, and stated, in relevant part:

*Net revenues.* CME's sales, net of business tax and related surcharges increased to $53.5 million for the three months ended June 30,2010 from $ 19.1 million for the three months ended June 30, 2009. The increase was primarily attributable to the

increased total amount of advertising time that CME sold, an increase in average rates per second, increase in CME's advertising base, expansion of the geographic coverage of CME's network, increase in the portion of the direct sales to the advertisers, additional revenue generated from the embedded advertisement which was displayed during the broadcasting of the content for the three months ended June 30, 2010. In addition, CME started to separate out the airport express buses from the original inter-cities buses and sold the timeslots and the embedded advertisement separately to the advertisers and agencies in the first quarter of 2010. For the three months ended June 30, 2010, CME covers Beijing, Fuzhou, Guangzhou, Qingdao airports in the PRC. The charge rates for these airport express buses route were higher than those inter-cities buses, which partially contributes to the increase in CME's sales. The net revenue generated from the airport express buses for the three months ended June 30, 2010 was approximately $ 13.6 million.

*Concession fees.*  Concession fees charged by inter-city express bus operators and airport express increased to $7.2 million for the three months ended June 30, 2010 from $6.2 million for the three months ended' June 30, 2009. The increase was attributable to the increase in the concession fees payable to the group of bus operators participating in CME's network through the execution of long-term framework agreements for the three months ended June 30, 2010, an increase in the number of inter-city express buses and airport express buses carrying CME's network as a result of the increase in number of buses operators that signed contracts with CME and the amortization of lump sum payment to the media company in order to obtain the operating right of some regions. Since first quarter of 2010, management reviewed the growth rate of concession fee, and CME increased the growth rate of the concession fees to 15% per year, instead of the original estimate of 10% per year. For three months ended June 30, 2010 and March 31, 2010, it resulted an increase of COGS totaled 0.7M and $ 1.8M, respectively.

*Gross profit.*  As a result of the foregoing, CME's gross profit increased to $42.1 million for-the three months ended June 30,2010 from $11.9 million for the three months ended June 30, 2009.  The increase in the margin was because we enjoyed a high margin June 30, 2010 was 78.7% compared to the gross profit margin of 62.1% for the three months ended June 30, 2009. The increase in the margin was because we enjoyed a higher margin on the airport express buses and also the higher margin from the embedded advertisement.

*Net income.*  As a result of the foregoing, CME's net income increased by 244% to $28.5 million for the three months ended June 30, 2010 from $8.3 million for the three months ended June 30, 2009. CME's net profit margin increased to 53.3% for the three months ended June 30,2010 from 43.4% for the three months ended June 30, 2009, primarily attributable to an increase in gross profit in the three months ended June 30, 2010.

The Q2 2010 Form 10-Q was materially false and misleading in that, among other things, a) the financial information contained therein was false and misleading and not prepared in compliance with GAAP; and b) it misrepresented the size of the Company's advertising network.

79.      On November 8, 2010, the Company issued a press release announcing financial results for the period ended September 30, 2010. The press release stated, in part:

### CHINA MEDIAEXPRESS HOLDINGS, INC. ANNOUNCES THIRD QUARTER FINANCIAL RESULTS

**Third Quarter Revenue and Net Income Increased by 118% and 167%, Respectively Increases 2010 Net Income Guidance to Between $100 Million and $104 Million**

**Fujian, China –** November 8, 2010 – China MediaExpress Holdings, Inc. (NASDAQ GS:  CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announces financial results for the three and nine months ended September 30, 2010.

**<u>Third Quarter 2010 vs. Third Quarter 2009</u>**

- Revenue increased by 118% to $57.0 million as compared to $26.1 million;
- Gross margin was 76.8% as compared to 67.0%;
- Income from operations increased by 166% to $41.2 million as compared to $15.5 million; and,
- Net income increased by 167% to $31.1 million or $0.81 per diluted share as compared to $11.7 million or $0.56 per diluted share.

**<u>Nine Months 2010 vs. Nine Months 2009</u>**

- Revenue increased by 142% to $155.0 million as compared to $64.0 million;
- Gross margin was 72.6% as compared to 64.1%;
- Income from operations increased by 179% to $103.8 million as compared to $37.2 million;
- Net income increased by 184% to $77.8 million or $1.86 per diluted share as compared to $27.4 million or $1.31 per diluted share; and,
- As of September 30, 2010, the Company had approximately $170 million in cash.

This press release was materially false and misleading in that, among other things, the financial information contained therein was false and misleading and not prepared in compliance with GAAP.

80.     In discussing the financial results for the period ended September 30, 2010,

Defendant Cheng made the following statements in the same press release:

> As expected, revenue and net income maintained very strong growth in the third quarter. The growth was primarily attributed to the power from our largest inter-city buses network in China where our advertising time sold, average advertising rates, number of our advertising customers, and a greater proportion of direct sales to agency sales increased substantially compared to last year.

> In addition, embedded advertising continued to generate a significant portion of our revenue as we have packaged and sold it separately to our clients since Q3 2009.  The embedded advertising, which is displayed during the broadcasting of the content, has relatively low production cost, generates high margins and accounts for approximately 23% of our revenue for the nine months ended September 30, 2010,

> Furthermore, our year-to-date results reflect the success of our airport express bus business. Since the first launch of this new business line at the beginning of 2010, the advertising packages sold for airport express buses have been at premium prices because of the demographics of airport express bus travelers, exclusivity for all the buses from the airports and the unique captive environment. As a result, the expansion of this business has generated significant revenue and has produced higher gross margins overall.  For the nine months ended September 30, 2010, the revenue generated from airport express buses was approximately $35.1 million, of which approximately $15.0 million was generated in the third quarter. Our network today covers six large and important airports in China: Beijing, Fuzhou, Guangzhou, Qingdao, Changsha and Chongqing.

> We continue to grow our bus network through new contracts with bus operators in regions we already serve and by expanding into new regions in this highly fragmented niche market. Since the start of this year, we have grown our network by more than 4,000 express buses and have expanded into five new regions: Zhejiang, Hunan, Jianxi, Henan and Inner Mongolia. We have long-term contracts in place, ranging from three to eight years with 63 bus operators.

81.     On November 9, 2010, the Company filed a Form 10-Q with the SEC for the

period ending September 30, 2010. The Form 10-Q was certified by Defendant Cheng, and

largely reiterated the financial results and other disclosures in the press release that was issued on

November 8, 2010, and was materially false and misleading for the same reasons as the

November 8, 2010 press release.

## VII.  THE TRUTH ABOUT CCME'S MASSIVE FRAUD BEGINS TO EMERGE

### A.  The Citron Report

82.  On January 31, 2011, Citron Research published an analyst report questioning

multiple aspects of CCME's business operations and accounting. The report stated the following:

> Every investor protection website, from the SEC on down, posts
> this advice for investors:  "If it sounds too good to be true, it is ..."
> Looking back on major frauds like Bernie Madoff, the most
> common expression of regret from duped investors is framed just
> this way. Yet the "too good to be true" story is always tempting –
> especially so for those who haven't been burned yet.
>
> China Media Express (NASDAQ:CCME) operates a very simple
> business. They claim to be the largest television advertising
> operator on inter-city buses and airport express buses in China.
>
> Management claims the company has grown faster and produced
> more cash flow than any other US listed Chinese media company
> over the last 4 years. In spite of having spent a mere fraction of
> what competitors have on infrastructure, CCME has purportedly
> grown profits from $2M to its recently raised guidance of $85M
> expected this year, on revenues of $200 million. Over the last 8
> quarters, CCME reported generating $95 million of cash flow after
> all CAPEX and for-cash acquisitions. If true, this ROI would be
> one of the highest in the world, and a complete outlier in the
> Chinese advertising market, generating even more profit than giant
> Focus Media, and outpacing all of their competition by a landslide,
> despite their smaller footprint. There is only one problem: No One
> in China Has Ever Heard of Them. It is Citron's opinion that if this
> company were operating in the United States, the stock would have
> buckled long-ago over the lack of transparency in its story.
>
> The perpetual burden of the short seller is "how can you prove a
> negative?" The internet has created new approaches to that
> conundrum. It wasn't so easy finding public information on
> "sewage waste-water treatment" in China, (that being the investor
> catastrophe that was RINO), or getting specifics on a business
> model with such a broad name and scope as "China Energy
> Savings" (ditto CESV). So when both companies turned out to be
> frauds, shareholders' due diligence failures could be understood.
>
> By contrast, advertising on mass transit in China is an extremely
> well-known and highly visible business.  Therefore, there is no
> excuse for a lack of proper due diligence on CCME.
>
> **Does anyone know how to use Google or Baidu??**
>
> If you simply go to Google or Baidu and put in the Chinese names
> for the three principal public media advertising operators in China,
> you will find a plethora of local media coverage about them in

their native Chinese language. Articles range from new routes, partnerships, and industry information.

