UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

DANIEL McINTIRE,                    :
                                    :
                 Plaintiff,         :
                                    :
      - against -                   :
                                    :
CHINA MEDIAEXPRESS HOLDINGS,        :     11 Civ. 0804(VM)
INC., et al.                        :
                                    :     **DECISION AND ORDER**
                 Defendants.        :
------------------------------------X
                                    :
IN RE CHINA MEDIAEXPRESS HOLDINGS,  :
INC. SHAREHOLDER LITIGATION         :
                                    :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Lead Plaintiffs Irrevocable Trust FBO Lansing Davis and the Davis Partnership LP brought this action on behalf of a potential class (collectively, "Plaintiffs") of purchasers of common stock of China MediaExpress Holdings, Inc. ("CCME") between October 5, 2009 and March 11, 2011 (the "Class Period") against defendants CCME, Zheng Cheng ("Cheng"), Jacky Wei Kei Lam ("Lam"), Theodore Green ("Green"), Malcolm Bird ("Bird"), Deloitte Touche Tohmatsu in Hong Kong SAR ("DTT HK"), Deloitte Touche Tohmatsu Limited ("DTTL"), Deloitte LLP ("Deloitte U.S."), and A.J. Robbins, P.C. ("A.J. Robbins") (collectively, "Defendants"). Plaintiffs assert claims under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"),

1

15 U.S.C. § 78j(b) ("§ 10(b)"); Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("§ 20(a)").

Defendants moved to dismiss Plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), 9(b) ("Rule 9(b)"), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, asserting that the amended complaint fails to state a claim upon which relief may be granted and to plead fraud with sufficient particularity.

## I.   BACKGROUND[1]

A.   THE PARTIES

1.   Plaintiffs

Plaintiffs assert that they bring this action "on behalf of themselves and all other persons or entities that purchased shares of [CCME] common stock" between October 5, 2009 and March 11, 2011. Am. Compl. ¶ 1.

---

[1] The facts below are taken from the Amended Complaint filed on October 25, 2011, and the documents cited or relied upon for the facts pled therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v. Technology Fin. Group, Inc., 67 F.3d 463, 465 (2d Cir. 1995)). A court may take into account any written instrument attached to the complaint, as well as statements and documents "incorporated in [the complaint] by reference" without converting a motion to dismiss into one for summary judgment. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)(internal quotation marks omitted). Except where specifically quoted, no further reference to the Amended Complaint will be made.

2.   <u>CCME Defendants</u>

Defendant CCME is a Delaware corporation with its principal place of business in Hong Kong.  CCME purportedly operates the largest television advertising network on inter-city and airport express buses in China.  Defendants Zheng Cheng and Jacky Wai Kei Lam were both officers of CCME during the Class Period.  Cheng was the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of CCME.  Cheng is also founder of Hong Kong Mandefu Holding Limited ("Hong Kong Mandefu"), a wholly-owned CCME subsidiary, and the largest individual shareholder of CCME. Lam was the Chief Financial Officer ("CFO") of CCME during the Class Period.  Lam resigned as CFO on March 13, 2011.[2]

3.   <u>TM Defendants</u>

Defendant Theodore Green is the former Chairman of the Board, co-CEO and interim CFO of TM Entertainment and Media, Inc. ("TM"), CCME's predecessor corporation. Defendant Malcolm Bird is the former co-CEO of TM.

4.   <u>Deloitte Defendants</u>

Defendant DTT HK is a Hong Kong entity that is a member firm of Defendant DTTL.  DTT HK provides audit, accounting, and other financial consulting services to its

---

[2] Plaintiffs have not yet effected service on defendants Cheng or Lam.

clients.   DTT HK served as CCME's independent auditor from December 4, 2009 to March 11, 2011, when it resigned.

Defendant DTTL is a private company based in the United Kingdom and is the parent company of DTT HK.

Defendant Deloitte U.S. is a Delaware corporation with its headquarters in the United States and is a member firm of DTTL.

### 5.   Defendant A.J. Robbins

Defendant A.J. Robbins is a professional corporation with its primary place of business in Colorado.   Beginning in January 2009, A.J. Robbins was engaged by Hong Kong Mandefu to audit its consolidated financial statements. Following the acquisition of Hong Kong Mandefu by TM on October 15, 2009, A.J. Robbins served as the independent auditor of CCME until December 4, 2009.

### B.   FACTUAL ALLEGATIONS

On October 17, 2007, TM had its initial public offering of stock ("IPO").   In the accompanying prospectus, TM described itself as a newly-formed "blank check" company organized for the purpose of effecting a merger or other business combination with a "domestic or foreign operating business in the entertainment, media, digital or communications industries."   Am. Compl. ¶ 53.   The prospectus provided that if TM was unable to consummate a

business combination by October 17, 2009, its corporate existence would cease by operation of law.

In January 2009, TM signed a non-binding letter of intent to acquire Hong Kong Mandefu, a privately-owned company based in the People's Republic of China. Hong Kong Mandefu, through contractual arrangements with Fujian Fenzhong Media Co. Ltd. ("Fujian Fenzhong"), an entity in which Cheng had a majority ownership interest, purported to operate "the largest television advertising network on inter-city buses in China." Am. Compl. ¶ 56.

TM sought to acquire Hong Kong Mandefu by means of a transaction called a "reverse merger." In a reverse merger, a private operating company seeking to trade or sell shares in public equity markets, in this case Hong Kong Mandefu, is acquired by an already-registered publicly-traded shell company, in this case TM. The private operating company then assumes control of the already-registered publicly-traded shell company, allowing the private operating company to quickly become publicly traded yet bypass the rigorous examination process that the Securities and Exchange Commission's ("SEC") Division of Corporate Finance normally performs on registration statements submitted by private operating companies for an IPO.

On September 30, 2009, TM's Board of Directors, including Green and Bird, approved an amended Share Exchange Agreement between Hong Kong Mandefu and TM.

On October 5, 2009, TM filed a proxy statement (the "2009 Proxy Statement") on Schedule 14A with the SEC regarding its proposed acquisition of Hong Kong Mandefu. The 2009 Proxy Statement, signed by Green in his capacity as Chairman of the Board, co-CEO and interim CFO of TM, disclosed that TM's Board of Directors, including Green and Bird, recommended that shareholders approve the reverse merger transaction. The 2009 Proxy Statement described Hong Kong Mandefu as having the "largest television advertising network on inter-city express buses in China," with a network of 16,000 inter-city buses. Am. Compl. ¶ 60. The 2009 Proxy Statement also included Hong Kong Mandefu's reported financial results for the years ended December 31, 2008, 2007, and 2006. The 2009 Proxy Statement disclosed that this financial information had been audited by A.J. Robbins, Hong Kong Mandefu's independent auditor, and provided to TM by A.J. Robbins on February 27, 2009.

Following approval of the reverse merger by shareholders on October 15, 2009, Hong Kong Mandefu assumed control of TM, which was renamed China MediaExpress

Holdings, Inc.  Upon completion of the reverse merger transaction, the approximately 33.4 million shares of CCME were owned by Cheng (13,266,684 shares), Green (2,428,000), Bird (648,000), and a variety of other public shareholders.

On December 4, 2009, CCME engaged DTT HK to replace A.J. Robbins as its independent auditor and to render audit opinions upon CCME's 2009 financial statements.  On March 23, 2010, CCME published a press release, announcing its 2009 fourth quarter and annual financial results.  The press release reported outstanding financial results and touted the large and growing network of advertisers using CCME.  CCME's shares jumped $2.26 on the reported good news to close at $14.54, an 18.4% increase from the previous day's closing price.

On March 31, 2010, CCME filed its Form 10-K annual report for the year ended December 31, 2009 (the "2009 Form 10-K Annual Report") with the SEC, which contained the same financial information that was previously disclosed in the March 23, 2010 press release.  The 2009 Form 10-K Annual Report contained an audit report dated March 30, 2010 that was prepared by DTT HK (the "2009 DTT HK Audit Report").  The 2009 DTT HK Audit Report stated that DTT HK had audited the consolidated balance sheet of CCME and its subsidiaries as of December 31, 2009 and had concluded that CCME's

reported financial statements "present fairly, in all material respects, the financial position of [CCME and its subsidiaries] as of December 31, 2009, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America [("GAAP")]." Am. Compl. ¶ 71. The 2009 Form 10-K Annual Report also contained an audit report dated February 7, 2009, prepared by A.J. Robbins (the "2009 A.J. Robbins Audit Report"). The 2009 A.J. Robbins Audit Report stated that A.J. Robbins had audited the consolidated balance sheet of CCME and its subsidiaries as of December 31, 2008, and the related consolidated statements and cash flows for each of the years ended December 31, 2008 and 2007. The 2009 A.J. Robbins Audit Report concluded that these reported financial results presented fairly, in all material respects, the financial position of the company and the results of its operations and its cash flows, in conformity with GAAP. The 2009 Form 10-K Annual Report also contained certifications signed by Cheng and Lam under Sarbanes-Oxley § 302. See Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 302, 116 Stat. 745, 777-78 (2002) (codified at 15 U.S.C. § 7241).

On May 14, 2010, CCME filed a Form 10-Q with the SEC for the first quarter of 2010, signed and certified by Cheng, and announced in a press release "strong" first quarter financial results. Am. Compl. ¶ 73. On August 13, 2010, CCME filed a Form 10-Q for the second quarter, signed and certified by Cheng, and announced in a press release "record" financial results. Id. ¶ 77. On November 9, 2010, CCME filed a Form 10-Q for the third quarter, signed and certified by Cheng. One day earlier, CCME had announced strong third quarter financial results. As CCME continued to announce outstanding financial results, share prices continued to rise from less than $8.00 per share prior to the Class Period up to a high of $22.81 per share on January 27, 2011.