Yet, if you Google or Baidu for CCME . . ., you will see not one article written on their operating business. There is vacuum of "local media coverage of the company. So we are supposed to believe that the most profitable advertising company in China is just unknown to the Chinese people?

**CCME – The Phantom Company**

The clearest example of the "phantom' CCME is an 87 page report prepared by Analysis International on the Chinese Outdoor LCD Screen Market for the year 2010. Every major real player in the space is mentioned ... not just the top three, but the top ten! And guess who is missing? CCME is not mentioned anywhere in the doc.

Then there was a recent article written in January 2011 about 360 media, the largest live trading platform for outdoor media in China. In it, they discuss all of inter-city bus advertising and again, with no mention of CCME. Covered entities are Towona, Bus-Online, and Vision China Media.
http://news.cnfol.com/l10121/101,1587,9211427,00.shtml

This one is from China Business Intelligence, which mentions every player in the space and again…no CCME:

http://chinabizintel.com/industry-updates/public-transport-tv-market-expanding-in- china.html

OK … just one more. This one is from CNTV, China Network Television, which mentions everyone in the "bus media space" ....no CCME.

http://english.cntv.cn/english/special/AD/20101221/108457.shtml

So CCME is a black box, a company that does not appear on its industry's radar, beyond their stock symbol. A simple trip to the CCME website does not reveal much, either for investors or potential business partners. If you go try to get a rate card, you get nothing.

http://www.ccme.tv/eng/pns/rate.php

If you try to click on the page that shows Cooperating Bus Operators, you get nothing.

http://www.ccme.tv/gb/news/operators.php

If you click on the link for Business Partners- you get the logos of just two media providers and no advertising agents.

http://www.ccme.tv/eng/about/partners.php

It appears to Citron that CCME's entire website is intended solely to reinforce the real business of CCME – which is pushing the stock. All of this non-disclosure on their site and in filings is in stark contrast to the colorful investor presentations that proclaim clients and partners that we read about in no other places except investor presentations.

Contrast this to the real companies in the bus ad operating space. Below are the sites of Vision, Bus-online, and Towona. All 3 show either: routes, rate cards, media mentions, and advertising partners on both client and agency side. While apparently dwarfed in size by CCME's reported financial results, each of these competitors have legitimate and documented relationships with large scale advertisers and bus operators as identified throughout their sites.

http://www.bus-online.com.cn/(they actually list all of their advertising agents)
http://www.bus-online.com.cn/?action-category-catid-44

http://www.visionchina.cn/phoenix.zhtml?c=215970&p=index
http://www.towona.com/

**Just One Example of the Numbers that Don't Make Sense**

How can CCME generate three and a half times the revenue, per screen of its competitors?  CCME has roughly  55-60K displays; VISN has appx 120,000 screens.  In Q2, 2010. VISN's total revenue was $31 million and CCME generated $53 million from less than half the screens. Remember that VISN operates bus advertising in major metropolitan areas, compared to CCME, which claims inter-city buses between 2nd and 3rd tier markets. That is what the company wants investors to believe.

**The Cover-up**

The company's attempted to add some clarity to their story at its recent investor day. Out of all the people who could have spoken positively about the company, they chose a representative from Shanghai Apollo Culture Corp. Here is the video. http://www.youtube.com/watch?v=tli7AI2r9Io. In reality Apollo is nothing more than a 2 person shop that can barely pay their bills and had annual revenue of $330K RMB (yes $60K US Dollars), as stated in this article below. http://www.51jms.com/news/137195.htm

The lack of disclosure extends to the last two press releases about the actual business from CCME that announce two sizable contracts, but no counterparties ... in typical CCME fashion. http://www.ccme.tv/eng/ir/press/p101124.pdfhttp://www.ccme.tv/eng/ir/press/p110113.pdf

**Debunking The "Alleged" Government Deal.**

In the filings we read that CCME has become the "sole strategic partner for "an entity affiliated with the Ministry of Transport". In reality the deal is with the (Transport Television Audio Video Center) TTAVC. This is not an "exclusive with the government", but rather with a Production Company with government affiliation and should have no authority over directing local bus advertising. Better yet, if you go to the website of TTAVC and look under a list of companies who they work with, CCME is noticeably absent. Neither can you find CCME operating subsidiary anywhere on the site of the TTAVC.http://www.jtbtv.com/worktogether.php

Citron notes that CCME has further confused the story for the US Investor to think that they have an exclusive with the Government for inter-city buses. That is just a lie. We are not saying there is no deal with this production company, just that it does not appear to be significant enough to be written anywhere except some corporate filings.

http://www.ccme.tv/eng/about/free installation.pdf

**No Substantial Analyst Coverage**

It appears that CCME might be a darling for college kids and bloggers (retail), but the analysts know better.  Ask yourself this question:  How could the fastest growing advertising company in all of China, with industry leading margins and profit, not even get a proper analyst to believe this crazy story?

The two analysts who cover CCME are Global Hunter and Northland. Global Hunter, a small new firm, has been a long time banker of Chinese RTOs and even had a $20 target on RINO. http://www.streetinsider.com/New+Coverage/Global+Hunter+Starts+RINO+International+(RINO)+at+Buy/5998411.html.

As for Northland Securities, as a professional courtesy, the editor of Citron phoned analyst Darren Aftahi yesterday, to see if they knew something Citron didn't. After a nice conversation, Darren admitted the possibility that China Media could be a fraud. Furthermore, Citron believes that Northland and its analyst have become mere cheerleaders for the stock, as this morning they recommended their clients "buy on weakness" without considering the doubts of their own analyst or having the benefit of all available information. It is Citron's opinion that urging clients to buy without considering important concerns just now surfacing is like encouraging people to drink the Kool Aid without finding out first what's in it.

By contrast, Focus Media, while larger in top line but lower operating income, is covered by: Goldman Sachs, JP Morgan, CSFB and Deutsche Bank. More alarming are Vision China Media and AirMedia which are a fraction of CCME's profitability and market cap, yet are covered by JP Morgan, BOA, and Oppenheimer.

The moral of the story is that short sellers are not the only ones who are aware of the problems with CCME. It has become a stock for the "sucker retail investor" ....sorry to say, but true.

Not only have the mainstream analysts and local media ignored CCME, but none of the other Chinese advertising companies list CCME as a competitor in their SEC filings.  These include Focus, AirMedia, and Vision China Media. That leaves this company a complete mystery to everyone except its fervent shareholders.

**They Got the Big Mac, We Got the Big Mick.**

In order to add to the confusion over the story and possibly to further themselves on someone else's reputation, we would like to point out something very odd. In Chinese, the name of the CCME's operating corp. is "Fujian Focus Media" – Fujian being the province they are domiciled. Focus Media is the largest and most' respected advertising company in China. To make your name so similar would be as if someone were to open a software company in New York and called it "Microsoft New York".  This does not seem like behavior of a company that wants to build a brand, but rather a company opting for deception instead of brand-building.

**Conclusion**

In preparing this report, Citron has come across a plethora of information pointing to CCME being a fraud. These include but are not limited to: SAIC documents, Credit Rating Agency Documents, fake awards and accolades, quotes from industry professionals, and more financial analysis than this company even deserves. The purpose of this report was to look at CCME using simple common sense to understand that the company does not exist at the scale that they are reporting to the investing public. We are not saying that they do not operate any buses, but if you believe that the company operations are truly reflected, or even close to their stated financial disclosures, than you must go to Taco Bell for some filet mignon.

83.     Upon disclosure of Citron's report, on January14, 2011, the Company's stock

decreased $3.02 per share, more than 14%, and closed at just $17.84 per share.

84.     On February 1, 2011, the Company issued a press release on its website,

responding to Citron's research report, which stated in part:

Based on a review of the negative statements, however, CME strongly disagrees with the views expressed [by Citron] and believes that investors should rely on the Company's public reports filed with the Securities and Exchange Commission. The Company expects to announce its audited financial results for the year entitled 12/31/10 on schedule and will host an earnings call during which management will answer investor questions.

- 43 -

This press release was materially false and misleading when issued in that the Defendants were aware that Citron was correct, and the Defendants knew or recklessly disregarded that investors should *not* rely on CCME's previously reported financial results.