On January 31, 2011, Citron Research ("Citron") published an analyst report (the "Citron Report") questioning multiple aspects of CCME's business operations and accounting practices. Citron stated that it had "come across a plethora of information pointing to CCME being a fraud." Am. Compl. ¶ 82. In its independent investigation, Citron found that there was "not one article written on [CCME's] operating business" and that there was "a vacuum of 'local media coverage of [CCME].'" Id. Compared to the "plethora of local media coverage" of the

9

three principal public media advertising operators in China, Citron stated that it was problematic that "No One in China Has Ever Heard of [CCME]." Id. Citron pointed out that several recent articles and reports had been prepared on the inter-city bus advertising industry in China, but each had failed to mention CCME, despite discussing other major industry players. Further, Citron noted that CCME's website was missing key information such as rate cards and a list of business partners, in contrast to the websites of other companies in the industry.

Citron also questioned CCME's representation that it had become the "sole strategic partner" for "an entity affiliated with the Ministry of Transport," concluding that the entity with which CCME purported to work, Transport Television Audio Video Center ("TTAVC"), was in fact a government-affiliated production company with "no authority over directing local bus advertising." Id. On its website, TTAVC also failed to include CCME on a list of companies it worked with, according to Citron.

The Citron Report found CCME's lack of substantial competitor coverage equally alarming: "Not only have the mainstream analysts and local medial ignored CCME, but none of the other Chinese advertising companies list CCME as a competitor in their SEC filings." Id. Citron concluded

10

that "if you believe that the company operations are truly reflected, or even close to their stated financial disclosures, th[en] you must go to Taco Bell for some filet mignon." Id.

Following the publication of the Citron Report on January 31, 2011, CCME's stock declined 14%, closing at $17.84 per share. On February 1, 2011, CCME issued a press release in which it disagreed with the views expressed by Citron and encouraged investors to rely on CCME's public reports filed with the SEC.

On February 3, 2011, just two days later, Muddy Waters Research ("Muddy Waters") published a 25-page report on CCME (the "Muddy Waters Report"), questioning its business model and accounting practices and highlighting multiple signs of fraud. Muddy Waters alleged that CCME was engaged in a "massive 'pump and dump' scheme," in which it was "significantly inflating its revenue and earnings in order to pay management earn-outs and inflate the stock price so insiders can sell." Id. ¶ 85. As evidence, Muddy Waters highlighted major discrepancies in CCME's reported business model and Muddy Waters's independent findings.

Specifically, Muddy Waters estimated, based on its independent investigation, that CCME had overstated its 2009 revenue by over 464%, reporting revenue of $95.9

million when in reality it had earned no more than $17 million. Muddy Waters further concluded that CCME had materially overstated its bus fleet, noting that CCME had reported to investors that it had over 27,200 buses in its network, but had separately told advertisers that it only had 12,565 buses. Muddy Waters also stated that it had surveyed over fifty CCME buses and found that "over half of CCME's network buses do not actually play CCME content." Id. Muddy Waters discovered that CCME similarly misrepresented its relationships with advertisers. For example, Muddy Waters reported that, while CCME purports to have created an online shopping platform which has an agreement with Apple, Inc. ("Apple") or one its distributors, Apple has denied this claim. Muddy Waters also questioned CCME's industry presence, reporting that "[n]one of the major media buyers with whom we spoke — including several who represent CCME's purported customers — had even heard of CCME." Id.

Muddy Waters concluded that CCME was engaged in a massive fraud, the purpose of which was to "generate earn-outs for management, and to increase the market value [of] their stock so they can sell it." Id. Muddy Waters noted that "[a]n institutional investor informed us that CCME management was quite interested in selling him

approximately $50 million of their shares" and that, in
October 2010, "a party closely connected to management sold
nine million dollars of stock." Id.

Following the publication of the Muddy Waters Report
on February 3, 2011, CCME's stock declined $5.52 per share
from an initial value of $16.61 to close at $11.09, a drop
of more than 33%. Four days later, on February 7, 2011,
Cheng posted a letter to shareholders on CCME's website,
denying the allegation that CCME was a fraud or that
revenue was exaggerated. Cheng pointed out that CCME's
"revenues and cash position have been audited by reputable
and well-known auditors who have confirmed both." Id.
¶ 87. But not for long.

On March 3, 2011, DTT HK sent a letter to CCME's Board
of Directors and its Audit Committee that outlined enormous
signs of fraud that DTT HK had encountered during its audit
of CCME's 2010 financial statements.

For example, DTT HK encountered significant "red
flags" when it attempted to confirm Fujian Fenzhong's
clients and bus operators. DTT HK discovered that three of
Fujian Fenzhong's top ten customers did "not appear to have
a proper legal status." Id. ¶ 131. DTT HK encountered
further difficulties when it attempted to conduct site
visits of Fujian Fenzhong's clients and bus operators,

finding that "the reported addresses . . . [were] occupied by other companies" or that the companies did "not seem to exist in that vicinity." Id. ¶ 132. Tellingly, although DTT HK did receive replies from Fujian Fenzhong's various bus operators and clients when DTT HK mailed them confirmation letters, it found that "replies from different customers and bus operators appear to have been sent back . . . together. Replies from two customers . . . in Fuzhou were mailed at the same post office on the same day at the same time and processed by the same staff. . . . Our record indicates that there is no apparent relationship between these companies." Id.

DTT HK encountered further possible signs of fraud when it sought to confirm Fujian Fenzhong's advertising content and bus fleet. DTT HK attempted to obtain corroborating evidence for each step of the production process, such as original DVDs from content providers, but was rebuffed. DTT HK was provided only one advertising schedule and one advertising program for Tianjin in December 2010. DTT HK's review of Fujian Fenzhong's bus records raised additional "red flags." It found that a cursory review of the license plate information "shows that some license plates have been double counted both within one bus operator and also double counted across different

14

bus operators . . . .   As a result, approximately 1,330 buses were over counted."  Id. ¶ 143.

DTT HK also encountered possible signs of fraud in attempting to confirm CCME's reported financial information.  First, DTT HK discovered "huge differences" in the financial information reported by Fujian Across Express Information Technology Co., Ltd. ("Fujian Express"), a wholly-owned subsidiary of CCME through which all or most of its revenue was produced, to the SEC and the financial information reported to the Chinese Administration of Industry and Commerce ("SAIC").  Id. ¶ 136.  Second, DTT HK's site visits to the banks where Fujian Fenzhong held accounts were marked with possible signs of fraud.  On a visit to Xiamen International Bank Fuzhou, DTT HK investigators were met by a company employee after normal business hours and led through a side entrance.  The company employee refused to provide DTT HK investigators his full name or his business card and produced bank transaction details printed on "plain A4 papers that do not contain the bank's logo or letterhead." Am. Compl., Ex. A at 7.  DTT HK documented these and other possible signs of fraud in its March 3, 2011 letter to CCME's Board of Directors and its Audit Committee.

15

On March 11, 2011, DTT HK resigned as CCME's auditor, stating that "no tangible progress" had been made with respect to the issues raised in its letter of March 3, 2011. Id. ¶ 88. It further informed CCME that "it was no longer able to rely on the representations of management and that it had lost confidence in the commitment of the Board and the Audit Committee to good governance and reliable financial reporting." Id. That same day, the NASDAQ suspended trading in CCME shares.

On March 12, 2011, Seeking Alpha published an article titled "The End of CCME's Fairy Tale." The article documented the author's visit to CCME's corporate headquarters in Hong Kong. The author observed that "during the middle of the work hours, no one was working," instead "[i]ts workforce . . . plays cards and sleeps in the middle of the day." Id. ¶ 91. The author concluded that CCME was "a big fraud" and a "Potemkin company." Id.

Shortly thereafter, Lam, CCME's CFO, resigned on March 13, 2011. On March 14, 2011, CCME issued a press release announcing that both DTT HK and Lam had formally resigned. As a result, CCME announced that the reporting of its 2010 year-end results and 10-K filing would be delayed and it would request the suspension of trading of its stock on the NASDAQ.

16

Two days later, on March 16, 2011, Dorothy Dong ("Dong"), a member of CCME's Board of Directors resigned, citing concerns with the "conduct of CCME's management" and "irregularities concerning the bank account balances for CCME's PRC subsidiaries." Id. ¶¶ 4, 94.

In a Form 8-K/A report filed with the SEC on March 31, 2011, CCME disclosed that DTT HK had disclaimed and withdrawn the 2009 DTT HK Audit Report.

Approximately one week later, Marco Kung ("Kung"), a member of CCME's Board of Directors and Chairman of its Audit Committee, resigned, citing an inadequate response by Cheng to resolutions passed by the Board of Directors in March 2011. This left CCME without the requisite number of independent directors required by NASDAQ regulations.

On May 2, 2011, CCME announced that it had retained DLA Piper to "assist in [the] investigation of concerns raised by [DTT HK] when it resigned as [CCME's] registered independent accounting firm." Id. ¶ 97.

CCME's shares resumed trading on May 19, 2011 and their value immediately plummeted from $11.88 to just $2.16 per share, a loss of $9.72 per share or 81.8%. As of October 20, 2011, CCME shares were trading at just $0.17 per share.

Plaintiffs allege that Defendants made material misstatements in both filings with the SEC and in contemporaneous press releases, including:  (a) the 2009 Proxy Statement; (b) the March 23, 2010 press release; (c) the 2009 Form 10-K Annual Report; (d) the 2009 DTT HK Audit Report; (e) the 2009 A.J. Robbins Audit Report; (f) the May 14, 2010 10-Q and accompanying press release; (g) the August 13, 2010 Form 10-Q and accompanying press release; and (h) the November 9, 2010 Form 10-Q and accompanying press release.[3]

Plaintiffs allege that the 2009 Proxy Statement was false and misleading in that it materially overstated the reported financial results for Hong Kong Mandefu and misrepresented the size of Hong Kong Mandefu's advertising network, falsely stating that it had the "largest television advertising network on inter-city express buses in China" with 16,000 inter-city buses.  Id. ¶ 60.