## B.     Muddy Waters Questions CCME's Legitimacy

85.     On February 3, 2011, Muddy Waters Research also published an extensive report questions various aspects of CCME's business model and accounting practices. The report, which was over 25 pages long, highlighted multiple indicia of fraud within the Company, and stated, in part:

> Muddy Waters, LLC believes that China MediaExpress Holdings, Inc. ("CCME" or the "Company") is engaging in a massive "pump and dump" scheme.  The Company is significantly inflating its revenue and earnings in order to pay management earn-outs and inflate the stock price so insiders can sell.
>
> Management owns approximately $312 million worth of shares. An institutional investor informed us that management was quite interested in selling him $50 million worth of their shares. In October 2010, a party closely connected to management sold nine million dollars of stock.
>
> We estimate that CCME's actual 2009 revenue was no more than $17 million versus reported revenue of $95.9million, an overstatement of over 464%. Note that the SAIC financial statements of the operating company, Fujian Focus Media Co. Ltd., show 2009 revenue of $760,000 (generating a net loss of $920,000), and 2008 revenue of $337,000 (generating a net loss of $890,000).
>
> We doubt that CCME would have been profitable on $17 million in revenue, but giving it the benefit of the doubt, we would assume net income of $1.7 million, or basic EPS of $.05. We place a 5x multiple on the earnings due to our belief that the real earnings could very well be lower than $.05. This yields a value of $.25 per share. We add in the cash balance to value the Company. If one assumes that the $169.9 million in cash on the balance sheet is accurate, which is a large assumption considering we do not believe the reported income, one would value CCME at $5.28 per share. However, to the extent that the cash balance is inflated, we would value CCME at a lower price. Therefore our per share valuation is currently $5.28, but is subject to change should we believe that the cash number is incorrect.
>
> **BUSted - a Small Advertising Company Creating a Lot of Wealth for Management.**

CCME tells investors that it has over 27,200 buses in its network.4 However, it tells advertisers that it only has 12,565 buses in its network ...

The CTR research upon which CCME relies to (re)assure investors contains gross errors. We found that the largest operator in the report never had a business relationship with CCME. We also found that the CTR research exaggerates the numbers of buses of 13 operators by a collective 424%. We hold CCME management responsible for these errors.

The next issue is that over half of CCME's network buses do not actually play CCME content. Many of the buses in which CCME installs hard drives and screens also have DVD players connected to the screens. We surveyed over 50 CCME buses, and the majority was playing DVDs instead of CCME content ...

We caught CCME's management telling a particularly egregious lie. It recently announced it had created an online shopping platform that has an agreement with Apple Inc. (NASDAQ: AAPL – yes, THAT Apple) or one of AAPL's distributors. AAPL made clear to us that it has no such relationship with CCME's subsidiary. Further, AAPL keeps tight control over its distribution in China, with only two authorized online distributors (including Amazon.com's China subsidiary). None of AAPL's China distributors have authority to sub-license.

Reminiscent of RINO, CCME is in reality an obscure company in its industry. None of the major media buyers with whom we spoke – including several who represent CCME's purported customers – had even heard of CCME ...

It is not uncommon for small media companies in China to show ads from large prestigious brands with which they have no contract or business relationship. Usually this is done in order to impress potential advertisers. We suspect that CCME does this to a fair extent, but to impress investors.

The purpose of this fraud is to generate earn-outs for management, and to increase the market value their stock so they can sell it. An institutional investor informed us that CCME management was quite interested in selling him approximately $50 million of their shares. In October 2010, a party closely connected to management sold nine million dollars of stock.

Management (including, through companies owned by family and close associates) owns approximately 18.3 million shares of stock (54.1% of the shares outstanding). At current market value, that equals $312 million. There has been some fanfare around a 104,000-share management purchase in December 2010. We view this purchase, along with the dividend that the Company announced it intends to pay (essentially a partial return of investor funds), as investor relations expenses ...

86.     Following the disclosures contained in the Muddy Waters Research report, the Company's stock again declined $5.52 per share, or more than 33%, to close on February 3, 2011, at $11.09 per share.

87.     On February 7, 2011, Defendant Cheng posted a letter to shareholders on the Company's website, addressing the allegations raised by the Citron and Muddy Waters research reports and attempting to allay investor fears as to CCME being a fraud. The letter denied allegations that the company was a fraud and that revenue was exaggerated, stating the "Company is strong and doing well"  and even stated that the Company's "revenues and cash position have been audited by reputable and well-known auditors who have confirmed both."

88.     On March 11, 2011, DTT resigned as CCME's auditor, stating that "no tangible progress" had been made with respect to the issues raised in its March 3, 2011 letter, and further informed the Company that "it was no longer able to rely on the representations of management and that it had lost confidence in the commitment of the Board and the Audit Committee to good governance and reliable financial reporting."

## C.     The NASDAQ Suspends Trading in CCME Shares

89.     Also on March 11, 2011, the Class Period ends as the NASDAQ suspended trading in CCME shares.

## VIII.   POST CLASS-PERIOD DISCLOSURES CONFIRM MASSIVE FRAUD

## A.     Seeking Alpha's Surprise Visit at CCME' s Headquarters.

90.     On March 12, 2011, SEEKING ALPHA published an article titled "The End of CCME's Fairy Tale," which discussed the author's suspicions that CCME was a "rank fraud." To test his suspicions, the article's author traveled to China and literally knocked on the door of the Company's corporate headquarters in Hong Kong, after his initial meeting with executives had been canceled. The article describes the author's interactions with the corporate staff of CCME, as he is taken on a tour of the Company.

91.     In discussing the general atmosphere of the Company's corporate headquarters, the article states:

There were nothing: no impromptu hall meetings, no one was at a copier, no huddles of twos and threes in the corner, no one was working the phones. No one was pounding a keyboard or studying a spreadsheet. No one, as far as could be seen, did anything for the entire time we were there. It was like B-roll footage for a documentary about office life: people looked the part, but there was nothing going on.

Asked if it was a "special" day, or a holiday, Vinne appeared puzzled at the question. No, it was a normal day at ChinaMediaExpress she assured us, a company that in less than four years of full time focus on the business of placing ads on various bus lines, was poised to post nearly a nine figure net income.

*****

James Yu, the senior executive at headquarters that day, was with us on much of this little tour. No one grinned or acted sheepishly when he walked in on them IM'ing, studying for a night school test or doing absolutely nothing; it was seemingly unremarkable to him or his colleague that in the rooms we were in, during the middle of work hours, no one was working.

Recall that this was a surprise visit: our meeting had been cancelled. This was China MediaExpress as it really was. It was a Potemkin company, a headquarters with the trappings of modern business but whose workers did nothing because their was nothing much to do.

Which is strange when you think about it.

Life at China MediaExpress should be just this side of frantic. Its net income has more than doubled since the end of the fourth quarter of 2009, to over $31 million from $14 million; its most recent net income margin was almost 55%, an utterly astounding figure. A company can only report these numbers through four paths:·

The first three involve having some combination of an a historical competitive advantage, a commanding position in a market that is undergoing an explosion in size, and a workforce where personal productivity is fetishized and handsomely rewarded. Those are hard arguments to make in China MediaExpress's case. It sells ads on buses ridden by the lower economic  strata in a marketplace that its competitors willingly abandoned. Its workforce, notwithstanding their amiability, plays cards and sleeps in the middle of the day.

The fourth is that in the main, China MediaExpress is a big fraud.

92.     The SEEKING ALPHA article author was also taken on a tour of the Company's "nerve center;" or programming room, where "much important work went on in grafting the ads from the likes of China Mobile and Coca-Cola ...."   The article described this "nerve center" as follows:

> Four people sat around the table and appeared to have been involved in some fantasy role-playing type card game. Two people were napping – one of whom refused to stir despite our presence – and one who woke up, laughed and started texting someone on her cellphone. A seventh smiled happily as she instant messaged her friends. The centerpiece of the room was a 2005 or so vintage laptop covered in dust with some masking tape on its screen. It was this, our guide assured us –she had backed off the "brain center" routine at this point and everyone was back to screwing around anyhow, except for the guy who was still asleep –where the really important work of editing went on.

93.     On March 14, 2011, the Company issued a press release announcing that DTT had formally resigned its engagement by the Company, as of March 11, 2011.  In addition, the Company announced that its Chief Financial Officer, Jacky Lam had also resigned, effective immediately. As a result, the Company's 2010 year end results and 10-K filing would be delayed, and the Company had requested suspension of trading of the CCME's stock on the NASDAQ. The release stated, in part, the following:

**China MediaExpress Holdings, Inc. Announces Resignation of Independent Auditor and Chief Financial Officer**
***2010 Year End Results and filing of 10-K to be delayed***

Fujian, China – March 14, 2011 – China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announced that the Company's registered independent accounting firm, Deloitte Touche Tohmatsu ("DTT") has formally resigned its engagement by the Company as of March 11, 2011. Following the receipt of the DTT resignation letter, on March 13, 2011, the Company received notice of the resignation of Jacky Lam from his position as Chief Financial Officer and director of the Company, effective immediately. As a result, CME will delay its fourth quarter earnings release and will not file its Form 10-K for the fiscal year ended December 31,2010 by March 16,2011, its original due date.