Plaintiffs allege that the 2009 Form 10-K Annual Report and the corresponding March 23, 2010 press release

---

[3] Plaintiffs attribute the alleged material misstatements in the 2009 Proxy Statement to defendants Green and Bird.  Plaintiffs attribute the alleged material misstatements in the March 23, 2010 press release, the 2009 Form 10-K Annual Report, the May 14, 2010 Form 10-Q and accompanying press release, the August 13, 2010 Form 10-Q and accompanying press release, and the November 9, 2010 Form 10-Q and accompanying press release to defendants CCME, Cheng, and Lam.  Plaintiffs attribute the alleged material misstatements in the 2009 A.J. Robbins Audit Report to defendant A.J. Robbins.  Plaintiffs attribute the alleged material misstatements in the 2009 DTT HK Audit Report to defendants DTT HK, DTTL, and Deloitte U.S.

were false and misleading in that they materially overstated CCME's reported financial results, falsely asserted that CCME's reported financial results were prepared in compliance with GAAP and SEC regulations, and significantly exaggerated the number of buses in CCME's advertising network as well as the scope of its geographic footprint. According to Plaintiffs, the 2009 Form 10-K Annual Report also falsely represented that CCME's client pool included certain significant advertisers, such as Coca Cola and Procter & Gamble, when in fact it did not. Plaintiffs further assert that the 2009 Form 10-K Annual Report stated that CCME's financial controls were effective when in fact they were entirely lacking. Plaintiffs also allege that the Sarbanes-Oxley certifications signed by Cheng and Lam included in the 2009 Form 10-K Annual Report were false and misleading, because Cheng and Lam were aware that the 2009 Form 10-K Annual Report contained untrue statements of material facts and did not fairly represent the financial condition of CCME.

Plaintiffs allege that the May 14, 2010 Form 10-Q, the August 13, 2010 Form 10-Q, the November 9, 2010 Form 10-Q, and their accompanying press releases also contained false and misleading financial information that was not prepared in compliance with GAAP. Plaintiffs further state that the

Form 10-Qs and the press releases misrepresented the size of CCME's advertising network and falsely characterized certain advertisers as clients of CCME.

Finally, Plaintiffs assert that the 2009 A.J. Robbins Audit Report and the 2009 DTT HK Audit Report were false and misleading because the reported financial results of CCME did not in fact comply with GAAP as the audit reports asserted. Further, Plaintiffs allege that DTT HK and A.J. Robbins did not perform their audit procedures in compliance with Generally Accepted Auditing Standards ("GAAS").

C.   PROCEDURAL HISTORY

Plaintiffs commenced the first suit affiliated with this action on February 4, 2011. By Order dated April 4, 2011 and Order dated April 15, 2011, the Court consolidated four separate actions against Defendants. By Order dated June 6, 2011, the Court appointed Irrevocable Trust FBO Lansing Davis and the Davis Partnership LP as Lead Plaintiffs and approved the selection of Hagens Berman Sobol Shapiro LLP as Lead Counsel. Plaintiffs filed an amended and consolidated complaint on October 25, 2011. These motions followed.

## II.   **LEGAL STANDARD**

A.   MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. The task of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted). A court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

B.  SECTION 10(b) AND RULE 10b-5 PLEADING STANDARDS

To adequately state a cause of action for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5, a

plaintiff must assert facts showing that "the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (quoting San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996)). In an action under § 10(b) and Rule 10b-5, plaintiffs must allege a state of mind evidencing "'an intent to deceive, manipulate or defraud.'" Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).

Securities fraud actions are also subject to the heightened pleading requirements of the PSLRA as well as those of Rule 9(b). See Kalnit, 264 F.3d at 138; see also Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000).

1.   False or Misleading Statement or Omission

To satisfy the pleading standards of Rule 9(b), allegations of fraud must be pled with particularity. Specifically, the complaint must: (1) specify the statements that the plaintiff alleges were fraudulent, (2) identify the speaker, (3) indicate when and where the statements were made, and (4) explain why the statements were fraudulent. See Novak, 216 F.3d at 306. The PSLRA

22

imposes similar heightened pleading standards when a plaintiff alleges a material misrepresentation or omission. See Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004); 15 U.S.C. § 78u-4(b)(1).

### 2. Scienter

In order to plead scienter adequately under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Pursuant to the PSLRA, a plaintiff can allege sufficient facts to support a "strong inference" of the requisite state of mind by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

Allegations of motive and opportunity must allege that defendants "benefitted in a concrete and personal way from the purported fraud." South Cherry St. LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009) (quoting Novak, 216 F.3d at 311). Motives that can be ascribed to "virtually all corporate insiders," or "any publicly owned, for profit endeavor" are not sufficient to support a claim of fraud. Kalnit, 264 F.3d at 138-39; Chill v. General

Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996).   Examples of general motives which fail to support a strong inference of scienter include "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation."   Kalnit, 264 F.3d at 139.   In order to plead opportunity, a plaintiff must "show that the individual defendants possessed 'the means and likely prospect of achieving concrete benefits by the means alleged.'"   In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 297 (S.D.N.Y. 2008) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)); see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

Where plaintiffs fail to allege scienter through motive and opportunity, the securities fraud claim may still be sufficiently stated by allegations demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness," Kalnit, 264 F.3d at 138-39 (internal citations omitted), but "the strength of the circumstantial allegations must be correspondingly greater," id. at 142.

24

To state a claim based on recklessness, a plaintiff must allege "conscious recklessness" or "a state of mind approximating actual intent, and not merely a heightened form of negligence." South Cherry Street, 573 F.3d at 109. (internal quotation marks and emphasis omitted). To satisfy this standard, a plaintiff must allege conduct which at a minimum, "is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks omitted); see also Chill, 101 F.3d at 269 (noting that, in some cases, "[a]n egregious refusal to see the obvious, or to investigate the doubtful" may give rise to an inference of recklessness) (internal quotations omitted). Sufficient evidence of recklessness exists if the factual allegations demonstrate that defendants (1) possessed knowledge of facts or access to information contradicting their public statements, or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." Novak, 216 F.3d at 308.

      To summarize:

> the required strong inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 194 (2d Cir. 2008) (internal citation omitted).

In addition, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A strong inference of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.

### 3. Causation

Lastly, to adequately state a claim for securities fraud, a plaintiff must plead both transaction causation and loss causation. See ATSI Commc'ns, 493 F.3d at 106. Transaction causation is similar to reliance and requires a showing that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." Lentell v. Merrill

Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted).  Loss causation requires a link between the alleged misconduct and the ultimate economic harm suffered by the plaintiff, and a plaintiff must claim that "the loss [was] foreseeable and that the loss [was] caused by the materialization of the concealed risk."  Id. at 173 (emphasis in original).  In their various motions to dismiss, no defendant in this action has argued that Plaintiffs have failed to adequately allege loss causation and this element will, therefore, not be addressed further.

C.   SECTION 20(a) PLEADING STANDARD

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Liability for § 20(a) violations is derivative of liability for § 10(b) violations.  See Securities Exchange Comm. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996), cert. denied, 118 S. Ct. 57 (1997).  In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) "a

primary violation by the controlled person"; (2) "control of the primary violator by the targeted defendant"; and (3) that the "controlling person was in some meaningful sense a culpable participant in the controlled person's fraud."[4] ATSI Commc'ns, 493 F.3d at 108 (internal citation omitted).

To establish the second element of control over the primary violator, a plaintiff must show that the defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2; see also First Jersey, 101 F.3d at 1472-73. "To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 1881514, *3 (S.D.N.Y. Aug. 5, 2005) (internal quotation omitted); Cohen v.

---

[4] Plaintiffs cite to several decisions for the proposition that culpable participation is not a required element for pleading a prima facie § 20(a) claim. See Pls.' Omnibus Mem. of Law in Opp'n, 67 & n.60. However, the Second Circuit has repeatedly held that a plaintiff must allege that the controlling person culpably participated in the underlying fraudulent transactions to satisfy the pleading requirements of § 20(a). See, e.g., Solow v. Citigroup, Inc., No. 12-2499-cv, 2013 WL 149902, at *2 (2d Cir. Jan. 15, 2013); see also ATSI Commc'ns, 493 F.3d at 108; First Jersey, 101 F.3d at 1472. Further, notwithstanding the cases cited by Plaintiffs, this Court also has repeatedly required plaintiffs to allege "culpable participation" in bringing a § 20(a) claim. See, e.g., Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 413 (S.D.N.Y. 2010); Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 618 (S.D.N.Y. 2008), aff'd, 347 F. App'x 665 (2d Cir. 2009); In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 660-61 (S.D.N.Y. 2007).

Stevanovich, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010). Moreover, a § 20(a) defendant "must not only have actual control over the primary violator, but have 'actual control over the transaction in question.'" In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) ("Alstom I") (emphasis in original) (quoting In re Global Crossing, 2005 WL 1875445, at *3); see also Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 425 (S.D.N.Y. 2010).

Because fraud is not an essential element of a § 20(a) claim, Plaintiffs need not plead control in accordance with the particularity required under Rule 9(b). See In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 170-71 (S.D.N.Y. 2008); Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 235 (S.D.N.Y. 2008). Instead, control may be pled in accordance with the notice pleading standard prescribed in Federal Rule of Civil Procedure 8(a) ("Rule 8(a)"). See In re Alstom SA, 454 F. Supp. 2d 187, 210 (S.D.N.Y. 2006). Where Rule 8(a)'s pleading standard governs, dismissal is improper as long as the complaint furnishes adequate notice of the basis of the plaintiff's claim and "relief could be granted under [some] set of facts consistent with the allegations." In re Global Crossing, No. 02 Civ. 910, 2005 WL 2990646, *8 (S.D.N.Y. Nov. 7, 2005) (internal quotation marks omitted).