The DTT resignation letter stated that *DTT was no longer able to rely on the representations of management*, and recommended that certain issues encountered during the audit be addressed by an *independent investigation*. DTT's letter also stated that *these issues*

> *may have adverse implications for the prior periods' financial reports* and that; in their view, further *investigatory procedures would be required to determine whether the prior periods' financial reports are reliable.*  Upon receipt of the formal DTT resignation letter, the *Company requested the suspension of trading in the Company's common stock* on the NASDAQ Global Market to permit full disclosure of DTT's resignation to be disseminated to the public.
>
> The Board of Directors of the Company met over the weekend of March 12-13 and confirmed its intent to authorize an independent committee of the Board to launch an investigation with respect to the concern of DTT, which committee would be authorized to engage a forensic accounting firm and independent legal advisors , and initiate a search for a new CFO a new independent auditor. The Company expects that the announcement of final results for 2010 and the filing of its Annual Report on Form 10-K could be delayed for at least a month to permit the completion of all necessary fieldwork of the new independent auditor and to complete the independent investigation of several potential issues raised in the DTT resignation letter.(Emphasis added.)

94.     On March 16, 2011, director Dorothy Dong resigned from the Company, citing concerns with the "conduct of CCME's management."

95.     On March 31, 2011, CCME filed a current report on Form 8-K/A with the SEC. This current report described how DTT had informed CCME that "it was no longer able to rely on the representations of management and that it had lost confidence in the commitment of the Board and the Audit Committee to good governance and reliable financial reporting."  This Form 8-K/A continued by making the shocking revelation that DTT had disclaimed and withdrawn its previously issued audit opinion on the 2009 financial statements:

> DTT has since reached the conclusion that they are no longer able to place reliance on management representations in relation to prior period financial reports.  Accordingly, DTT requests that the Company take immediate steps to make the necessary Form 8-K filing to state that continuing reliance should no longer be placed on its audit report on the 2009 financial statements and moreover that DTT declines to be associated with any of the company's financial communications during 2010 and 2011.

96.     On April 7, 2011, Marco Kung, a director and Chairman of the Audit Committee, resigned from the Company, citing a lack of response by Defendant Cheng to board resolutions

passed in March of 2011.  This left CCME without the requisite number of "independent" directors under NASDAQ regulations.

97.     On May 2, 2011, the Company announced in a press release over the BUSINESS WIRE that it had retained the law firm DLA Piper to "assist in [the] investigation of concerns raised by [DTT] when it resigned as the Company's registered independent accounting firm."

98.     On May 19, 2011, CCME's shares resumed trading (this time on the "pink sheets" following its de-listing on the NASDAQ) and its shares immediately plummeted from $11.88 to just $2.16 per share – a loss of $9.72 per share, or 81.8%.  The shares currently trade at less than $0.20 per share, causing hundreds of millions of dollars in losses to Plaintiffs and the Class.

## IX.     CCME'S MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

99.     These improper accounting practices and manipulations were in direct violation of GAAP and SEC rules, as described below, and resulted in materially overstated financial results for each quarter ended between March 31, 2010 and September 30, 2010, as well as the years ended 2006 through 2009.

100.    GAAP is the set of conventions, rules and procedures which constitute the professional standards of the accounting profession.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading or inaccurate.

101.    In March of 2011, DTT resigned as CCME's independent auditor and took the highly unusual step of disassociating itself from CCME's 2009 financial statements, which it had previously audited and given a clean opinion to.  It was reckless of Robbins, in light of the overwhelming evidence, not to similarly disassociate itself from its prior "clean" audit opinions.

102.    CCME's financial statements contained in its reports filed with the SEC throughout the Class Period were presented in a manner that violated GAAP, including the following principles:

a.      The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

b.      The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

c.      The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

d.      The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

e.      The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

f.      The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

g.      The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

h.      The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

103.    In addition, CCME's accounting and financial reporting violate the following specific provisions of GAAP:

## A.      Revenue Recognition Problems

104.     According to its 2009 annual report on Form 10-K filed during the Class Period, CCME recognizes revenues "ratably over the contractual period for which the advertisements are broadcasted, and collection of such fee is probable."  However, as stated in CCME's Form 8-K filed with the SEC on March 29, 2011, it was unable to verify certain advertising agents/customers and bus operators."

105.     Under GAAP, CCME should not have recognized revenues from its transactions until the transactions had actually taken place.  ASC 605-10-25-1 provides that revenue is not recognized until "earned."  This standard considers the revenue "earned" when the entity "has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  Further, the revenue is only realizable when related assets are received or held are "readily converted into cash."  *Id.*

## B.      Bank Balances

106.     Pursuant to CCME's stated accounting policies, "the carrying amounts of cash, accounts receivable, accounts payable, payables for acquisition of equipment, and amounts due to related parties approximate to their fair values due to the short-term nature of these instruments."  Likewise, GAAP defines "cash" to include currency on hand and demand deposits with banks or other financial institutions.  ASC 305-10-20.  It is axiomatic that the reported amount of cash cannot exceed the amount of cash actually on hand or in bank accounts.  However, CCME reported material amounts of "cash" in its financial statements which had no basis in fact.  CCME did not disclose the fact that its cash accounts were dramatically overstated.

107.     One of the primary issued raised by DTT prior to resigning was the authenticity of bank statements provided to the auditor.  Pursuant to the above referenced accounting policies and relevant GAAP standards, the carrying amount of cash on the financial statements must approximate its fair value.  Because CCME had materially overstated its cash balances at banks, it was in violation of both GAAP and its own accounting policies as disclosed in the 2009 Form 10-K.

## X.      DTT AND ROBBINS' FALSE AND MISLEADING DISCLOSURES AND DEFICIENT AUDIT PROCEDURES

108.    Public investors, creditors and others rely on independent, registered public accounting firms to audit financial statements and assess internal controls when deciding whether to invest in or do business with a public company. "In all audits, the auditor should obtain an understanding of internal control sufficient to plan the audit." AU § 319.02 (1990).[3]  To do so, "the auditor should obtain evidential matter about the effectiveness of both the design and operation of controls to reduce the assessed level of control risk."  AU § 319.03 (1990).   In addition, "[t]he auditor should obtain sufficient knowledge of the information system relevant to financial reporting to understand," among other things, the classes of significant transactions, "the related accounting records…supporting information and specific accounts in the financial statements involved" in the processing and reporting of transactions, the accounting processing involved in recording, processing, accumulating and reporting transactions, and the financial reporting process used to prepare financial statements.  AU § 319.49 (1990).

109.    The PCAOB, established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards Generally Accepted Auditing Standards ("GAAS") as described by the American Institute of Certified Public Accountants Auditing Standards Board's Statement of Auditing Standards No. 95, Generally Accepted Auditing Standards, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Company Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. For simplicity, all reference to GAAS hereinafter includes the standards of the PCAOB.

---

[3] All references to "AU §___" are to the Codification of Auditing Standards issued by the American Institute of Certified Public Accountants.

A.     **Defendant Robbins' False and Misleading Disclosures**

110.    Defendant Robbins knew, or recklessly disregarded the fact that its audit report on Hong Kong Mandefu's annual financial statements for the years 2006, 2007 and 2008 would be included in the October 2009 Proxy and CCME's 2009 Form 10-K filed with the SEC on March 31, 2010.

111.    Defendant Robbins directly participated in CCME's fraud by ignoring numerous "red flags" about CCME's admitted internal control weaknesses and knowingly or recklessly certifying the above referenced financial statements.  In its audit opinion letter dated February 7, 2009, which was included in the 2009 Proxy and the 2009 Form 10-K filed with the SEC by CCME on March 31, 2010, Defendant Robbins falsely maintained that "[w]e conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)," and that these financial statements were "in conformity with accounting principles generally accepted in the United States of America."

112.    Defendant Robbins also disclosed that its audit procedures provided a "reasonable basis" for these opinions.  Yet, Robbins failed or was reckless in not appropriately modifying the nature, extent and timing of its audit procedures in light of known internal control deficiencies – and, significantly, in light of the fact that CCME was relatively new at reporting its financial statements to comport with U.S. GAAP – Robbins failed to consider or recklessly disregarded the ramifications that these deficiencies had on the reliability of CCME's financial statements, and issued an unqualified audit opinion. The statements in Robbins' audit opinion were materially false and misleading when made because Defendant Robbins knew, or was reckless in not knowing, that it had failed to conduct its audits in compliance with GAAS and PCAOB rules, and that Hong Kong Mandefu's financial statements for the years ended 2006, 2007 and 2008 were materially misstated and did not comply with GAAP.