However, the heightened pleading standards of the PSLRA apply with respect to the third-prong of a § 20(a) claim, which requires plaintiffs to allege facts demonstrating that the defendant was a culpable participant. See Alstom I, 406 F. Supp. 2d at 491 (quoting 15 U.S.C. § 78u-4(b)(2)). In order to plead culpable participation then, Plaintiffs must plead with particularity "facts giving rise to a strong inference that the defendant acted with the requisite state of mind," i.e., scienter. Id.; see also In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 1907005, *12 (S.D.N.Y. Aug. 8, 2005) (requiring that § 20(a) plaintiffs allege with particularity that the controlling person "knew or should have known" that the primary violator was engaging in fraudulent conduct). In order to withstand a motion to dismiss, a § 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness. See In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 414-17 (S.D.N.Y. 2001) ("This Court is persuaded that recklessness is the appropriate minimum standard of culpability that plaintiffs must plead under § 20(a)."); Cohen, 722 F. Supp. 2d at 435.

Finally, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (internal quotation marks omitted).

### III.    DISCUSSION

A.    SECTION 10(b) AND RULE 10b-5 CLAIMS

    a.    Defendant CCME

CCME argues that Plaintiffs fail to sufficiently plead (1) false or misleading statements or omissions and (2) scienter. For the reasons discussed below, the Court finds CCME's arguments unavailing. Accordingly, CCME's motion to dismiss is denied.

    i.    False or Misleading Statements or Omissions

Plaintiffs allege that CCME made false or misleading statements in the March 23, 2010 press release, the 2009 Form 10-K Annual Report, the May 14, 2010 Form 10-Q and accompanying press release, the August 13, 2010 Form 10-Q and accompanying press release, and the November 9, 2010 Form 10-Q and accompanying press release. As evidence thereof, Plaintiffs cite to the Citron Report, the Muddy Waters Report, the March 3, 2011 DTT HK letter, the resignation of DTT HK as CCME's independent auditor, the March 12, 2011 Seeking Alpha article, the subsequent

31

resignations of Lam, Dong, and Kung, and DTT HK's withdrawal of the 2009 DTT HK Audit Report.

As an initial matter, CCME argues that Citron and Muddy Waters constitute functionally confidential witnesses and the allegations contained in their respective reports must, therefore, be examined under the heightened particularity standards for confidential sources applied under the PSLRA. See CCME's Mem. of Law in Support, 13-14, 17. CCME cites to Katz v. China Century Dragon Media, Inc., No. LA CV-1102769, 2011 WL 6047093 (C.D. Cal. Nov. 30, 2011) and Gary Redwen v. Sino Clean Energy, Inc., No. CV 11-3936, slip op. (C.D. Cal. Jan. 30, 2012) for the proposition that reliance "on the unsubstantiated and uncorroborated allegations of short sellers" does not satisfy the pleading requirements of Rule 9(b), let alone those of the PSLRA. CCME's Mem. of Law in Support, 17-18. However, CCME's reliance on these cases is entirely misplaced. Neither China Century nor Redwen discussed whether allegations contained in short-seller reports were subject to the particularity standards applied to confidential sources under Rule 9(b) or the PSLRA.[5] The

---

[5] China Century and Redwen addressed an entirely different proposition, holding that the respective plaintiffs had failed to meet the heightened pleading standard of Rule 9(b) in alleging that the financial information of the respective defendants filed with SEC was false where plaintiffs had pled that the financial information filed

32

majority of courts that have addressed the issue have held that a short-seller report, "such as the Muddy Waters Report . . . 'does not implicate the same skepticism as a "traditional" anonymous source.'"   Ho v. Duoyuan Global Water, Inc., No. 10 Civ. 7233, 2012 WL 3647043, *8 (S.D.N.Y. Aug. 24, 2012) (quoting In re China Educ. Alliance, Inc. Sec. Litig., No. CV 10-9239, 2011 WL 4978483, *4 (C.D. Cal. Oct. 11, 2011)).   "The rationale is that a ruling that finds financial analysts' reports as suspect would mean that a plaintiff would never be able to rely on an unsigned analyst's report to support a securities fraud allegation." Ho, 2012 WL 3647043, at *8 (citing China Educ., 2011 WL 4978483, at *4).

CCME protests that the Citron Report and the Muddy Waters Report "are inherently unreliable," because Citron and Muddy Waters "may hold short positions in CCME's stock." CCME's Mem. of Law in Support, 16.  However, this contention has been repeatedly rejected in prior cases. The truth of the Citron Report and the Muddy Waters report is "'a factual dispute not appropriate for resolution at

---

with SEC was different from that filed with the SAIC but had not alleged why "the SEC numbers, not the SAIC numbers, [were] false." China Century, 2011 WL 6047093, at *4; see also Redwen, slip op. at 4-5. Indeed, the only reference to the relevance of allegations contained in short-seller reports occurs in a subsequent opinion issued in the Redwen matter, where the court denied defendant's motion to strike the short-seller allegations.  See Redwen v. Sino Clean Energy, Inc., No. CV 11-3936, 2012 WL 19911762, *5 (C.D. Cal. June 4, 2012).

this stage.'" China Educ., 2011 WL 4978483, at *4 (quoting Henning v. Orient Paper, Inc., No. CV 10-5887, 2011 WL 2909322, *4 (C.D. Cal. July 20, 2011)); see also Ho, 2012 WL 3647043, at *8 ("Even though Defendants claim that Muddy Waters is a biased party, and that it openly admits the possible inaccuracy of the Report, the reliability of the report is a question of fact.") (internal quotations omitted); but see In re Longtop Fin. Techs. Ltd. Sec. Litig., No. 11 Civ. 3658, 2012 WL 5512176, *8-9 (S.D.N.Y. Nov. 14, 2012). Therefore, at this stage of the proceedings, the Court must accept the factual allegations contained in the Citron Report and the Muddy Waters Report as sufficiently reliable as a factual source for Plaintiffs' allegations. See Chambers, 282 F.3d at 152; Bernstein v. Seeman, 601 F. Supp. 2d 555, 556 (S.D.N.Y. 2009) ("[A] motion to dismiss is not the proper stage at which to resolve factual disputes.").

Secondly, CCME argues that Plaintiffs have failed to allege that the financial information filed with the SEC is false, citing to cases which stand for the proposition that "a purported inconsistency between Chinese regulatory filings and SEC filings is not sufficient to plead falsity." Defs' Omnibus Reply Mem. of Law, 3-5 (citing China Century, 2011 WL 6047093, at *4 ("Although Plaintiffs

plead that the SAIC numbers differ from the SEC numbers, this is merely consistent with the SEC numbers being false, and does not suffice to make that claim plausible.") (internal quotations omitted)); Redwen, slip op. at 4-5; Arfa v. Mecox Lane Ltd., No. 10 Civ. 9053, 2012 WL 697155, *12 (S.D.N.Y. Mar. 5, 2012).

Plaintiffs respond by citing case law standing for the opposite proposition. See Pls.' Omnibus Mem. of Law in Opp'n, 23-24, n.19 (citing Scott v. ZST Digital Networks, Inc., No. CV 11-03531, 2012 WL 538279, *4 (C.D. Cal. Feb. 14, 2012) ("[The Court] concludes that the discrepancies between the two public filings constitute sufficient pleading of both falsity and scienter, and [ ] the issue of which set of reports is accurate is not properly resolved on a motion to dismiss."); China Educ., 2011 WL 4978483, at *6; Dean v. China Agritech, Inc., No. CV 11-01331, 2011 WL 5148598, *3 (C.D. Cal. Oct. 27, 2011) ("When compared to the Chinese filings, the U.S. 10-Q and 10-K filings reveal 2008 and 2009 revenues inflated by approximately 1,444% and 900% respectively. . . . Based on these allegations the Court finds that Plaintiffs have adequately pleaded a false statement.")); see also Ho, 2012 WL 3647043, at *13 ("Although Plaintiffs have not proven that the SEC filings were in fact false, the extreme discrepancies alleged in

35

the financial reports, coupled with the logical inference
that can be made regarding these figures, at this stage of
the proceedings, sufficiently alleges that the statements
made in the SEC filings are false. . . . Based on the fact
alleged that [the defendant] had more negative disclosures
in China and positive disclosures with the SEC, the
reasonable conclusion is that there is a fraudulent motive
to overstate the numbers yet no fraudulent motive to
understate them.").

In the present case, as in Dean and Ho, Plaintiffs
have alleged that Fujian Express filed drastically
different financial statements with the SEC and the SAIC
for 2009.  With the SEC, Fujian Express reported total
assets of RMB 521,409,081.70; with the SAIC, Fujian Express
reported only RMB 4,400,343.18.  With the SEC, Fujian
Express reported total liabilities of RMB 44,809,524.16;
with the SAIC, Fujian Express reported only RMB 221,146.78.
With the SEC, Fujian Express reported an ending cash
balance of RMB 747,964.78; with the SAIC, Fujian Express
reported only RMB 39,100.97.  With the SEC, Fujian Express
reported 2009 revenue of RMB 434,040,421.85; with the SAIC,
Fujian Express reported 2009 revenue was zero.

These discrepancies provide an adequate basis for
Plaintiffs' claim.  The Court is persuaded that "the

36

reasonable conclusion is that there is a fraudulent motive to overstate the numbers yet no fraudulent motive to understate them." <u>Ho</u>, 2012 WL 3647043, at *13. Defendants' arguments to the contrary are untenable. In essence, Defendants conflate pleading and proof at this stage of the litigation. In the complaint, Plaintiffs are not required to "prove" the falsity of the alleged misrepresentations, as Defendants' theory would suggest. It is sufficient for them to point to circumstances that, drawing reasonable inferences in their favor, would render their claims plausible. Reporting discrepancies of the large magnitude of those alleged by Plaintiffs raise sufficient circumstantial grounds from which a court could reasonably infer that one or the other number was known by to be false and was misrepresented by CCME.