113.     The fact that the Company alerted its auditors to the fact that it was evaluating significant deficiencies and material weaknesses in its internal controls in the SOX certifications was a clear red flag to the auditors, and Robbins had a duty to inquire as to why CCME was labeling these concerns "significant" and "material" rather than confirming that these controls were in place. Similarly, CCME's declaration in its 2009 10-K that "management does not expect that our disclosure controls or internal controls will prevent all error and all fraud" should have served as an additional red flag.  All of these facts required Robbins to conduct an even more rigorous audit to confirm the accuracy of the evidentiary material supporting the Company's financial statements.  Defendant Robbins was reckless in either failing to modify its audit procedures in light of the Company's known internal control problems or, if it did make such modifications, it recklessly disregarded the audit evidence which existed at the time of the audit.

## B.     Defendant DTT's False and Misleading Disclosures

114.     DTT directly participated in the CCME fraud by issuing an unqualified opinion on the Company's financial statements for the year-ended December 31, 2009.  In its opinion letter dated March 30, 2010, DTT stated that "We have audited the accompanying consolidated balance sheet of China MediaExpress Holdings, Inc. (the "Company"), its subsidiaries and its variable interest entity (the "Group") as of December 31, 2009 and the related consolidated statements of operations, shareholders' equity and comprehensive income (loss), and cash flows for the year then ended."  DTT further represented that "We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  DTT also disclosed its opinion that CCME's reported financial statements "present fairly, in all material respects, the financial position of the Group as of December 31, 2009, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America," and that DTT's audit procedures provided a "reasonable basis" for this opinion.  These statements were materially false and misleading when made because DTT knew, or recklessly disregarded the facts that: a) it failed to

conduct its audit in compliance with GAAS or PCAOB rules; and b) that CCME's financial statements were materially false and misleading.

115.    The fact that the Company alerted its auditors to the fact that it was evaluating significant deficiencies and material weaknesses in its internal controls in the SOX certifications was a clear red flag to the auditors and DTT had a duty to inquire as to why CCME was labeling these concerns "significant" and "material" rather than confirming that these controls were in place.  Similarly, CCME's declaration in its 2009 10-K that "management does not expect that our disclosure controls or internal controls will prevent all error and all fraud" should have served as an additional red flag.  All of these facts required DTT to conduct an even more rigorous audit to confirm the accuracy of the evidentiary material supporting the Company's financial statements.  Defendant DTT was reckless in either failing to modify its audit procedures in light of the Company's known internal control problems or, if it did make such modifications, it recklessly disregarded the audit evidence which existed at the time of the audit.

**C.    The Auditor Defendants' Failure to Comply With GAAS and PCAOB Rules**

116.    There are ten GAAS provisions, which are divided into three types of standards: (1) General Standards, which provide guidelines for auditor staffing and exercising due professional care; (2) Standards of Field Work, which provide guidelines for audit planning, collecting evidential verification for audit findings, and the proper evaluation of internal controls; and (3) Standards of Reporting, which are primarily concerned with ensuring that a company's financial statements are presented in accordance with GAAP.

117.    GAAS General Standard No. 3 states that: "Due professional care is to be exercised in the performance of the audit and the preparation of the report." GAAS Standards of Field Work No. 1 states that: "The work is to be adequately planned and assistants, if any, are to be properly supervised." GAAS Standards of Field Work No. 2 states: "A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine

the nature, timing and extent of tests to be performed." GAAS Standards of Field Work No. 3 states: "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." GAAS Standards of Reporting No. 1 states: "The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP)."

118.    Given the nature of CCME's business and lack of transparency, the Auditor Defendants were required to exercise due professional care in performing its audit; to adequately plan its audit; to obtain a sufficient understanding of CCME's  internal controls; and to obtain sufficient competent evidential matter in auditing CCME's revenues and bank balances.  Both Defendant Robbins and Defendant DTT failed to conduct their audits in compliance with these fundamental GAAS provisions.  Had either of these Defendants performed their audits in compliance with GAAS, they would have uncovered CCME's overstatements of revenues and cash balances held at banks.

## XI.    ADDITIONAL SCIENTER ALLEGATIONS

119.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CCME, their control over, and/or receipt and/or modification of CCME's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning CCME, participated in the fraudulent scheme alleged herein.

A.    **Defendants Cheng and Lam**

120.    Defendants Cheng and Lam made materially false and misleading statements regarding CCME's financial results, advertising network and customer list in order to enable Defendants Cheng and Lam to receive generous "earn-out" payments pursuant to the reverse merger agreement.  In fact, the fraudulent reported financial results for 2009 triggered the "earn-out" provision, and Defendants Cheng and Lam received their payments on August 12, 2010.

B.    **Defendants Green and Bird**

121.    Additionally, scienter is demonstrated as to Defendants Green and Bird by the motivations they had to cause TM to enter into the reverse merger transaction by preparing and disseminating a materially false and misleading proxy statement.  As described above, the financial reporting misrepresentations, as well as the other misrepresentations regarding CCME's advertising network and client base were so elementary and pervasive that any reasonable due diligence investigation would have easily uncovered these deceptions.  The fact that Green and Bird did not report, disclose, identify or rectify these problems in CCME's reported financial results and narrative description of its business contained in the proxy statement indicates that they turned a "blind eye" to the serious misrepresentations contained in these financial results and narrative descriptions, in a willful and reckless attempt to consummate the reverse merger transaction before the October 17, 2009 deadline.  Their desire to "cash-out" their pre-IPO shares of TM demonstrates that they had the motive and opportunity to carry out such deception.

C.    **Defendant DTT**

122.    On March 3, 2011, DTT sent a letter to the board and audit committee of CCME outlining numerous irregularities it encountered during its audit of CCME's 2010 financial statements, including irregularities concerning the bank account balances for CCME's PRC subsidiaries.  The letter is attached hereto as Ex. A. This letter sets forth in great detail the numerous "red flags" that existed at CCME prior to the 2009 audit, but which were ignored by DTT in its audit procedures, including:

1)   Abnormalities in CCME's bank balances;

2)  Unusual confirmations of bank balances;

3)  Wildly different sets of financial statements provided to DTT and Chinese authorities;

4)  Enormous profits and growth rates, with a small number of paid staff;

5)  Reported operating income percentages far in excess of competitors;

6)  Dramatically increased net income with virtually no spending in increased infrastructure; and

7)  Faster growth in reported income and cash flow than any other U.S.-listed Chinese media company.

123.     DTT went into great detail describing the overwhelming warnings which it recklessly failed to notice when it issued a "clean" audit opinions of CCME's 2009 financials, as discussed below.  The false and misleading 2009 annual financial reports that were audited by DTT were given an unqualified or "clean" opinion by DTT in its previously described audit report contained in CCME's 2009 annual report on Form 10-K, filed with the SEC on March 31, 2010.  Although these "red flags" existed during DTT's audit procedures related to the 2009 financial statements, they were ignored by DTT.  These "red flags" would have placed a reasonable auditor on notice that CCME was engaged in wrongdoing to the detriment of Plaintiffs and the Class.  However, it was not until *after* the Citron and Muddy Waters reports and numerous other articles and media reports in early 2011 had turned sharply critical of CCME that DTT bothered to finally investigate these "red flags" that were obvious to them once they actually took a look into them, and would have been obvious to any reasonable auditor.   In light of these numerous "red flags," DTT either knowingly or recklessly failed to take even the most rudimentary auditing steps, as described in the following instances.

### 1.     DTT Auditors Were Reckless in Failing to Discover Fake Bank Slips

124.     DTT auditors had multiple reasons to believe that the CCME Defendants fabricated bank slips and statements purportedly from the Agricultural Bank of China ("ABC"). Specifically their "review of the bank slips attached in Fujian Fenzhong Media Co Ltd ("Fujian

Fenzhong")')'s accounting books and the bank statements of Fujian Fenzhong and its subsidiary

Fujian Suliangou revealed anomalies that cast doubts upon the authenticity of these documents."

125.   DTT  revealed that bank statements provided by Fujian Fenzhong differed both in

overall format and in the "specific details such as the date format and item description."