But even if the alleged filing discrepancies were insufficient to allege falsity, Plaintiffs have supplemented these discrepancy allegations with a multitude of additional allegations that, viewed holistically, adequately allege that CCME substantially overstated its financial position in its filings with the SEC and in its public statements, as documented in the Citron Report, the Muddy Waters Report, the March 3, 2011 DTT HK letter, the resignation of DTT HK as CCME's independent auditor, the

37

March 12, 2011 Seeking Alpha article, the subsequent resignations of Lam, Dong, and Kung, and DTT HK's withdrawal of the 2009 DTT HK Audit Report.

Accepting all well-pleaded assertions of fact in the Amended Complaint as true, see Iqbal, 129 S. Ct. at 1949, and drawing all reasonable inferences and resolving all doubts in favor of the non-moving party, see Kaluczky v. City of White Plains, 57 F.3d 202, 206 (2d Cir. 1995), the Court concludes that, under the standards of Rule 9(b) and the PSLRA, Plaintiffs have adequately pled that CCME made false or misleading statements in the March 23, 2010 press release, the 2009 Form 10-K Annual Report, the May 14, 2010 Form 10-Q and accompanying press release, the August 13, 2010 Form 10-Q and accompanying press release, and the November 9, 2010 Form 10-Q and accompanying press release, by (1) specifying the statement that Plaintiffs allege was fraudulent, (2) identifying the speaker, (3) indicating when and where the statement was made, and (4) explaining why the statement was fraudulent. See Novak, 216 F.3d at 306.

    ii. Scienter

The Supreme Court has instructed courts to view scienter under the PSLRA "holistically" and deny a motion to dismiss if the inference of scienter advanced by

plaintiffs is "at least as compelling as any opposing inference one could draw from the facts alleged." Matrixx Initiatives, Inc. v. Siracusano, __ U.S. __, 131 S. Ct. 1309, 1324 (2011)(citing Tellabs, 551 U.S. at 323).

When the defendant is a corporate entity, as is the case here, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local, 531 F.3d at 195.  While the "most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant . . . it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." Id. at 195.  For example, "[s]uppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." Id. at 195-96 (internal quotations omitted).

In the present case, Plaintiffs have pled a number of factual allegations that previously have been held to constitute strong indicators of corporate scienter.  For

39

example, Plaintiffs have alleged that CCME reported drastically different income and revenue figures with the SEC and the SAIC. See China Educ., 2011 WL 4978483, at *6 (considering disparate filings in finding that plaintiffs had adequately alleged scienter); China Agritech, 2011 WL 5148598, at *4 (same). Plaintiffs have also alleged that CCME's reported financial statements violated certain principles of GAAP, resulting in the premature recognition of, and the significant overstatement of, revenues. See In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 231-32 (S.D.N.Y. 2006) ("[C]ourts have recognized that accounting manipulations involving premature revenue recognition . . . are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue.") (internal quotations omitted); Varghese v. China Shenghuo Pharm. Holdings, Inc., 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) ("[A]lthough GAAP violations do not independently sustain an inference of scienter, they may contribute to that inference. In finding that [defendants'] GAAP violations add to the inference of scienter, the Court takes into account Plaintiffs' allegations that the accounting violations caused [defendants'] 2007 income to be overstated by

40

133%.") (internal citation omitted); In re Am. Bank Note Holographics, Inc. Sec. Litig., 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000) ("That revenues were radically inflated over a period of two years, and in repeated 10-Q and 10-K filings with the SEC, is circumstantial evidence of recklessness giving rise to a strong inference of fraud.").

In addition to these financial disparities and irregularities, Plaintiffs have pled a number of "red flags" that contribute to support a reasonable finding of scienter. Plaintiffs have alleged that investigators visited CCME's facilities and found that no employees were actually working. See China Educ., 2011 WL 4978483, at *6 (finding that plaintiffs had alleged scienter where investigators visited defendant's facility "only to find it an empty building"). They have also alleged that the CFO, two board members, and the independent auditor resigned. See Varghese, 672 F. Supp. 2d at 608 (citing resignations as "contribut[ing] to a strong inference of scienter"); In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (same).

Taking into account these allegations, as well as Plaintiffs' additional allegations discussed earlier, the Court finds that Plaintiffs have raised a strong inference of scienter based on conscious disregard or recklessness

that is at least as compelling as any opposing non-fraudulent inference. See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made."); In re Am. Bank Note, 93 F. Supp. 2d at 448 ("[T]he magnitude of the accounting irregularities removes the actions from the sphere of mere corporate mismanagement to the realm of reckless behavior.").

   b.   Green and Bird

   Green and Bird move to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claims on the grounds that Plaintiffs have failed to adequately allege that: (1) they are the "makers" of the allegedly false statements contained in the 2009 Proxy Statement for § 10(b) and Rule 10b-5 purposes; (2) the statements contained in the 2009 Proxy Statement are false; and (3) they possessed the requisite scienter under § 10(b) and Rule 10b-5. Because the Court finds that Plaintiffs have not adequately alleged scienter with respect to Green and Bird, it need not address the other

42

arguments advanced.   Accordingly, Green and Bird's motion to dismiss is granted.

### i.   Scienter

### 1.   Motive & Opportunity

Plaintiffs allege that Green and Bird were motivated to make the false statements contained in the 2009 Proxy Statement, because "if the transaction with Hong Kong Mandefu did not go through, Green and Bird's approximately $17.2 million of shares in TM would become worthless." Pls.' Omnibus Mem. of Law in Opp'n, 46; see also Am. Compl. ¶¶ 53, 55.   However, courts have repeatedly held that "executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent."   In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).   "While unusual insider trading activity during the class period may permit an inference of bad faith and scienter," Plaintiffs have failed to allege that either Green or Bird traded any of their stock, let alone that such hypothetical stock sales were "unusual."   Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995). "[T]he desire to keep stock prices high to increase officer compensation" is precisely the kind of general motive that fails to support a strong inference of scienter.   Kalnit, 264 F.3d at 139.   Here, Plaintiffs cannot adequately allege

scienter as to Green and Bird by merely noting their substantial stock holdings in TM.

2. <u>Conscious Misbehavior or Recklessness</u>

Plaintiffs allege that Green and Bird, according to the 2009 Proxy Statement, conducted a due diligence review of Hong Kong Mandefu's business and operations and that Hong Kong Mandefu's misrepresentations "were so elementary and pervasive that any reasonable due diligence investigation would have easily uncovered those deceptions." Am. Compl. ¶ 121. However, nowhere in the Amended Complaint do Plaintiffs allege that Green and Bird knew that Hong Kong Mandefu's representations in the 2009 Proxy Statement were fraudulent or that they had access to information contradicting its public statements. "It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." <u>In re Sotheby's Holdings, Inc. Sec. Litig.</u>, No. 00 Civ. 1041, 2000 WL 1234601, *7 (S.D.N.Y. Aug. 31, 2000); <u>see also Novak</u>, 216 F.3d at 309.

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or

access to information contradicting their public statements. Under such statements, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Novak, 216 F.3d at 308. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Id. at 309. However, as to Green and Bird, Plaintiffs have failed to specifically identify "any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements." [6] Teamsters Local, 531 F.3d at 196.

---

[6] In their Omnibus Memorandum of Law in Opposition, Plaintiffs contend that Green and Bird knew of, but "ignored," numerous "red flags" that should have placed them on notice of Hong Kong Mandefu's fraudulent misrepresentations. See Pls.' Omnibus Mem. of Law in Opp'n, 46-47. These allegations appear nowhere in the Amended Complaint and therefore are not considered for purposes of this motion. See, e.g., Cohen v. Avande, Inc., 874 F. Supp. 2d 315, 319 n.1 (S.D.N.Y. 2012); Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (stating that a complaint may not be amended by a party's brief in opposition to a motion to dismiss); Guippone v. BH S & B Holdings LLC, 681 F. Supp. 2d 442, 446 (S.D.N.Y. 2010) (stating that pleading defects cannot be cured in a party's brief in opposition to a motion to dismiss). In addition, it is, at best, questionable whether knowledge of many of these "red flags" could even be attributed to Green and Bird, absent further specific factual allegations. For example, Fujian Express's 2009 financial information filed with the SAIC was submitted "subsequent to [DTT HK']s 2009 audit," dated March 30, 2010. Am. Compl., Ex. A at 8. Knowledge or access to these filings cannot, therefore, be attributed to Green and Bird when the 2009 Proxy Statement was issued on October 5, 2009. Along these lines, many of the other "red flags" first came to light in the Citron Report, the Muddy Waters Report, or the March 3, 2011 DTT HK letter, all issued subsequent to the 2009 Proxy Statement. Absent specific factual allegations establishing Green and Bird's

Essentially, Plaintiffs' argument boils down to the allegation that if Green and Bird had performed "any reasonable due diligence investigation," they "would have easily uncovered" the deceptions documented in subsequent reports and statements. Am. Compl. ¶ 121. However, standing alone, allegations that a defendant "would have learned the truth" if it had performed sufficient due diligence have been repeatedly rejected as insufficient to allege knowledge or conscious recklessness. See South Cherry Street, 573 F.3d at 112 (internal quotations omitted). "[A] failure to investigate does not rise above the level of negligence unless there are factual allegations which tend to establish knowledge of the alleged fraudulent acts." Griffin v. McNiff, 744 F. Supp. 1237, 1251 (S.D.N.Y. 1990), aff'd, 996 F.2d 303 (2d Cir. 1993).

Allegations that Green and Bird "should have known" that Hong Kong Mandefu's financial information was fraudulent is insufficient to plead recklessness under § 10(b) and Rule 10b-5. "[I]f recklessness means something more culpable than negligence, as it must, then an allegation that a defendant merely 'ought to have known' is not sufficient to allege recklessness." Hart v. Internet

knowledge of such "red flags" prior to issuing the 2009 Proxy Statement, they cannot form the basis for Green or Bird's scienter.