126.   DTT then went on to "note" that the bank statements to both companies as well as

the confirmations were all stamped with a bank chop containing the same number.  With ABC,

the staff member responsible for processing a particular transaction would use his or own unique

bank and name chop on the supporting documents.  In a particularly understated sentence, DTT

concluded that "[w]e observed that there are about 6 tellers at ABC Jin'an Branch and we feel it

might be too much of a coincidence that all of Fujian Fenzhong's monthly bank statements

(which as stated above were obtained at different times throughout the year) as well as our bank

confirmation request were in fact processed by the same bank staff and no others."

127.   Moreover, DTT did not, as it would have expected, find any name chop on Fujian

Fenzhong's monthly bank statements or on confirmations they received from ABC Jin'an

Branch, as they would expect from a bank statement and confirmation process.

128.   Finally, DTT "observed anomalies in various ABC bank slips attached to a

number of accounting vouchers including receipts and payments."  For example, the receipts

were formatted the same and all indicated high-value payments – regardless of which bank

settled the payment.  DTT also noticed that "the bank chops were of different sizes which []

raise[s] doubt as to the authenticity of these documents."

### 2.   DTT Recklessly Failed to Conduct an On-Site Visit at ABC Bank

129.   In 2011, when DTT finally conducted onsite visits to ABC to check numbers

(long after it had recklessly issued its clean audit opinion), the visits "were arranged during lunch

time or close to end of business hours and we were arranged to meet with the 'Bank Supervisor'

directly instead of following the normal procedure of queuing up for the application."

130.   In a shocking revelation, which would be comical except for its tragic

consequences, DTT stated that "'Bank. Supervisor' Ms. WU Jianshen we met during our visits

on 20 January 2011, 27 January 2011 and 23 February 2011 appears to be **two different persons**." (emphasis added). In support of its conclusion, DTT recounted the following:

> We received two versions of business cards of WU Jianshen which differ not only differ in format, but also in the name and contact telephone numbers.
>
> The signature of the 'Bank Supervisor' appears to be different. . . . The 'Bank Supervisor' (purportedly WU Jian Shen) was asked by us to sign her name to confirm that the documents we obtained during our visit on 23 February 2011 were provided by her. She signed her name on the envelope (as mentioned above) originally as WU Jianxin but later corrected it to WU Jianshen. Nevertheless, this name is still different from the signature on the bank confirmation we received on 27 January 2011. In the February 23 visit we specifically requested a printed copy of the bank statements directly from the bank's printer and we have requested to observe the printing process. Through observation we believe the transactions details (as opposed to bank statements) provided to us were not those that were printed in front of our people.

None of these discoveries were made during DTT's audits of CCME.

### 3. Deloitte's Reckless Audit Failed to Reveal that CCME Reported Fake Customers to Investors

131. During its belated investigation, DTT discovered that three of Fujian Fenzhong (and thus CCME's) allegedly top ten customers did not have legal status as companies – a fact it discovered using basic company searches which it recklessly failed to do during its audit of CCME. Specifically, DTT stated in its letter that:

> Company searches of the top ten customers of Fujian Fenzhong indicate that one customer has filed for deregistration and the business license of another company has been revoked. Both companies are advertising agents instead of ultimate advertisers. In addition, there is no record of another customer filed with the AIC. These companies therefore do not appear to have a proper legal status.

132. DTT could also not confirm that some of the customers and bus operators existed at the last known addresses provided by Fujian Fenzhong. Astonishingly, other companies occupy those addresses or there are other circumstances which make it clear that at least the addresses are wrong. Most disturbing, there seemed to be a deliberate effort to conceal CCME's

fraud by faking responses from these addresses.   Specifically, DTT belatedly discovered the

following:

> We have conducted site visit of one of Fujian Fenzhong's bus operators, ("Shanghai Bus"), but we cannot locate this company at the address provided by Fujian Fenzhong. This address turned out to be a long-haul bus terminal and this company does not seem to exist in that vicinity. We note from internet search of Shanghai Bus that it is a listed company and that the company has received a new business license from Shanghai AIC approving the legal name change from on 22 May 2009. Contrary to this information, the contract with Fujian Fenzhong on 26 December 2009 was entered into in the name of Shanghai Bus but not the new name.
>
> Since Shanghai Bus does not in fact exist at the address given by Fujian Fenzhong, we do not understand how the confirmation was delivered to this company. We did however receive a confirmation reply from this company which indicates that the reply was sent from this wrong address.
>
> By checking the delivery status of our confirmation letters with the website of the courier company, we found that our letters have not been delivered to ("Qixing") and ("Shanghai Apollo"). The addresses of Qibaozhai and Qixing were written wrongly by mistake when the confirmation letters were sent out and that was the reason why they could not be delivered.  Shanghai Apollo's address turns out to be a market and the company cannot be located at that address. Nevertheless, we did receive replies from these three companies and the replies indicate that they were sent from the addresses provided by Fujian Fenzhong. We further conducted site visits at the address provided by Fujian Fenzhong to locate these companies and found that the reported addresses of both Qibaozhai and Qixing are occupied by other companies.
>
> We have also conducted site visits to two customers located in the Fuzhou area: We could not locate both companies at their respective addresses. We learnt from our site visits that [name only in Chinese characters] had moved out from its last known address as of end of last year. The address of [name only in Chinese characters] is occupied by another company called [name only in Chinese characters]. We were told that this address has been occupied by [name only in Chinese characters] for some time and the people there had never heard of [name only in Chinese characters].  Contrary to this finding, our confirmation letters as indicated on the website of the courier company have been successfully delivered to these companies and replies were also received from them.
>
> We also found that replies from different customers and bus operators appear to have been sent back to us together. Replies from two customers [names only in Chinese characters] in Fuzhou were mailed at the same post office on the same day at the same time and processed by the same staff. Replies from one contractor

[name only in Chinese characters] and one bus operator [name
only in Chinese characters] in Huizhou were again posted at the
same post office, on the same day at the same time and received by
the same staff. Our record indicates that there is no apparent
relationship between these companies.

133.    Interviews DTT belatedly conducted with one of Fujian's purported customers
further confirmed the fraud.  As stated in DTT's letter:

Fujian Fenzhong arranged an interview for us with one of its
customers [name only in Chinese characters] on 24 February 2011.
As we learnt that [name only in Chinese characters] no longer

occupies the address our confirmation letter was directed to, we
asked the representative LIN Xiaoying if she had received our
letter. She indicated that she had never received the confirmation
letter. When we attempted to verify the contracts she had with
Fujian Fenzhong, she indicated that she could not confirm the
contracted amount. However, our records show that she was the
sender who returned the confirmation to us on 10 February 201 1.

### 4.    Evidence that  DTT Recklessly Failed to Discover CCME's Xiamen International Bank Accounts Were a Fraud

134.    DTT's investigation, long after it certified CCME's financials as "clean," also
turned up evidence of fraud at CCME's Xiamen International Bank accounts.  When doing their
investigation, DTT was "brought to Xiamen International Bank Fuzhou Branch by the company
employee after its normal business hours (it was 5:30pm when we arrived at the bank on 24
February 2011) and we were led into the premise from a side entrance."  The actual visit was
also filled with suspicious refusals and problematic signs.   DTT's request to observe the printing
process of bank statements was refused and "bank transaction details (again, as opposed to bank
statements) were printed on plain A4 paper that do not contain the bank's logo or letterhead. The
bank confirmation and all the bank statements previously obtained for each month of 2010 were
stamped with the bank chop containing the same number. The staff handling the confirmation
only provided us with his surname and refused to provide his full name or business card."

### 5.    DTT Recklessly Failed to Audit All Bank Accounts and Loans

135.    In its March 3, 2011 letter to CCME, DTT revealed that it had belatedly
discovered that, despite the fact that the Financial Controller of Fujian Fenzhong informed DTT
that Fujian Fenzhong only holds one bank account with the Agricultural Bank of China,

information extracted from the Chinese Administration of Industry and Commerce ("AIC")
showed that Fujian Fenzhong had other bank accounts and held short-term loans that were not
reported to DTT.