46

Wire, Inc., 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (internal citation omitted). Even if Green and Bird "'should have done more to attempt to uncover and disclose the alleged fraud, without factual allegations tending to establish knowledge of those practices . . . [their] failure [to make further inquiries does] not rise above the level of negligence, which is legally insufficient.'" Id. at 369 (quoting The Limited, Inc. v. McCrory Corp., 683 F. Supp. 387, 394 (S.D.N.Y. 1988)). Thus, "even an egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes to the facts." Id. at 368-69 (internal quotation marks omitted).

Here, Plaintiffs have not identified any documents or statements containing contradictory information that were available to Green and Bird at the time that they issued the 2009 Proxy Statement and that would have alerted Green and Bird that Hong Kong Mandefu's submitted financial information was fraudulent. Nor is their failure to conduct a more rigorous due diligence investigation sufficient grounds, in and of itself, to establish their knowledge or conscious recklessness. Absent such factual allegations, Plaintiffs' allegations of knowledge or conscious recklessness fail.

Because Plaintiffs have not established a strong inference of scienter, Green and Bird's motion to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claims is granted. The Court, however, dismisses these claims without prejudice. In the event that during the course of discovery Plaintiffs come upon sufficient evidence that could reasonably support a finding of knowledge or conscious recklessness on the part of Green or Bird in connection with the fraudulent conduct Plaintiffs allege, Plaintiffs may seek leave to replead the claims dismissed.

c.   A.J. Robbins

A.J. Robbins moves to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claim against it on the grounds that Plaintiffs have failed to plead "with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2)(A). The Court agrees. Accordingly, A.J. Robbins' motion to dismiss is granted.

i.   Scienter

The standard for pleading auditor scienter is "stringent," Varghese, 672 F. Supp. 2d at 609, and "demanding." In re Marsh & McLennan, 501 F. Supp. 2d at 488. Here Plaintiffs do not plead motive and opportunity, but allege that A.J. Robbins was reckless in failing to uncover CCME's alleged fraud. "For recklessness on the

48

part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000) (internal quotation marks omitted). Against an auditor, plaintiffs must allege that "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." In re Scottish Re Grp., 524 F. Supp. 2d at 385 (internal quotation marks omitted).

"[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." Novak, 216 F.3d at 309 (internal quotations and citations omitted); see also Anwar, 728 F. Supp. 2d at 450 ("Violations of professional auditing standards, without more, do not constitute strong circumstantial evidence of conscious recklessness."). "A

49

complaint might reach the 'no audit at all' threshold by alleging that the auditor disregarded specific 'red flags' that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." In re Tremont Sec. Law, State Law & Ins. Litig., 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010). Indeed, "[a]llegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter." In re AOL Time Warner, Inc. Sec. and "ERISA" Litig., 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004).

However, merely alleging that the auditor had access to the information by which it could have discovered the fraud is insufficient. See Rothman, 220 F.3d at 98; In re Tremont, 703 F. Supp. 2d at 370. Unseen red flags cannot be heeded. Hence courts in the Second Circuit "have consistently dismissed fraud claims against auditors . . . that have not sufficiently alleged that an auditor knew of red flags." Stephenson v. PricewaterhouseCoopers L.L.P., 768 F. Supp. 2d 562, 573 (S.D.N.Y. 2011) ("Stephenson I"); see also Stephenson v. Citco Grp. Ltd., 700 F. Supp. 2d 599, 624 (S.D.N.Y. 2010) ("Without an allegation that PWC had knowledge of [ ] red flag(s), the Complaint does not adequately allege scienter.").

In the present case, assuming that Plaintiffs have adequately pled that A.J. Robbins failed to conduct its audit in compliance with GAAS, the Court finds that Plaintiffs have nonetheless failed to allege that A.J. Robbins knew of any specific "red flags" that would have placed it on notice that CCME was engaged in fraudulent wrongdoing.

In the Amended Complaint, Plaintiffs point to CCME's "known internal control deficiencies" as the "red flag" that should have placed A.J. Robbins on notice of CCME's fraudulent misrepresentations.  Specifically, Plaintiffs point to language contained in the 2009 Form 10-K Annual Report, in which CCME stated that it "'may have difficulty'" in "'collecting financial data'" and "'preparing financial statements'" and that "'management does not expect that our disclosure controls or internal controls will prevent all error and all fraud.'"  <u>See</u> Am. Compl. ¶¶ 6, 113 (<u>quoting</u> 2009 Form 10-K Annual Report at 32, 71).  However, Plaintiffs quotations are selective, conveniently omitting CCME's preceding statements that it believes both that "it will be able to maintain sufficient internal control systems to comply with Section 404 of the Sarbanes-Oxley Act," 2009 Form 10-K Annual Report at 32, and that its "disclosure controls and internal controls

51

currently provide reasonable assurance that our desired control objectives have been met," id. at 71.[7]

Viewed holistically, this internal controls language fails to "place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." Meridian Horizon Fund, L.P. v. Tremont Group Holdings, Inc., 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010). In order to constitute "red flags" sufficient to establish scienter, a plaintiff's allegations must be "closer to 'smoking guns' than mere warning signs." Nappier v. Pricewaterhouse Coopers L.L.P., 227 F. Supp. 2d 263, 278 (D.N.J. 2002) (internal quotation marks omitted). Plaintiffs' so-called "red flag" does not satisfy this pleading requirement. "[F]lags are not red merely because the plaintiff calls them red." Stephenson I, 768 F. Supp. 2d at 574. Plaintiffs "must allege that facts which come to a defendant's attention would place a reasonable party in defendant's position on notice of wrongdoing."[8] Id.

---

[7] In addition, the 2009 A.J. Robbins Audit Report is dated February 7, 2009, more than a year before the issuance of the 2009 Form 10-K Annual Report. It is unclear, therefore, how internal controls disclosures contained in the 2009 Form 10-K Annual Report could form the basis of A.J. Robbins' scienter when it issued the 2009 A.J. Robbins Audit Report.

[8] In their Omnibus Memorandum of Law in Opposition, Plaintiffs contend A.J. Robbins knew of, but "ignor[ed]," numerous "red flags" that should have placed them on notice of Hong Kong Mandefu's fraudulent misrepresentations. See Pls.' Omnibus Mem. of Law in Opp'n, 51. These allegations appear nowhere in the Amended Complaint and therefore are

Plaintiffs' allegations boil down to the assertion that, if A.J. Robbins had performed a better audit, it would have uncovered CCME's fraud. "At most this describes negligence by [A.J. Robbins], not the recklessness approaching actual intent required by the PSLRA." In re Longtop, 2012 WL 5512176, at *7. Because Plaintiffs have not established a strong inference of scienter, A.J. Robbins' motion to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claims is granted. The Court, however, dismisses these claims without prejudice. In the event that during the course of discovery Plaintiffs come upon sufficient evidence that could reasonably support a finding of knowledge or conscious recklessness on the part of Green or Bird in connection with the fraudulent conduct Plaintiffs allege, Plaintiffs may seek leave to replead the claims dismissed.

d.   DTT HK

---

not considered for purposes of this motion. See, e.g., Cohen, 874 F. Supp. 2d at 319 n.1. In addition, it is, at best, questionable whether knowledge of many of these "red flags" could even be attributed to A.J. Robbins, absent further specific factual allegations. For example, Fujian Express's 2009 financial information filed with the SAIC was submitted "subsequent to [DTT HK']s 2009 audit," dated March 30, 2010. Am. Compl., Ex. A at 8. Knowledge or access to these filings cannot, therefore, be attributed to A.J. Robbins prior to the publication of the 2009 A.J. Robbins Audit Report. Along these lines, many of the other "red flags" first came to light in the Citron Report, the Muddy Waters Report, or the March 3, 2011 DTT HK letter, all issued subsequent to the 2009 A.J. Robbins Audit Report. Absent specific factual allegations establishing A.J. Robbins' knowledge of such "red flags" prior to issuing the 2009 A.J. Robbins Audit Report, they cannot form the basis for A.J. Robbins' scienter.

DTT HK moves to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claim on the grounds that: (a) Plaintiffs have failed to properly serve DTT HK with process; (b) Plaintiffs have failed to adequately allege that DTT HK made a material misstatement or omission; and (c) Plaintiffs have failed to adequately plead scienter. For the reasons discussed below, the Court finds DTT HK's arguments unavailing. Accordingly, DTT HK's motion to dismiss is denied.

i.  Service of Process

As a preliminary matter, DTT HK claims that it was not properly served in the instant matter. "[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." Mississippi Publ'g Corp. v. Murphree, 326 U.S. 438, 444-45 (1946). "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987). "Once a defendant raises a challenge to the sufficiency of service of process, the plaintiff bears the burden of proving its adequacy." Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002).

In the present case, Plaintiffs filed an affidavit of service stating that DTT HK was served with a copy of the summons and complaint in this matter by agent on March 1, 2012. DTT HK does not dispute the factual recitation contained in the affidavit of service, but contends that this method of service was improper under the Federal Rules of Civil Procedure.

Rule 4 of the Federal Rules of Civil Procedure provides that a corporation "may be served at a place not within any judicial district of the United States . . . by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Fed. R. Civ. P. 4(f); see also Fed. R. Civ. P. 4(h). Both the United States and Hong Kong are signatories to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 (hereinafter, the "Hague Convention"), and thus service of process on a corporate defendant in Hong Kong is governed by the Hague Convention. "[C]ompliance with the [Hague] Convention is mandatory in all cases to which it applies." Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 705 (1988).

The Hague Convention was intended "to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time." Hague Convention, Preamble, Nov. 15, 1965 20 U.S.T. 361, 658 U.N.T.S. 163. The Hague Convention provides for several alternative methods of service.