> **6.** **DTT Recklessly Failed to Learn that CCME's Subsidiary Filed Two Entirely Different Sets of Audited Financials For The Same Year (2009)**

136.     Fenzhong, through contractual relationships with Hong Kong Mandefu's wholly-
owned subsidiary Fujian Across Express Technology Co. Ltd. ("Fujian Across Express"),
produced all or most of CCME's revenue.  DTT, as part of its belated investigation, took the
simple step of comparing Fujian Across Express's audited financials for 2009 with the audited
financial reported Fujian Across Express filed with AIC, the Chinese Administration of Industry
and Commerce.  DTT discovered that "although the two reports were issued by the same
accounting firm and contain[] the same report reference number, there are huge differences in the
information Across Express reported."  DTT collected some of "highlights" from this list of
discrepancies in the chart below:

| Item | Audit report provided to DTT | Audit report filed with AIC |
|---|---|---|
| Total Assets | RMB 521,409,081.70 | RMB 4,400,343.18 |
| Total liabilities | RMB 44,809,524.16 | RMB 221,146.78 |
| Ending cash balance | RMB 747,964.78 | RMB 39,100.97 |
| Revenue | RMB 434,040,421.85 | RMB 0 |
| Tax payable | RMB 43,688,711.97 | RMB 0 |
| Taxes paid | RMB 80,802,451.85 | RMB -40.13 |

137.     DTT also belatedly discovered that "Across Express also disclosed 3 bank
accounts in the audited financial statements in the AIC filings, one of which we do not have any
knowledge of."

### 7.    DTT Recklessly Failed to Perform Standard Audit Tests for Tax Invoices

138.    After sample testing a number of CCME's largest transactions from the major

categories of its expenses – a step DTT apparently failed to perform during its audits – DTT

discovered that "certain tax invoices only contain a 7-digit invoice number and do not contain

any invoice code."  According to the tax bureau consulted by DTT, this means that the tax

invoices were potentially invalid as they should have 8-digit invoice codes and that the invoice

codes on the invoices are inconsistent with the standard invoice coding method.

### 8.    DTT Recklessly Failed to Confirm Tax Records

139.    DTT attempted to visit local and state tax bureaus "to verify the status of

tax payments of Fujian Fenzhong and Across Express," but were repeatedly and bizarrely

thwarted.

> The Financial Controller of Fujian Fenzhong Ms Fanny ZHENG
> accompanied us twice to visit the Fuzhou Jin'an Office of the State
> Administration of Taxation ("SAT") seeking to obtain the tax
> records of Across Express for 2008 to 2010. The first visit was
> arranged on 23 February 2011 at around 11:30 am. Ms. ZHENG
> brought us to the Jin'an Office of SAT and introduced us to a Mr.
> CHEN Biao, who claimed to be Across Express's designated tax
> officer.  CHEN stated that Across Express is a "small-scale tax-
> payer" with no record of tax in default. However, CHEN refused to
> verify the enterprise income tax returns and tax payment records of
> Across Express that we brought along. He indicated that if Across
> Express would like to retrieve its tax records, it should prepare an
> application with relevant documentation and visit the Collection
> Hall of the SAT Jin'an Office (at the second floor of the same
> building).
>
> Ms. ZHENG went back with us at noon of the next day (24
> February 2011) to SAT Jin'an Office and brought us to Counter 11
> of Integrated Services in the Collection Hall. According to the tax
> officer there, there is no record of Across Express's enterprise
> income tax for 2008 and onwards in the system. The tax officer
> informed that Across Express is a pure local tax account which
> falls under the administration of local tax bureau. If we need to
> retrieve the tax records of Across Express, we should go through
> its designated tax officer. As a result, we were not able to obtain
> and verify any tax records of Across Express from our two visits.
>
> In the afternoon of 25 February 2011, we were informed that
> Fujian Fenzhong's representative had contacted Across Express's
> designated tax officer CHEN Biao and submitted the request for
> retrieval of tax records in the afternoon of 24 February 2011 after
> we left. CHEN had printed the tax payment records of Across

Express and they were ready for our collection. However as we do
not know how these records were produced, we would prefer to
obtain such records directly from the tax bureau through the
normal and open channel.

**9.     DTT Recklessly Failed to Independently Confirm Display of Advertisements
For Customers**

140.    In their long-overdue interview with purported customer Lin Xiaoying, DTT

discovered that an independent check on Fujian Fenzhong that Fujian Fenzhong allowed its

customers to confirm that their ads were actually being run, did not actually exist.  As DTT

wrote in its letter:

> We have also asked LIN about the CTR report which Fujian
> Fenzhong claimed to provide independent confirmation for
> customers for the display of their advertisements. We learnt from
> Fujian Fenzhong that in order to assure its customers of the display
> of their advertisements, Fujian Fenzhong had commissioned CTR
> to prepare an independent review of the advertisement programs
> played on its buses on a sample basis; and this monthly report will
> be sent directly from CTR to Fenzhong's customers. Contrary to
> this information, LIN indicated that she received the monthly CTR
> reports from Fujian Fenzhong instead of from CTR directly. This
> contradicts with the claim by Fujian Fenzhong that CTR would
> deliver the reports directly to its customers.

**10.     DTT Recklessly Failed to Discover that Fujian Fenzhong Claimed to Have
Paid Its Employees Despite Creating Virtually No Supporting
Documentation**

141.    As DTT put it in its understated way – it first learned of "unusual practices for

salary payments" in 2011.  Specifically, from "the accounting vouchers [which DTT apparently

never looked at before], we notice that salary payments were made ***in cash*** for each month of

2010. The ***only supporting document*** was a salary form containing signatures of all the

employees working in different offices of Fujian Fenzhong, the employee signatures purport to

support that individual employees had received the said salaries."  (Emphasis added).  DTT drew

the following conclusion from this peculiar practice:

> Given the sensitivity of employee salary information, we question
> why the company should request all employees, even in different
> offices, to sign on the same salary form and how salaries were in
> fact distributed without any supporting documentation except for
> one single salary form.  There was insufficient information to
> ascertain and verify the amount of salary paid each month and to

confirm the exact number of employees working for Fujian
Fenzhong.

In other words, this bizarre practice made no practical sense.

> **11.    DTT Recklessly Failed to Discover that No Records Existed To Confirm That Fujian Fenzhong Had Any Business that Would Justify the Majority of its Purported Revenue**

142.    DTT, having recklessly failed to check prior to 2011, could not verify that Fujian

Fenzhong operated a real business at all.  Fujian Fenzhong's business was the creation of media

and advertising programs to be put on buses – to DTT's surprise, there was insufficient evidence

to verify that these programs were ever created.  Specifically, DTT belatedly found the

following:

> We have interviewed the Production Manager CHEN Xiaohui in order to understand the production process and verify the free media programs and the advertisement programs that were produced each month for the 16 regions. For each step of the production process, we have attempted to obtain corroborating evidence to support that production actually took place.  However, no substantive records were shown to us except for one advertising schedule and one advertising program for Tianjin in December 2010.

> We have asked CHEN to show us original DVDs from the content providers but were told that the programs once copied to a staffs computer the original DVDs would be returned. CHEN directed us to two staff who were supposed to edit the media programs but did not show us any of the final edited programs. We were told that these programs would be sent to the regional technical departments and no back-up copies would be retained. As a result, we were unable to further verify whether Fujian Fenzhong had in fact displayed the media content from its intended suppliers.

> We received similar responses regarding the advertisements from customers. CHEN told us that the advertisements would be sent by QQ (a chat program similar to MSN) and two staff would edit and arrange the advertisements in the correct display order. Same as the media content, the final advertisement programs would be delivered to the regional technical departments in CD/DVD format. Production Department would not keep any advertising schedules or advertising programs once the advertising programs were sent out. He would only sample one to two regions per month to retain the advertisement programs. There is simply insufficient information for further procedures to verify the production process.

**12.    DTT Recklessly Failed to Confirm That the Number of Outlets Playing CCME's Ads Was False and Overstated**

143.    In another example of a late discovery, through a simple process of matching license plate numbers DTT discovered that Fujian Fenzhong was lying about the number of buses its ads played on – a major metric for CCME's business.  DTT knew the number was false, that it was a significantly smaller number than reported, but could not determine how small that number should be.  In DTT's own words:

> The records of bus information provided by Fujian Fenzhong indicate that as of December 2010, there were 22,205 buses playing CCME programmes. Further examination of the license plates information shows that some license plates have been double counted both within one bus operator and also double counted across different bus operators (that are within the same region).
>
> As a result approximately 1,330 buses were over counted. We were informed that Fujian Fenzhong would not ask for and retain the engine number from the bus operators. We are therefore unable to verify the existence of all 22,205 buses CCME claims to have without the engine number or other unique identification number of the buses.

**D.    Defendant Robbins**

144.    Defendant Robbins has a long and documented history of auditing violations. Reports authored by the Public Company Accounting Oversight Board on December 22, 2008 and March 31, 2010 document numerous audit failures.  Robbins continues to be identified on the PCAOB website as a firm that "that *failed to address quality control criticisms satisfactorily*."

http://pcaobus.org/Inspections/Reports/Pages/FirmsFailedToAddressQCSatisfactorily.aspx (emphasis added).