Article 5 of the Hague Convention allows service through a country's designated central authority. Id. at art. 5. Article 19 of the Hague Convention states: "To the extent that the internal law of a Contracting State permits methods of transmission, other than those provided for in the preceding Articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions." Id. at art. 19. Article 10 of the Hague Convention states: "Provided the State of destination does not object, the present Convention shall not interfere with . . . the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination." Id. at art. 10; see also Hong Kong Judicial Assistance, U.S. Dep't of State, http://travel.state.gov/law/judicial/judicial_65

0.html (last visited Jan. 29, 2013) ("The Hague Service Convention provides for service . . . by agent.").

Hong Kong has not objected to service by agent.  See *Hong Kong Judicial Assistance*, U.S. Dep't of State, http://travel.state.  gov/law/judicial/judicial_650.html (last visited Jan. 29, 2013) ("Hong Kong did not make any reservations with respect to service . . . by agent."); see also Pacific Worldwide, Inc. v. Ample Bright Dev., Ltd., 2012 U.S. Dist. LEXIS 89954, at *1-2 (S.D.N.Y. Apr. 5, 2012).  As a result, DTT HK's argument that its being served by agent in Hong Kong was improper fails.

### i.   False or Misleading Statement or Omission

Plaintiffs have alleged that DTT HK made false or misleading statements or omissions in the 2009 DTT HK Audit Report.  Specifically, Plaintiffs allege that the following statement by DTT HK was false and misleading when made: "We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) [the "PCAOB"]. . . . We believe that our audit provides a reasonable basis for our opinion."  2009 Form 10-K Annual Report, F-1.  Plaintiffs also allege that the following statement by DTT HK was false and misleading when made:

> In our opinion, [the] consolidated financial
> statements . . . present fairly, in all material
> respects, the financial position of [CCME] as of
> December 31, 2009, and the results of their
> operations and their cash flows for the year then
> ended, in conformity with [GAAP].

Id.

Because the statements are couched as opinions, the parties dispute whether Plaintiffs must show that DTT HK "did not actually hold the belief or opinion stated, and that the opinion stated was in fact incorrect" or merely that the opinion stated was in fact incorrect in order to demonstrate falsity. Bond Opportunity Fund v. Unilab Corp., No. 99 Civ. 11074, 2003 WL 21058251, *5 (S.D.N.Y. May 9, 2003)(emphasis in original); compare DTT HK's Mem. of Law in Support, 17-19 with Pls.' Opp'n, 23-24; see also Varghese, 672 F. Supp. 2d at 609; In re Lehman Bros. Sec. and ERISA Litig., 799 F. Supp. 2d 258, 302 (S.D.N.Y. 2011). However, because Plaintiffs must adequately allege DTT HK's scienter to survive a motion to dismiss, this is a distinction without a difference. See In re Lehman Bros., 799 F. Supp. 2d at 302 ("E & Y's statement regarding GAAS compliance inherently was one of opinion. In order for the [complaint] sufficiently to have alleged that it was false, it had to allege facts that, if true, would permit a conclusion that E & Y either did not in fact hold that

58

opinion or knew that it had no reasonable basis for it. The scienter analysis with respect to this claim is substantially the same."). For purposes of organizational clarity, the Court will first consider whether Plaintiffs have adequately alleged that the statements, whether they were opinions or factual assertions, were in fact incorrect, before turning to an assessment of DTT HK's state of mind.

For the reasons discussed earlier with respect to CCME, the Court finds that Plaintiffs have adequately alleged that the consolidated financial statements contained in the 2009 Form 10-K Annual Report did not "present fairly, in all material respects, the financial position of [CCME] as of December 31, 2009, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America." 2009 Form 10-K Annual Report, F-1. Indeed, DTT HK does not appear to seriously contest this fact, given the fact that it disclaimed and withdrew the 2009 DTT HK Audit Report and its filings have reflected this position. See, e.g., DTT HK's Mem. of Law in Support, 1 ("Plaintiffs do not allege that DTT had actual knowledge of the CCME fraud when DTT issued its audit report on CCME's 2009 financial

statements."). Given this apparent concession and the strength of the allegations, the Court finds that Plaintiffs have adequately alleged that DTT HK's "opinion . . . was in fact incorrect." Bond Opportunity Fund, 2003 WL 21058251, at *5.

The Court also finds that Plaintiffs have adequately alleged that DTT HK did not conduct its audit for the 2009 DTT HK Audit Report "in accordance with the standards of the [PCAOB]."[9]  2009 Form 10-K Annual Report, F-1. Plaintiffs have alleged that DTT HK violated certain GAAS standards, including, among others, GAAS Standards of Field Work No. 3, which provides: "Sufficient appropriate evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." See AU Section 150: Generally Accepted Auditing Standards, PCAOB, http://pcaobus.org/Stan dards/Auditing/PagesAU150.aspx (last visited Feb. 26, 2013); see also Am. Compl. ¶ 117. In the present case, DTT HK in its March 3, 2011 letter documented massive evidence

---

[9] "The PCAOB, established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards [GAAS] as described by the American Institute of Certified Public Accountants Auditing Standards Board's Statement of Auditing Standards No. 95, [GAAS], and related interpretations in existence on that date." Am. Compl. ¶ 109.

of significant fraud that it had uncovered during its audit of CCME's 2010 financial statements, after numerous red flags had already been identified in the Citron Report and the Muddy Waters Report.  The Court has already found that Plaintiffs have adequately alleged that such fraudulent practices also resulted in material misstatements in the 2009 Form 10-K Annual Report, which contained the 2009 DTT HK Audit Report.

Plaintiffs have alleged that, if DTT HK had engaged in sufficient investigation, as required under GAAS Standards of Field Work No. 3 and as it did during its audit of CCME's 2010 financial statements, it would have uncovered CCME's fraudulent misrepresentations.  DTT HK has responded by noting that "PCAOB auditing standards recognize that even a properly planned and performed audit may not detect fraud."  DTT HK Mem. of Law in Support, 8 (citing AU §§ 230.10, 316.12).  While true, the size of the fraud alleged here strongly suggests that DTT HK's audit investigation failed to comply with GAAS standards enumerated in the Amended Complaint.  See In re Longtop, 2012 WL 5512176, at *9 ("Naturally, the weight of the showing needed to plausibly allege a material misstatement varies with the underlying auditing defect.  In some cases, the problems with the audit will be so egregious that issuing an

61

unqualified opinion will qualify as a false statement without additional allegations of subjective falsehood.").

The Court finds that Plaintiffs have: (1) specified the statements that it alleges were fraudulent; (2) identified the speaker; (3) indicated when and where the statements were made; and (4) explained why the statements were fraudulent. See Novak, 216 F.3d at 306. Accordingly, "considering both the alleged GAAP violations in [DTT HK's] financial statement as well as the alleged GAAS violations committed by [DTT HK] while performing the audit, the Court concludes that Plaintiffs sufficiently allege a false or misleading statement attributed to [DTT HK]." Varghese, 672 F. Supp. 2d at 609.

ii.   Scienter

Plaintiffs have not alleged motive and opportunity against DTT HK, but instead proceed on a theory of knowledge or conscious recklessness. The Court need not repeat the demanding standard applied to allegations of auditor scienter. See Section III(A)(c)(i), supra.

Plaintiffs have alleged that either DTT HK knew of, but ignored, the "red flags" later disclosed in its March 3, 2011 letter when it issued the 2009 DTT HK Audit Report, or DTT HK conducted a "sham audit" in verifying CCME's 2009 financial statements, amounting to "no audit at all." In

62

re Scottish Re Grp., 524 F. Supp. 2d at 398 (internal quotation marks omitted).  For its part, DTT HK maintains that it conducted a rigorous audit of CCME's 2009 financial statements, but did not uncover any evidence of fraud and, only a year later, discovered CCME's fraudulent misrepresentations.

Plaintiffs have alleged an immense fraud in which CCME substantially overstated its 2009 financial position in filings with the SEC.  "[T]he magnitude of the alleged fraud provides some additional circumstantial evidence of scienter."  In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig., 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011). "Allegations of particularly large frauds might go far toward creating a compelling inference of auditor scienter based on recklessness even where actual knowledge of the fraud by the defendant auditor is not alleged."  In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 484-85 (S.D.N.Y. 2008) (internal citation omitted).  "Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of [the client's] fraudulent accounting and [the accountant's] failure to conduct a thorough and objective audit create a strong inference that [the auditor] was reckless in not

knowing that its audit opinions materially misrepresented
[the company's] financial state." In re Worldcom, 2003 WL
21388087, at *7; see also In re Leslie Fay Cos., Inc. Sec.
Litig., 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("[W]hen
tidal waves of accounting fraud are alleged, it may be
determined that the accountant's failure to discover his
client's fraud raises an inference of scienter on the face
of the pleading. . . . Alleged fraud of this magnitude,
coupled with plaintiffs' other allegations creates an
implication of recklessness, on the face of the pleading,
which compels us to deny defendant's motion."); In re
Longtop, 2012 WL 5512176, at *9 (S.D.N.Y. Nov. 14, 2012)
("Naturally, failing to detect a fraud of large magnitude
provides some circumstantial evidence of scienter, just as
failing to detect a large boulder in front of your face
qualifies as circumstantial evidence of blindness."); In re
Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 347
(S.D.N.Y. 2004) ("[P]laintiffs have alleged a fraud of a
magnitude only rarely seen — at least until recent years.
In such cases, the scope of the fraud alleged may
appropriately be considered in determining whether scienter
has been adequately pled.")

     In the face of this alleged immense fraud, the Court
finds it somewhat implausible for DTT HK to maintain that

it conducted a rigorous audit of CCME's 2009 financial statements and was unable to uncover any evidence of fraud, but that in the course of just one month, following the publication of reports of fraud apparently obvious even to third-party short-sellers Citron and Muddy Waters, DTT HK was able to unearth a wealth of glaring "red flags" strongly pointing towards a massive fraud perpetrated by CCME and essentially confirming what the third parties' investigations had already concluded. This alternative explanation proposed by DTT HK simply does not pass the smell test.