145.    The deficiencies that PCAOB identified in both of Robbins' cited audits included deficiencies of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements. With the 2008 audit, PCAOB has outlined the deficiencies to include, among other failures:  (1) the failure to perform audit procedures to evaluate whether certain affiliated entities

were variable interest entities and potentially subject to consolidation; (2) the failure to perform audit procedures to evaluate the appropriateness of offsetting amounts due to and from affiliated entities in the financial statements and the collectability of amounts due from affiliated entities; and (3) the failure to perform sufficient audit procedures related to the valuation of goodwill. With the 2010 audit, PCAOB's report stated: "The inspection team identified what it considered to be audit deficiencies.8/ The deficiencies identified in two of the audits reviewed included deficiencies of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."

146.     These reports demonstrate Defendant Robbins' grossly negligent audit procedures in multiple instances on an ongoing basis.


## XII.     LOSS CAUSATION

147.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

148.     Throughout the Class Period, as set forth above, the market price of CCME shares was inflated by the material omissions and false and misleading statements made by the Company and the Individual Defendants, which were widely disseminated to the securities markets, investment analysts and the investing public.  The false and misleading statements materially misrepresented to the market the Company's financial results and prospects, and caused CCME shares to trade at prices in excess of their true value.

149.     As a result, Lead Plaintiffs and the Additional Named Plaintiffs purchased CCME shares at artificially inflated prices.  When the truth about CCME's financial results and prospects was revealed to the market through several partial disclosures, the price of CCME shares declined in response, as the artificial inflation caused by Defendants' misrepresentations

and omissions was removed from the price of CCME shares, thereby causing substantial damages to the Lead Plaintiffs, the Additional Named Plaintiffs, and the Class.

150.    Immediately prior to the Class Period, CCME shares (then known as TM) closed trading at $7.66 per share.  After the reverse merger transaction, CCME shares rose more than 25% to generally trade between $10.00 and $12.00 for the rest of 2009.  On March 23, 2010, CCME announced outstanding reported financial results for the year ended December 31, 2009, causing CCME shares to jump more than 18% to close trading at $14.54 per share.  As CCME continued to report excellent financial results throughout 2010, its share price remained fairly steady, but trended up, with CCME shares closing trading at $15.84 per share on December 31, 2010.  This general upward trend in CCME's share price continued during the first month of 2011, with CCME shares closing at a Class Period high of $22.81 per share on January 27, 2011.

151.    On January 31, 2011, Citron Research published the first analyst report questioning multiple aspects of CCME's business.  This bad publicity dropped the Company's stock more than 14%, closing at $17.84 per share.  But the bad news was just beginning.  On February 3, 2011, Muddy Waters Research issued a scathing research report highlighting multiple indicia of fraud at CCME.  This bad news caused CCME shares to drop from a close of $16.61 on February 2, 2011 to close at just $11.09 on February 3, 2011 – a decline of $5.52 per share, or more than 33%.  Shares traded in this general range for the next month or so, until March 11, 2011, when questions swirling around the Company, its auditor and its reported financial condition caused the NASDAQ to suspend trading in the Company's shares.  CCME shares were never again traded n the NASDAQ, being de-listed on May 19, 2011.  When trading resumed again on May 19, 2011 on the "pink-sheets," CCME shares plummeted 81.8% to close at just $2.16.  CCME shares closed trading at just $0.17 per share on October 20, 2011.

## I.    APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

152.    At all relevant times, the market for CCME common stock was an efficient market for the following reasons, among others:

(a)     CCME common stock met the requirements for listing and was listed and actively traded on the NYSE AMEX Exchange, and then later on the NASDAQ, both highly efficient and automated markets;

(b)     as a regulated issuer, CCME filed periodic public reports with the SEC and the NYSE AMEX Exchange and the NASDAQ;

(c)     CCME regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     CCME was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

153.    As a result of the foregoing, the market for CCME common stock promptly digested current information regarding CCME from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of CCME common stock during the Class Period suffered similar injury through their purchase of CCME common stock at artificially inflated prices and a presumption of reliance applies.

## II.      NO SAFE HARBOR

154.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CCME who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

155.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

156.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.    Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

158.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CCME common stock.  Plaintiffs and the Class would not have purchased CCME common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

159.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of CCME common stock during the Class Period.

010244-11  482143 V1

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

160.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

161.    The Individual Defendants acted as controlling persons of CCME within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of CCME, and their ownership of CCME stock, the Individual Defendants had the power and authority to cause CCME to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT III

### Violation of Section 20(A) of
### the Exchange Act Against DTTL

162.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

163.    DTTL acted as a controlling person of DTT within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of the control exercised by DTTL's CEO, DTTL's power to accept or reject engagements by DTT and impose regulations and requirements on DTT (including how to conduct audits), and to discipline DTTl for violation of DTTL policies,  DTTL had the power and authority to cause DTT to engage in the wrongful conduct complained of herein.  By reason of such conduct, DTT is  liable pursuant to Section 20(a) of the Exchange Act.

164.    As set forth above, DTTL , directly and through its member firms and employees, including but not limited to DTT committed primary violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated there under by virtue of the conduct set forth herein.

165.    DTTL acted as a controlling person of DTT within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of the unified international structure of the

auditing firm, the size of DTTL within that structure, the contractual relationships among member firms as alleged above, DTTL had the power to influence and control and did influence and control, directly or indirectly, the actions and decision making of DTT and its partners, senior executives and employees, its member firms and their respective partners.

166.    DTTL was provided with or had unlimited access to copies of DTT's audit of CCME, as well as copies of internal documents, reports, memoranda, communications, press releases, public filings and other statements alleged by Plaintiffs to be misleading and used in furtherance of the conduct set forth herein, and had the ability to prevent the issuance of false or misleading statements or to cause the statements to be corrected.

167.    DTTL also had direct involvement in and communications regarding its member firms' audits of CCME and its subsidiaries and, therefore is presumed to have had the power to control or influence the particular conduct giving rise to the securities law violations, and exercised that power, as set forth herein.

168.    By virtue of its position as a controlling person of DTT, DTTL, is liable pursuant to Section 20(a) of the Exchange Act.  As direct and proximate result of the wrongful conduct of DTT, Plaintiffs suffered damages in connection with their respective purchases of CCME securities for which DTTL is jointly and severally liable.

**COUNT IV**

**Violation of Section 20(A) of
the Exchange Act Against Deloitte LLP**

169.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.    As set forth above, DTTL, directly and through its member firms and employees, promulgated there under by virtue of the plan, scheme and cause of conduct set forth herein.

171.    Deloitte LLP acted as a controlling person of DTTL within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of the unified international structure of the auditing firm, the size of DTTL within that structure, the contractual

relationships among member firms as alleged above, Deloitte LLP had the power to influence and control and did influence and control, directly or indirectly, the actions and decision making of DTTL, its partners, senior executives and employees, its member firms and their respective partners.

172.     Deloitte LLP was provided with or had unlimited access to copies of its member firms' workpapers for auditor of CCME and its subsidiaries, as well as copies of internal documents, reports, memoranda, communications, press releases, public filings and other statements alleged by Plaintiffs to be misleading and used in furtherance of the plan, scheme and cause of conduct set forth herein, and had the ability to prevent the issuance of the false and misleading statements or to cause the statements to be corrected.

173.     Deloitte LLP also had direct involvement in and communications regarding its member firms' audits of, and consulting for, CCME and its subsidiaries and, therefore is presumed to have had the power to control or influence the particular conduct giving rise to the securities law violations, and exercised that power, as set forth herein.

174.     By virtue of its position as a controlling person of DTTL, Deloitte LLP, is liable pursuant to Section 20(a) of the Exchange Act.  As direct and proximate result of the wrongful conduct of Deloitte LLP, Plaintiffs suffered damages in connection with their respective purchases of CCME securities for which Deloitte LLP is jointly and severally liable.

### III.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  October 24, 2011

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
        JASON A. ZWEIG (JZ-8107)
One Penn Plaza, 36th Floor
New York, NY 10119
Telephone:  (212) 752-5455
Facsimile:  (917) 210-3980
jasonz@hbsslaw.com

Steve W. Berman
Jeniphr A.E. Breckenridge
Karl P. Barth
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
Jeniphr@hbsslaw.com
karlb@hbsslaw.com

Reed R. Kathrein
Peter E. Borkon
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

*Lead Counsel for Lead Plaintiff the Davis Entities*

Michael Eisenkraft (ME-6974)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745
meisenkraft@cohenmilstein.com

010244-11  482143 V1

Steven J. Toll
Julie Goldsmith Reiser
S. Douglas Bunch (SB-3028)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
dbunch@cohenmilstein.com

*Interim Co-counsel and Attorneys for the CME
Investor Group*

010244-11  482143 V1