Plaintiffs have alleged that DTT HK's accounting practices were:

> so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

In re Scottish Re Grp., 524 F. Supp. 2d at 398 (internal quotation marks omitted). The Court finds that Plaintiffs' allegation of scienter is cogent and at least as compelling as any opposing inference of nonfraudulent intent. Accordingly, DTT HK's motion to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claims is denied.

    e.   DTTL and Deloitte U.S.

DTTL and Deloitte U.S. move to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claims on, among others, the grounds that <u>Janus Capital Group, Inc. v. First Derivative Traders</u>, __ U.S. __, 131 S. Ct. 2296 (2011) precludes § 10(b) and Rule 10b-5 liability against a defendant who is not the "maker" of the alleged misstatement. The Court agrees. Accordingly, DTTL's and Deloitte U.S.'s motion to dismiss the § 10(b) and Rule 10b-5 claims is granted.

    i.   <u>Janus and Its Progeny</u>

In <u>Janus</u>, a class of stockholders filed a § 10(b) action against Janus Capital Group, Inc. ("JCG") and its wholly-owned subsidiary Janus Capital Management L.L.C. ("JCM") over alleged false statements made in mutual fund prospectuses filed by Janus Investment Fund, for which JCM was the investment advisor and administrator, which allegedly affected the price of JCG's stock. The Supreme Court held that, because the false statements included in the prospectuses were made by Janus Investment Fund and not by JCM, JCM could not be held liable under § 10(b). <u>Id.</u> at 2305. The Court limited liability for § 10(b) violations to parties that actually "make" misstatements of material fact and explained that the party who "makes" the misstatement is "the person or entity with ultimate authority over the [mis]statement, including its content

66

and whether and how to communicate it." Id. at 2302. The Court held that a person or entity that can "merely suggest what to say" does not make a statement in its own right, nor does a person or entity that "prepares or publishes a statement on behalf of another." Id. In the ordinary case, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by — and only by — the party to whom it is attributed." Id. In declining to expand § 10(b) liability any further, the Court cited to the control person liability provisions under § 20(a) as evidence that "Congress has already created [such liability] expressly elsewhere," and therefore the Court would "not expand liability beyond the person or entity that ultimately has authority over a false statement."[10] Id. at 2303-04.

In the present case, Plaintiffs allege that Deloitte U.S. "dominated and controlled" DTTL, which in turn controlled and directed DTT HK, the entity that issued the 2009 DTT HK Audit Report. Am. Compl. ¶ 32. As evidence of

---

[10] Even before Janus, the Second Circuit had held that "secondary actors can be liable in a private action under Rule 10b-5 for only those statements that are explicitly attributed to them. The mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient. To be cognizable, a plaintiff's claim against a secondary actor must be based on that actor's own 'articulated statement,' or on statements made by another that have been explicitly adopted by the secondary actor." Pacific Inv. Mgmt. Co. L.L.C. v. Mayer Brown LLP, 603 F.3d 144, 155 (2d Cir. 2010) (internal citations omitted) (emphasis in original).

Deloitte U.S.'s domination and control over DTTL, Plaintiffs allege that: (a) Deloitte U.S. and DTTL rotate leadership; (b) DTTL's main source of funding is Deloitte U.S.; (c) Deloitte U.S. has provided loans to DTTL and guaranteed DTTL's bank financing; (d) Deloitte U.S. makes decisions on behalf of DTTL on major matters; and (e) Deloitte U.S. and DTTL share office space. As evidence of DTTL's control and direction of DTT HK, Plaintiffs set forth many allegations, including that: (a) DTTL promulgates general professional and ethical standards, auditing procedures, and even the software on which professionals perform audits to its member firms; (b) DTTL has control over the acceptance and rejection of engagements by member firms; (c) DTTL prohibits member firms from suing each other and requires that one member firm accept client work referred from another member firm; (d) DTTL arranges for the transfer of employees from one member firm to another; (e) DTTL plays a substantial role in the legal and risk management affairs of member firms; (f) DTTL dictates the specific methodologies to be applied in conducting audits and the particular software and documentation procedures to be used.[11]

---

[11] Plaintiffs also cite In re Parmalat Securities Litigation, 594 F. Supp. 2d 444 (S.D.N.Y. 2009) in the Amended Complaint. In Parmalat, the Court relied on similar allegations in finding that DTTL could be

Plaintiffs have failed to allege that Deloitte U.S. was "the person or entity with ultimate authority over the [mis]statement, including its content and whether and how to communicate it." Janus, 131 S. Ct. at 2302. Similar allegations to those set forth in this case have previously been rejected. In Ho, shareholders brought a putative class action suit against, among others, Grant Thornton International, Ltd. ("GTIL"), "an umbrella organization comprised of independent registered public accounting firms." Ho, 2012 WL 3647043, at *2. The class action plaintiffs sought to hold GTIL liable under § 10(b) for the alleged misstatements of its member firms, GT-China and GT-Hong Kong, as independent outside auditors to a China-based manufacturer. The court rejected the class plaintiffs' allegations as insufficient under Janus, as GTIL did not have ultimate authority over the alleged misstatements. Id. at *20 ("Taking the allegations in the [Complaint] as true, Plaintiffs fail to allege a § 10(b) claim against GTIL."). The court wrote:

> Nowhere in the CAC do Plaintiffs allege that GT-HK audits were approved by GTIL before releasing them, or that GTIL had any authority to prevent GT-HK from releasing audits. As pled, GT-HK had the final authority to decide whether an audit opinion was released to the public, 'including

---

held liable under § 10(b) for the violations of its alleged agent, Deloitte Italy, under respondeat superior. Id. at 450-51. However, Parmalat preceded Janus.

69

> its content and whether and how to communicate it.'

Id. (quoting Janus, 131 S. Ct. at 2302).

Similar deficiencies are apparent in Plaintiffs' pleadings. Plaintiffs fail to allege that DTTL or Deloitte U.S. had ultimate authority over the 2009 DTT HK Audit Report or the alleged misstatements contained therein. Accordingly, their § 10(b) and Rule 10b-5 claims against DTTL and Deloitte U.S. fail under Janus and must be dismissed.

B.   SECTION 20(a) CLAIMS

   a.   DTTL & Deloitte U.S.

DTTL and Deloitte U.S. move to dismiss Plaintiffs' § 20(a) claims on the grounds that Plaintiffs have failed to adequately allege: (a) a primary violation; (b) actual control; or (c) culpable participation. The Court has already found that DTT HK committed a primary violation. Because the Court finds that Plaintiffs have not adequately alleged culpable participation with respect to DTTL or Deloitte U.S., it need not address the other arguments advanced. Accordingly, DTTL and Deloitte U.S.'s motion to dismiss the § 20(a) claims is granted.

   i.   Culpable Participation

DTTL and Deloitte U.S. argue that Plaintiffs have failed to allege culpable participation under the heightened pleading requirements of the PSLRA. In response, Plaintiffs contend that "failure to supervise" satisfies the culpable participation element required under § 20(a). Assuming for the sake of argument that alleging "failure to supervise" satisfies the culpable participation requirement under § 20(a),[12] the Court nevertheless finds that Plaintiffs have failed to adequately allege culpable participation under the heightened pleading requirements of the PSLRA. Plaintiffs plead only general and conclusory allegations against DTTL and Deloitte U.S., failing to set forth particularized facts establishing their culpable participation in CCME's alleged fraud. See Am. Compl. ¶¶ 24, 162-174. Such allegations fail to meet the heightened

---

[12] The Court is not persuaded that pleading "failure to supervise" does, in fact, satisfy the culpable participation requirements of § 20(a) in the circumstances of this case. The cases cited by Plaintiffs are inapposite. See Pls.' Omnibus Mem. of Law in Opp'n, 67-68. In CompuDyne Corp. v. Shane, 453 F. Supp. 2d 807 (S.D.N.Y. 2006), the court held that a broker-dealer had an affirmative duty under Section 15 of the Exchange Act to see that its employees complied with applicable securities regulations and that failure to comply with this statutorily-enumerated duty to supervise satisfied the culpable participation element established under Section 20(a). Id. at 830. No such statutorily-enumerated affirmative duty is alleged here against DTTL or Deloitte U.S. In another broker-dealer case, the court in STMicroelectronics v. Credit Suisse Group, 775 F. Supp. 2d 525 (E.D.N.Y. 2011), relying on CompuDyne, stated in dicta that "failure to supervise" could satisfy the culpable participation requirements of § 20(a). Id. at 537. Absent a statutorily-imposed affirmative duty, it would be strange indeed to hold that the failure to participate in an allegedly fraudulent action satisfies the requirement to allege "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108.

pleading standards of the PSLRA. Accordingly, DTTL and Deloitte U.S.'s motions to dismiss the § 20(a) claims are granted.

## IV.   ORDER

For the reasons discussed above, it is hereby

ORDERED that the amended motion (Dkt. No. 109) of defendant China MediaExpress Holdings, Inc. to dismiss the amended complaint is **DENIED**; and it is further

ORDERED that the motion (Dkt. No. 79) of defendants Malcolm Bird and Theodore Green to dismiss the amended complaint is **GRANTED WITHOUT PREJUDICE**; and it is further

ORDERED that the motion (Dkt. No. 98) of defendant A.J. Robbins to dismiss the amended complaint is **GRANTED WITHOUT PREJUDICE**; and it is further

ORDERED that the motion (Dkt. No. 135) of defendant Deloitte Touche Tohmatsu in Hong Kong SAR to dismiss the amended complaint is **DENIED**; and it is further

ORDERED that the motion (Dkt. No. 86) of defendant Deloitte LLP to dismiss the amended complaint is **GRANTED**; and it is finally

**ORDERED** that the motion (Dkt. No. 91) of defendant Deloitte Touche Tohmatsu Limited to dismiss the amended complaint is **GRANTED**.

**SO ORDERED:**
Dated:   New York, New York
         28 February 2013

———————————————————
                 Victor Marrero
                   U.S.D.J.