UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CHINA MEDIAEXPRESS HOLDINGS, INC. SHAREHOLDER LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | Civil Action No. 11-cv-0804 (VM)<br><br>CLASS ACTION<br><br>ECF Case<br>Electronically Filed |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................3

III.  ARGUMENT ..........................................................................................................5

    A.    Rule 23(a) Requirements ............................................................................6

        1.     The class is so numerous that joinder of all members is impracticable.......6

        2.     Questions of law or fact are common to the class. ....................................7

        3.     The Class Representatives' claims are typical of the class.........................8

        4.     The Class Representatives will fairly and adequately protect the Class's interests..........................................................................................9

        5.     The proposed class is ascertainable. .........................................................10

    B.    The Rule 23(b)(3) Requirements are Satisfied ........................................10

        1.     Common questions of law or fact predominate. .......................................10

            a.    Reliance may be presumed for class members under the "fraud on the market" doctrine. ..................................................12

                (1)    CCME traded on an efficient market. ...............................13

                    (a)    A history of immediate movement of the stock price caused by unexpected corporate events or financial releases. ...................................14

                    (b)    A large weekly trading volume............................16

                    (c)    Eligibility to file a S-3 registration statements.............................................................17

                    (d)    The existence of market makers and arbitrageurs. ........................................................18

                    (e)    The existence of a significant number of analyst reports. ......................................................18

                    (f)    *Krogman* Factors..................................................20

            b.    Option purchasers are also entitled to the presumption of reliance. .........................................................................................22

        2.     A class action is superior to other available methods of adjudicating.......22

a.    Any individual interest in controlling the prosecution of
          this action is minimal. ...................................................................23

b.    Other related litigation will not protect the Class's interests. .........23

c.    Litigating all of the claims in this forum is the most just and
          efficient course of action. ............................................................24

d.    The Court can effectively manage this case as a class action. ........24

IV.    CONCLUSION .......................................................................................................25

010244-11  627103 V1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amchem Prods., Inc. v. Windsor,*
 521 U.S. 591 (1997)..................................................................................9, 10

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
 ___ U.S. ___, 133 S. Ct. 1184 (2013)..................................................11, 12, 13

*Anwar v. Fairfield Greenwich,*
 289 F.R.D. 105 (S.D.N.Y. 2013) ...................................................... *passim*

*Basic Inc. v. Levinson,*
 485 U.S. 224 (1988)........................................................................................12

*Billhofer v. Flamel Techs., S.A.,*
 281 F.R.D. 150 (S.D.N.Y. 2012) ...................................................... *passim*

*Black v. Finantra Capital, Inc.,*
 418 F.3d 203 (2d Cir. 2005).........................................................................13

*Cammer v. Bloom,*
 711 F. Supp. 1264 (D.N.J. 1989) ..................................................13, 16, 18, 19

*Carnegie v. Household Int'l, Inc.,*
 376 F.3d 656 (7th Cir. 2004) .......................................................................23, 24

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.,*
 504 F.3d 229 (2d Cir. 2007)...........................................................................67

*Cheney v. Cyberguard Corp.,*
 213 F.R.D. 484 (S.D. Fla. 2003) ..................................................................20

*Deutschman v. Beneficial Corp.,*
 841 F.2d 502 (3d Cir. 1988)...........................................................................22

*Dunnigan v. Metropolitan Life Ins. Co.,*
 214 F.R.D. 125 (S.D.N.Y. 2003) ..................................................................10

*Dura-Bilt Corp. v. Chase Manhattan Corp.,*
 89 F.R.D. 87 (S.D.N.Y. 1981) ......................................................................11

*Erica P. John Fund, Inc. v. Halliburton Co.,*
 ___ U.S. ___, 131 S. Ct. 2179 (2011)..........................................................12

*Fogarazzo v. Lehman Bros.*,
263 F.R.D. 90 (S.D.N.Y. 2009) ...................................................................10

*Green v. Wolf Corp.*,
406 F.2d 291 (2d Cir. 1968).......................................................................6

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................ *passim*

*In re Bank of Am. Corp. Sec., Derivative, & Empl. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ...............................................................8, 10

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ...........................................................2, 5, 22

*In re DVI, Inc. Sec. Litig.*,
639 F.3d 623 (3d Cir. 2011)........................................................................13

*In re DVI Inc. Secs. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008), *aff'd*, 639 F.3d 623 (3d Cir. 2011) .....................18

*In re Dynex Capital, Sec. Litig.*,
2011 U.S. Dist. LEXIS 22484 (S.D.N.Y. Mar. 7, 2011) ......................................18

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ....................................................21, 22

*In re Fosamax Prods. Liab. Litig.*,
248 F.R.D. 389 (S.D.N.Y. 2008) ................................................................10

*In re Frontier Ins. Grp. Secs. Litig.*,
172 F.R.D. 31 (E.D.N.Y. 1997) ....................................................................7

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
725 F. Supp. 712 (S.D.N.Y. 1989).............................................................22

*In re Independent Energy Holdings PLC Sec. Litig.*,
210 F.R.D. 476 (S.D.N.Y. 2002) ...............................................................2, 6

*In re Juniper Networks Sec. Litig.*,
264 F.R.D. 584 (N.D. Cal. 2009)................................................................13

*In re Livent, Noteholders Sec. Litig.*,
210 F.R.D. 512 (S.D.N.Y. 2002) ...............................................................8, 23

*In re Longtop Fin. Techs. Secs. Litig.*,
2013 U.S. Dist. LEXIS 98330 (S.D.N.Y. July 10, 2013) ......................................12

*In re Merck & Co. Sec. Derivative & ERISA Litig.*,
    2013 U.S. Dist. LEXIS 13511 (D.N.J. Jan. 30, 2013) ............................................22

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    249 F.R.D. 124 (S.D.N.Y. 2008) ............................................................................22

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    199 F.R.D. 119 (S.D.N.Y. 2001) ............................................................................22

*In re Salomon Analyst Metromedia Litig.*,
    236 F.R.D. 208 (S.D.N.Y. 2006), *vacated on other grounds*, 544 F.3d 474 (2d Cir.
    2008) ............................................................................................................................12

*In re Scientific-Atlanta, Inc. Secs. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007) ...................................................................21

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)................................................................................9, 24

*In re Winstar Commc'ns Secs. Litig.*,
    2013 U.S. Dist. LEXIS 55800 (S.D.N.Y. April 17, 2013) .................................14, 18

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .........................................................................6, 23

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005)..............................................................................17, 20

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................20, 21

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ............................................................................22

*Lehocky v. Tidel Techs., Inc.*,
    220 F.R.D. 491 (S.D. Tex. 2004)............................................................................20

*Lumen v. Anderson*,
    280 F.R.D. 451 (W.D. Mo. 2012) ...........................................................................13

*Marisol A. by Forbes v. Giuliani*,
    126 F.3d 372 (2d Cir.1997)..................................................................................7, 8

*McIntire v. China MediaExpress Holdings, Inc.*,
    2013 U.S. Dist. LEXIS 28592 (S.D.N.Y. Feb. 28, 2013)............................... *passim*

*Moskowitz v. Lopp*,
    128 F.R.D. 624 (E.D. Pa. 1989)..............................................................................22

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
   2011 U.S. Dist. LEXIS 92597 (S.D.N.Y. Aug. 16, 2011) ....................................6, 8

*Public Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) .................................................................................7, 8

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
   185 F. Supp. 2d 389 (S.D.N.Y. 2002)..........................................................................13

*Rocco v. Nam Tai Elecs., Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) ...............................................................................6, 7

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010).........................................................................................................3

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   546 F.3d 196 (2d Cir. 2008)............................................................................13, 14, 18

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   283 F.R.D. 199 (S.D.N.Y. 2012) ..................................................................................11

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ........................................................................................21

*Van Dongen v. CNinsure Inc.*,
   2013 U.S. Dist. LEXIS 89534 (S.D.N.Y. June 24, 2013) ..........................................13

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) .............................................................................14, 22

**REGULATIONS**

17 C.F.R. § 239.13 ...............................................................................................................17

Lead Plaintiffs Irrevocable Trust FBO Lansing Davis and the Davis Partnership LP and additional plaintiffs John Haughton, Ethan Lamar Pierce and John Shaffer move for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Lead Plaintiff and the additional plaintiffs are hereinafter collectively referred to as the "Class Representatives."[1]

## I.   INTRODUCTION

China MediaExpress Holdings, Inc. ("CCME") was one of the numerous, and now infamous, "reverse-merger" Chinese companies that took advantage of a loophole allowing them to evade the rigorous SEC registration process by instead acquiring an already-registered U.S.-based "shell company." Without this rigorous registration process, the Company's independent auditor was the primary protection for investors against the possibility of fraud. With a "Big Four" auditor certifying outstanding reported financial results for the year 2009, CCME shares reached a Class Period high of $22.81 on January 27, 2011.

Unfortunately, these reported financial results were a fiction. Equally unfortunately for Class Members, Defendant Deloitte Touche Tohmatsu ("DTT"), CCME's independent auditor, abandoned its "public watchdog" role and failed to perform even the most basic audit procedures – even failing to notice that while CCME was reporting nearly $100 million in revenues to an unsuspecting stock market, it reported zero revenues to the Chinese Administration of Industry and Commerce ("AIC").[2] By March 2011, DTT had been confronted with such overwhelming evidence of CCME's massive fraud (from external sources, not from actually performing audit

---

[1] The Class Representatives seek to certify a class consisting of "all those who, between April 1, 2010, and March 11, 2011, inclusive, (the "Class Period") suffered losses as a result of their purchase of shares of CCME common stock, their purchase of CCME call options, and/or their sale of CCME put options (the "Class")." The Class Representatives also seek their appointment as Class Representatives for the above-described Class and the appointment of Hagens Berman Sobol Shapiro LLP ("Hagens Berman") as Lead Counsel and of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as Co-Counsel for the Class. This Class Period is shorter than the Class Period set forth in the Amended Complaint to reflect the fact that DTT made its first false statement on March 31, 2010, as described herein.

[2] As a company based in China with no assets in the U.S., CCME and the lawyers that assisted in founding the company were aware that CCME faced no real potential liability from the SEC. However, the officers of CCME could face potential criminal or civil charges for defrauding the AIC.

procedures) that it was forced to wake up and confront CCME management with the overwhelming evidence gathered by others. By the time DTT finally withdrew as its auditor, the damage had been done, with Class Members losing hundreds of millions of dollars in this massive financial fraud.

The Class Representatives seek to prove that they, like the other Class Members, were injured by a common course of conduct – material misrepresentations and omissions by DTT in connection with its role as the auditor of CCME.[3] Courts have consistently held that securities fraud claims are especially amenable to class certification.[4] To obtain class certification, the Class Representatives need to satisfy the four provisions of Fed. R. Civ. P. 23(a), and the relevant portions of Fed. R. Civ. P. 23(b).[5]

As detailed below, all of the requirements for class certification under Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – are easily met. Because CCME had millions of shares of stock that traded regularly, numerosity can be presumed. *See infra* at 6-7. Commonality is met because the Amended Complaint identifies numerous common issues of law and fact. *See infra* at 7. Likewise, the typicality requirement is met because each Class Members' claim arises from the same course of events, and each will make identical legal arguments to prove DTT's liability. *See infra* at 8. The adequacy prong is met because the Class Representatives have no interests conflicting with the class, and they have retained counsel qualified and experienced in class action and securities-fraud litigation. *See infra* at 9.

---

[3] *McIntire v. China MediaExpress Holdings, Inc.*, 2013 U.S. Dist. LEXIS 28592 (S.D.N.Y. Feb. 28, 2013).

[4] *See, e.g., In re Independent Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (class treatment is "particularly appropriate" for securities-fraud claims, and under such circumstances courts should err in favor of certifying a class); *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999) ("the Second Circuit … has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country").

[5] *Anwar v. Fairfield Greenwich*, 289 F.R.D. 105, 111 (S.D.N.Y. 2013).

This action also satisfies the two core requirements for certification under Rule 23(b)(3): (i) predominance of common questions of law or fact and (ii) superiority of a class action over other available methods for adjudication. The predominance of common questions of law or fact is demonstrated because each of the elements of a § 10(b) claim have long been held to be common issues, including the element of reliance, which is presumed for all Class Members pursuant to the "fraud on the market" doctrine. *See infra* at 10-22. A class action is the superior method of litigating this controversy because the costs of individual litigation and the resulting burden on the judicial system would be prohibitive. *See infra* at 22-25.

All of these requirements are met in this case. The class must be certified.[6]

## II.    STATEMENT OF FACTS

The Class Representatives have alleged that DTT made false or misleading statements or omissions in its audit report certifying CCME's 2009 financial statements, which was included in CCME's 2009 annual report on Form 10-K filed on March 31, 2010. ¶ 71.[7] Specifically, DTT falsely represented that CCME's financial statements "present fairly, in all material respects, the financial position of the Group as of December 31, 2009, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America." ¶¶ 71, 114.[8]

There appears to be no dispute that this statement was false, as even DTT now admits that CCME's 2009 financial statements were not "fairly presented," having withdrawn its audit report of the 2009 financial statements and stated that its audit report of CCME's 2009 financial statements should no longer be relied upon. ¶ 95.

---

[6] *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) (class certification mandatory when Rule 23 requirements met).

[7] "¶ __" refers to paragraphs of the Amended and Consolidated Complaint (Docket No. 64-1) filed on October 31, 2011 (the "Am. Compl."), unless otherwise noted.

[8] *See also China MediaExpress*, 2013 U.S. Dist. LEXIS 28592, at *1.

The Class Representatives have alleged that the following statements were also materially false and misleading when made by DTT:

- "We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States); and

- We believe that our audit provides a reasonable basis for our opinion."

¶¶ 71, 114.[9] Plaintiffs detail how these statements were false by demonstrating DTT's non-compliance with numerous GAAS and PCAOB standards.[10] ¶¶ 116-18. An audit that fails to comply with PCAOB standards provides no "reasonable basis" for its audit opinion.

Due in large part to DTT's unqualified opinion that CCME's financial statements complied with GAAP, an unsuspecting stock market sent CCME shares soaring to a Class Period high of $22.81 per share on January 27, 2011. ¶ 150.[11]

CCME's financial condition first came under fire on January 31, 2011, when Citron Research published an analyst report questioning CCME's business operations and accounting practices. ¶ 82.[12] A few days later, analyst Muddy Waters Research published an analyst report questioning CCME's business model and accounting practices, estimating that CCME had greatly overstated its reported earnings and highlighting multiple signs of fraud. ¶ 85.[13] These first challenges to CCME's reported financial results (as audited and given a "clean opinion" by DTT) caused CCME's share price to fall from $20.86 before the Citron report to just $11.09 per share immediately after the release of the Muddy Waters report – a decline of 46.8%. ¶¶ 83, 86.

---

[9] See also China MediaExpress, 2013 U.S. Dist. LEXIS 28592, at *67-68.

[10] The Public Company Accounting Oversight Board ("PCAOB") is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards Generally Accepted Auditing Standards ("GAAS") as described by the American Institute of Certified Public Accountants Auditing Standards Board's Statement of Auditing Standards No. 95, and related interpretations in existence on that date. ¶ 109; China MediaExpress, 2013 U.S. Dist. LEXIS 28592, at *71 n.9.

[11] China MediaExpress, 2013 U.S. Dist. LEXIS 28592, at *10-13.

[12] Id. at *13.

[13] Id. at *15.

Although DTT had turned a blind eye to CCME's problems, by March 3, 2011, enough evidence had been developed by analysts and other parties[14] that even DTT could no longer idly stand by and sent a letter to CCME's Board of Directors and its Audit Committee outlining the enormous signs of fraud that DTT had finally been forced to confront. ¶¶ 122-43, Ex. A.[15]

On March 11, 2011, DTT resigned as CCME's auditor, stating that "it was no longer able to rely on the representations of management and that it had lost confidence in the commitment of the Board and the Audit Committee to good governance and reliable financial reporting." ¶ 88. CCME was delisted and never again traded on the NASDAQ, and when its shares resumed trading on May 19, 2011 on the "pink sheets," their value immediately plummeted from $11.88 to just $2.16 per share – a decline of more than 90% from the Class Period high of $22.81 per share on January 27, 2011. ¶¶ 98, 151. CCME shares currently trade at pennies per share. ¶ 151. Class Members have lost hundreds of millions of dollars investing in CCME securities because they relied on the "clean" audit opinions prepared by DTT.

## III. ARGUMENT

"Class action treatment of related claims is particularly appropriate when plaintiffs seek redress for violations of the securities laws."[16] The Second Circuit thus "has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions."[17] As the Second Circuit stated in *Green v. Wolf*

---

[14] Besides the Citron and Muddy Waters reports, DTT received: 1) an anonymous email on February 1, 2011, alleging that CCME had overstated its revenues in 2009 and 2010; 2) another email on February 8 alleging the non-existence of CCME's reported cash balances; 3) a February 21 email from a private-fund manager alleging that CCME was committing accounting fraud; 4) a February 23 letter from Muddy Waters alleging that CCME was committing securities fraud; 5) a February 28 email from LMG Capital alleging that CCME was committing fraud; and 6) a March 2 email from Muddy Waters attaching its most recent research report "CCME: Irrefutable Evidence of Fraud." Am. Compl., Ex. A (Attachment A).

[15] *See also China MediaExpress*, 2013 U.S. Dist. LEXIS 28592, at *6.

[16] *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999).

[17] *Anwar*, 289 F.R.D. at 111; *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 274-75 (S.D.N.Y. 2008).

*Corp.*, "if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require."[18] To certify the proposed Class, the Class Representatives must satisfy all four of the requirements of Rule 23(a) and the relevant portions of Rule 23(b)(3).[19] As described below, each of these requirements are met in this case.

## A.    Rule 23(a) Requirements

### 1.    The class is so numerous that joinder of all members is impracticable.

To meet the requirements of Rule 23(a)(1), "the class must be so large that joinder of all members would be impracticable."[20] Impracticable does not mean impossible, but only that the difficulty of joining all Class Members make use of the class action appropriate.[21] In the Second Circuit, "numerosity is presumed at a level of 40 members."[22] Precise quantification of the Class Members is not necessary because the court may "make common sense assumptions"[23] and "may rely on reasonable inferences drawn from the available facts"[24] in order to estimate the size of the class. "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."[25] During the Class Period, CCME had more than 32.9 million shares outstanding, with between 10 and 15 million shares in

---

[18] *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968) (quoting *Esplin v. Hirshi*, 402 F.2d 94, 99 (10th Cir. 1968)). *See also In re Independent Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002).

[19] *Anwar*, 289 F.R.D. at 111.

[20] *Id.*

[21] *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 279 (S.D.N.Y. 2003).

[22] *Anwar*, 289 F.R.D. at 111 (citing cases). During the Class Period, there were 60 institutional investors, which alone would satisfy the numerosity requirement. There are likely many thousands of additional Class Members.

[23] *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 134-35 (S.D.N.Y. 2007).

[24] *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2011 U.S. Dist. LEXIS 92597, at *5 (S.D.N.Y. Aug. 16, 2011) (citations omitted).

[25] *In re Alstom*, 253 F.R.D. at 275 (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007)).

the public float. ¶¶ 59, 85. During the Class Period, investors traded nearly 300 million CCME shares (a weekly average of approximately 6 million shares). Jones Decl., ¶ 23.[26] CCME's shares outstanding, combined with its trading volume, is sufficient to demonstrate numerosity.[27]

> ### 2.     Questions of law or fact are common to the class.

Rule 23(a)(2) requires plaintiffs to demonstrate that common issues of law or fact affect all Class Members, which has been characterized as a "low hurdle."[28] Even a single common question of law or fact may suffice to satisfy the commonality requirement.[29]

The Amended Complaint identifies numerous common issues of fact and law, all of which are amenable to class-wide proof (¶ 40), including, but not limited to, the following:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of CCME;

- whether the price of CCME securities were artificially inflated during the Class Period; and

- to what extent the members of the Class have sustained damages and the proper measure of damages.

In a securities fraud class action, the "critical issues" for establishing liability are common to all members of the Class.[30] The Commonality requirement in this case has been met because Class Members have all been injured by similar material misrepresentations and omissions.[31]

---

[26] The Declaration of Cynthia L. Jones is attached as Exhibit A to the accompanying Declaration of Karl P. Barth in Support of Plaintiffs' Motion for Class Certification (the "Barth Decl.").

[27] *Rocco*, 245 F.R.D. at 134-35 (assuming numerosity where company had 12 million outstanding shares); *In re Frontier Ins. Grp. Secs. Litig.*, 172 F.R.D. 31, 40 (E.D.N.Y. 1997) ("[c]ommon sense suggests" that 13 million shares of outstanding common stock (of which 4.6 million shares trade on the NYSE) makes joinder impracticable).

[28] *Anwar*, 289 F.R.D. at 111 (citing *In re Sumitomo Copper Litig.*, 194 F.R.D. 480, 482 (S.D.N.Y. 2000)).

[29] *Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997); *Public Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011).

[30] *In re Alstom*, 253 F.R.D. at 281.

[31] *Anwar*, 289 F.R.D. at 111 (citing *In re Vivendi*, 242 F.R.D. at 84).

### 3.      The Class Representatives' claims are typical of the class.

Rule 23(a)(3) is satisfied when each Class Member's claim arises from the same course

of events and each Class Member makes similar legal arguments to prove the defendant's

liability.[32] The commonality and typicality requirements tend to merge into one another, so that

similar considerations animate analysis of Rules 23(a)(2) and (3).[33] Like the commonality test,

"the typicality requirement is not demanding."[34] "The focus of the typicality inquiry is not on the

plaintiff['s] behavior, but rather on the defendant[s'] actions."[35] Typicality does not require that

the situations of the named representatives and the Class Members be identical.[36] Rather, "Rule

23(a)(3) is satisfied when each Class Member's claim arises from the same course of events, and

each Class Member makes similar legal arguments to prove the defendant's liability."[37]

In a securities class action, when "plaintiffs will necessarily seek to develop facts relating

to … the dissemination of allegedly false or misleading statements underlying their claims," the

claims and nature of evidence "are generally considered sufficient to satisfy the typicality

requirement."[38] In this case, typicality is satisfied because DTT made false or misleading

statements or omissions in the audit report covering CCME's 2009 financial statements that

harmed each member of the proposed Class in the same way and the same evidence will be used

to prove the claims of each proposed Class Member.[39]

---

[32] *Anwar*, 289 F.R.D. at 112.

[33] *Marisol A.*, 126 F.3d at 376.

[34] *Ret. Sys. of Miss.*, 277 F.R.D. at 107 (citation omitted).

[35] *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2011 U.S. Dist. LEXIS 92597, at *8.

[36] *In re Livent, Noteholders Sec. Litig.*, 210 F.R.D. 512, 516 (S.D.N.Y. 2002).

[37] *Anwar*, 289 F.R.D. at 112.

[38] *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012) (citing *In re Vivendi*, 242 F.R.D. at 85).

[39] *Anwar*, 289 F.R.D. at 112.

4.   **The Class Representatives will fairly and adequately protect the Class's interests.**

Rule 23(a)(4) requires that the Class Representatives will "fairly and adequately protect the interests of the class." To meet this requirement: (i) the lead plaintiffs' counsel must be "qualified, experienced, and generally able to conduct the proposed litigation"; and (ii) the Class Representatives must not have interests conflicting with the class.[40]

Plaintiffs' attorneys have vigorously pursued these claims to date, as evidenced by the filings and records of this case, including the successful opposition of DTT's motion to dismiss the Amended Complaint.[41] Additionally, Proposed Lead Counsel and Co-Counsel have been appointed class counsel and have adequately represented classes in many other complex class actions, including securities fraud class actions in this district and throughout the country.[42]

The Class Representatives have demonstrated their commitment to representing the Class by being actively involved in the litigation and remaining in close contact with proposed class counsel about significant case details throughout this litigation. As described above, they have also retained counsel experienced in securities fraud and class action litigation. The Class Representatives "possess the same interest and suffer[ed] the same injury as the Class Members."[43] They have and will continue to adequately represent the Class, and suffer from no disabling conflicts. Any conflict that could prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite "must be fundamental, and speculative conflict should be disregarded at the class certification stage."[44] Accordingly, the adequacy requirement has been met.

---

[40] *Id.*

[41] *China MediaExpress*, 2013 U.S. Dist. LEXIS 28592.

[42] The firm resumés of Proposed Lead Counsel Hagens Berman and Proposed Co-Counsel Cohen Milstein are attached as Exhibits B and C to the Barth Decl.

[43] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

[44] *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citation omitted).

5.      **The proposed class is ascertainable.**

Some courts have also found an implied requirement of ascertainability to the express requirements set forth in Rule 23(a).[45] "Class Members need not be ascertained prior to certification, but must be ascertainable at some point in the case."[46] "An identifiable class exists if its members can be ascertained by reference to objective criteria."[47] In this case, as in most cases involving publicly traded securities, the Class Members may be easily identified by obtaining the records of CCME's transfer agent by subpoena.[48] ¶ 37.

B.      **The Rule 23(b)(3) Requirements are Satisfied**

In addition to satisfying Rule 23(a), Plaintiffs must also establish that this action is maintainable as a class action under Rule 23(b)(3). Plaintiffs seek to certify the proposed Class pursuant to Rule 23(b)(3), which provides that an action is maintainable as a class action if "questions of law or fact common to Class Members predominate over any questions affecting only individual members" (the "Predominance Requirement"), and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "Superiority Requirement").[49] Both of these requirements are satisfied in this case.

1.      **Common questions of law or fact predominate.**

Under Rule 23(b)(3), the proposed Class should be "sufficiently cohesive to warrant adjudication by representation."[50] The Predominance Requirement is "readily met in certain cases alleging … securities fraud."[51] At the class-certification stage, Rule 23(b)(3) requires only a showing that *questions* common to the class predominate, and a plaintiff seeking class

---

[45] *In re Bank of Am.*, 281 F.R.D. at 140.

[46] *Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003).

[47] *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008).

[48] *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 101 (S.D.N.Y. 2009) (class ascertainable through transfer agent records).

[49] *Anwar*, 289 F.R.D. at 112.

[50] *Amchem*, 521 U.S. at 623.

[51] *Anwar*, 289 F.R.D. at 113 (quoting *Amchem*, 521 U.S. at 625).

- 10 -

certification is not required to prove the answers to such *questions*.[52] "[I]n determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class."[53] Predominance does not require a plaintiff to show a complete absence of individual issues.[54] Rather, the requirement is satisfied if the "resolution of some of the legal or factual questions that qualify each Class Member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[55]

To prevail on their claim under § 10(b) at trial, all members of the proposed Class must similarly establish: (1) a material misrepresentation or omission by Defendants; (2) scienter on the part of Defendants; (3) a connection between the misrepresentation or omission and each proposed Class Member's purchase or sale of a security; (4) each proposed Class Member's reliance on the misrepresentation or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation and the loss.[56]

Courts routinely find the elements of material misrepresentation or omission in connection with the purchase of a security, scienter, economic loss and loss causation to be common issues in Section 10(b) cases, as this Court has previously held in *In re Alstom*[57]:

---

[52] *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, ___ U.S. ___, 133 S. Ct. 1184, 1196 (2013) ("[i]n other words, they need not, at that threshold, prove that the predominating question will be answered in their favor"). Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. *Amgen*, 133 S. Ct. at 1194-95. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Id.* "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.' *Id.*

[53] *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 210 (S.D.N.Y. 2012).

[54] *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("To be sure, individual issues will likely arise in this as in all class action cases," but to permit "various secondary issues of plaintiffs' claim[s] to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.").

[55] *Anwar*, 289 F.R.D. at 112-13 (citing *Moore v. PaineWebber, Inc.*, 306 F. 3d 1247, 1252 (2d Cir. 2002); *Vivendi*, 242 F.R.D. at 90).

[56] *Amgen*, 133 S. Ct. at 1191-92.

[57] *In re Alstom*, 253 F.R.D. at 281.

- 11 -

> The critical issues for establishing liability in this case include whether Defendants engaged in a fraudulent scheme and made the false and misleading statements and omissions, whether those statements and omissions were material, whether Defendants acted with scienter, and whether Defendants' conduct injured those who purchased Alstom shares during the Proposed Class Period. Plaintiffs will likely rely on similar evidence when establishing each of the foregoing issues of proof at trial, and thus, common issues predominate over individual issues.[58]

Likewise, the critical issues for establishing liability in this case include whether DTT engaged in a fraudulent scheme and made the false and misleading statements and omissions, whether those statements and omissions were material, whether Defendants acted with scienter, and whether Defendants' conduct injured members of the Class. Plaintiffs will likely rely on similar evidence when establishing each of the foregoing issues at trial, and thus, common issues predominate over individual issues. As in *Amgen*, the proposed Class is "entirely cohesive: It will prevail or fail in unison. In no event will the individual circumstances of particular Class Members bear on the inquiry."[59]

The remaining element of reliance may be presumed on a class-wide basis through the "fraud on the market" doctrine adopted by the U.S. Supreme Court in *Basic Inc. v. Levinson*.[60]

### a.   Reliance may be presumed for class members under the "fraud on the market" doctrine.

A party who purchases a stock traded on an efficient market need not show that it directly relied upon or even knew about the alleged misrepresentations.[61] "The fraud-on-the-market

---

[58] *See also Erica P. John Fund, Inc. v. Halliburton Co.*, ___ U.S. ___, 131 S. Ct. 2179, 2186 (2011) ("[t]he Court of Appeals erred by requiring [plaintiff] to show loss causation as a condition of obtaining class certification"); *Amgen*, 133 S. Ct. at 1191 ("the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class"); *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 218 (S.D.N.Y. 2006) ("[i]t is beyond dispute, for example, that in determining whether defendants made false representations or omitted material facts, with scienter, and in connection with the purchase or sale of securities … common issues will predominate over individual ones") (citation omitted), *vacated on other grounds*, 544 F.3d 474 (2d Cir. 2008); *In re Longtop Fin. Techs. Secs. Litig.*, 2013 U.S. Dist. LEXIS 98330, at *7 (S.D.N.Y. July 10, 2013) ("[c]ourts routinely find the elements of scienter, materiality and causation to be common questions in federal securities cases").

[59] *Amgen*, 133 S. Ct. at 1191.

[60] *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

theory rests on the premise that the 'market price of shares' will 'reflec[t] all publicly available information.'"[62] Accordingly, "courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities."[63] The presumption applies if the defendant company's securities traded in an efficient market.[64]

### (1)  CCME traded on an efficient market.

Although not dispositive of efficiency in itself, federal courts have repeatedly held that a listing on NASDAQ or the NYSE AMEX is a good indicator of efficiency.[65]

The Second Circuit has "not adopted a test for the market efficiency of stocks or bonds," but has noted that use of the factors enumerated in *Cammer v. Bloom*[66] (the "*Cammer* Factors") may be appropriately used as "analytical tool[s]" to guide the efficiency inquiry.[67] When assessing the market efficiency requirement, courts are to consider the following factors:[68]

- a history of immediate movement of the stock price caused by unexpected corporate events or financial releases;

- a large weekly trading volume;

- the eligibility of the company to file an S-3 registration statement;

- the existence of market makers and arbitrageurs in the security; and

---

[61] *Amgen*, 133 S. Ct. at 1192; *Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005).

[62] *Amgen*, 133 S. Ct. at 1192 (citing *Basic*, 485 U.S. at 246).

[63] *Id. See also Basic*, 485 U.S. at 245-47 ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.").

[64] *Van Dongen v. CNinsure Inc.*, 2013 U.S. Dist. LEXIS 89534, at *28 (S.D.N.Y. June 24, 2013) (citing *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 508 (S.D.N.Y. 2005)); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012).

[65] *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) (listing "on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency"); *Lumen v. Anderson*, 280 F.R.D. 451, 459-60 (W.D. Mo. 2012) ("the NYSE and NASDAQ are at least entitled to a presumption of efficiency"); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 405 (S.D.N.Y. 2002) (the AMEX "has always been found efficient"); *In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009) ("Plaintiffs made a prima facie showing that the fraud-on-the-market presumption of reliance applied because … Juniper's stock was actively traded on an efficient market – the NASDAQ").

[66] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[67] *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11, 210 (2d Cir. 2008).

[68] *In re Alstom*, 253 F.R.D. at 279-280 (citing *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303 n.162 (S.D.N.Y. 2005); *Cammer*, 711 F. Supp. at 1285-87).

- 13 -

- the existence of a significant number of analyst reports.

These *Cammer* Factors are not a checklist but an "analytical tool," and no set number of the five factors must be demonstrated for a finding of efficiency.[69]

### (a)   A history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

The Second Circuit held in *Teamsters*, that a causal connection between unexpected news and movement in a company's share price is the "most important" *Cammer* Factor and "the essence of an efficient market and the foundation for the fraud on the market theory."[70]

An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.[71] "Generally, event studies in cases such as these look at the expected return on a security; the unexpected return on the security due to an event, *i.e.*, the difference between the observed return or actual stock price and the expected return; and the statistical likelihood of an unexpected return as large as the one observed."[72]

Cynthia Jones, CFA of Financial Markets Analysis, LLC, performed such an event study based upon accepted scientific, peer-reviewed protocols, which demonstrated a direct causal connection between unexpected corporate events and movements in CCME's share price, with more than a 99% degree of certainty. In her declaration, Ms. Jones identified a total of 26 days on which there was information entering the market that was potentially likely to have been viewed as material information at the time it was announced ("News Days"). Jones Decl., ¶ 49.

---

[69] *Teamsters*, 546 F.3d at 210. These factors are addressed in a different order than set forth in *Cammer*.

[70] *Id.* at 207-08 (citing *In re Xcelera.com*, 430 F.3d 503, 512 (1st Cir. 2005) and *Cammer*, 711 F. Supp. at 1287).

[71] *Teamsters*, 546 F.3d at 207-08; *In re Winstar Commc'ns Secs. Litig.*, 2013 U.S. Dist. LEXIS 55800, at *30-31 (S.D.N.Y. April 17, 2013); *Billhofer*, 281 F.R.D. at 161; *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 120 n.7 (S.D.N.Y. 2008) ("[n]umerous courts have held that an event study is a reliable method for determining market efficiency and the market's responsiveness to certain events or information") (citation omitted).

[72] *Billhofer*, 281 F.R.D. at 162.

- 14 -

Ms. Jones performed a regression analysis demonstrating that the material information disclosed on "News Days" caused directionally appropriate and statistically meaningful abnormal returns (depending upon whether the news was positive or negative) on 11, or 42% of News Days. Jones Decl., ¶ 54.

Conversely, CCME's share price changed by a statistically meaningful amount on only 14 of the 212 (approximately 7%) of the "Non-News Days" that she tested during the Class Period. Jones Decl., ¶ 54. Statistically meaningful price changes thus were approximately six times more likely to occur on "News Days" than on "Non-News Days." Jones Decl., ¶ 54. This Court has previously found an identical statistical measure to be indicative of an efficient market.[73]

The 11 statistically significant abnormal returns on "News Days" are also much higher than would be expected in a random sampling of days without important news.[74] If 26 non-material news dates were selected, one would expect to observe an average of less than one-and-a-half statistically significant abnormal returns (.05 x 26 = 1.3), not the 11 that actually occurred during the Class Period. Jones Decl., ¶ 55. The fact that such a high percentage of abnormal returns occurred on News Days leads to the conclusion (with a greater than 99% level of certainty) that company news *caused* the abnormal returns because such a high level of abnormal returns would occur in virtually zero percent of randomly generated samples of Non-News Days. Jones Decl., ¶ 56.

Further, Ms. Jones observed statistically significant abnormal returns on four of the eight dates (50%) during the Class Period in which the Amended Complaint alleges false statements or

---

[73] *See In re Alstom*, 253 F.R.D. at 280 (expert opinion that company was "over 6 times more likely" to have a statistically significant return on a day with news than on a day with no news was significant to a finding of market efficiency).

[74] Ms. Jones found that the absolute abnormal return on "News Days" was 8.9%, which was more than three times greater than the 2.7% on "Non-News Days." Jones Decl., ¶ 57.

010244-11  627103 V1

disclosures of partially curative information, including abnormal returns of 15% on January 31,

2011 (following the release of the Citron report), and an abnormal negative return of 33.2%

following the Muddy Waters report on February 3, 2011. Jones Decl., ¶ 59.

Ms. Jones thus concluded that CCME's share price "responded rapidly to new, relevant

information" and "did not display significant price changes" in the absence of relevant

information. Jones Decl., ¶ 57. The "cause and effect" impact of unexpected news on CCME's

share price is strong evidence that CCME's share price moved significantly due to the news of

unexpected corporate events.[75] Accordingly, it is compelling evidence that CCME shares traded

on an efficient market because such price movements due to the disclosure of unexpected events

are "the essence of an efficient market and the foundation for the fraud on the market theory."[76]

### (b) A large weekly trading volume.

A large weekly trading volume, as measured by average weekly trading is also evidence

of market efficiency.[77] CCME was traded on the NYSE AMEX from the beginning of the Class

Period through June 2, 2010 and on the NASDAQ from June 3, 2010 through the end of the

Class Period. ¶ 37. An actively traded security, as evidenced by a large weekly volume of stock

trades, indicates "significant investor interest in the company," and therefore, a "likelihood that

many investors are executing trades on the basis of newly available or disseminated corporate

information."[78] "Turnover measured by average weekly trading of 2% or more of the outstanding

shares would justify a strong presumption that the market for the security is an efficient one."[79]

Ms. Jones examined the trading volume of CCME during the Class Period, noting a weekly

average of approximately 6 million CCME shares traded during the Class Period, for an average

---

[75] *Id.* at 162-63.

[76] *Cammer*, 711 F. Supp. at 1287.

[77] *Alstom*, 253 F.R.D. at 280.

[78] *Cammer*, 711 F. Supp. at 1286.

[79] *Id.* at 1293.

- 16 -

weekly turnover rate of 17.0%. Jones Decl., ¶ 23.[80] This weekly turnover rate of 17.0% far

exceeds the 2.0% weekly turnover rate that *Cammer* suggested would justify a "strong

presumption" that the market for the security is an efficient one.[81]

### (c)    Eligibility to file a S-3 registration statements.

Meeting the threshold requirements for filing a Form S-3 with the SEC tends to support a

finding of efficiency, as "[g]enerally speaking, it is the largest and most well-known companies

which register equity securities on Form S-3."[82] An S-3 Registration Statement is a SEC

registration form that may be used in a public offering by a company that is organized and

operating under the laws of the United States or its territories, has filed reports under the

Exchange Act for twelve months, has suffered no default of its obligations and has at least $75

million in market value of stock held by non-affiliates. 17 C.F.R. § 239.13.[83]

CCME met each of these requirements, and was eligible to file Form S-3. In fact, not

only was it eligible to file, but CCME *actually filed* two Forms S-3 (on December 16, 2009[84] and

August 16, 2010[85]), and an amended Form S-3/A (on October 5, 2010[86]). Accordingly, CCME's

meeting of threshold requirements for, and its actual filing of Form S-3, adds to the evidence that

the market for CCME was efficient, and satisfies this *Cammer* Factor.

---

[80] Even after removing the abnormally high trading during the week of February 4, 2011, average weekly volume was approximately 5 million shares, resulting in a turnover rate of 14.3%. Jones Decl., ¶ 23.

[81] *See also In re Alstom*, 253 F.R.D. at 280 (noting that the 4.3% average weekly trading volume of the company's securities "far exceeds the 1-2% benchmark set forth in *Cammer*").

[82] *Cammer*, 711 F. Supp. at 1271.

[83] *See also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 517 (1st Cir. 2005).

[84] China MediaExpress Holdings, Inc., Registration Statement (Form S-3) (Dec. 16, 2009). A copy of this document is attached as Exhibit E the Barth Decl.

[85] China MediaExpress Holdings, Inc., Registration Statement (Form S-3) (Aug. 16, 2010). A copy of this document is attached as Exhibit F the Barth Decl.

[86] China MediaExpress Holdings, Inc., Amended Registration Statement (Form S-3/A) (Aug. 16, 2010). A copy of this document is attached as Exhibit G the Barth Decl.

(d)     **The existence of market makers and arbitrageurs.**

The existence of market makers and arbitrageurs provides a mechanism through which the market is expected to receive information and fully incorporate it into the stock price of a security, as market makers "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[87] Courts have held that there only need be "some market makers" to satisfy this factor. [88] "Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption" of efficiency.[89]

Over the course of the Class Period, there were more than 200 firms making a market in CCME common stock, with 21 firms each that accounted for at least 1% of the reported trading in CCME common stock. Jones Decl., ¶ 32.[90] Even these 21 high-volume market makers is a far larger number than the 10 market makers that were considered sufficient by *Cammer* to give rise to the "substantial presumption" that CCME traded on an efficient market.[91] Additionally, the more than 60 institutional investors identified in the Jones Declaration (¶ 40) acted as arbitrageurs to further facilitate the efficiency of the market.[92]

(e)     **The existence of a significant number of analyst reports.**

The existence of securities analysts following CCME during the Class Period would imply that the market would rapidly and fully incorporate information into the stock price

---

[87] *Teamsters*, 546 F.3d at 206 (quoting *Cammer*, 711 F. Supp. at 1286-87). The SEC defines a "market maker" as "a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers." *Teamsters*, 546 F.3d at 206 (quoting 17 C.F.R. § 240.15c3-1[c][8] (2006)).

[88] *In re Dynex Capital, Sec. Litig.*, 2011 U.S. Dist. LEXIS 22484, at *15 (S.D.N.Y. Mar. 7, 2011).

[89] *Cammer*, 711 F. Supp. at 1293.

[90] Because market makers are used only for securities traded on the NASDAQ or over the counter, this factor is not relevant prior to June 3, 2010, when CCME traded on the NYSE AMEX. *In re DVI Inc. Secs. Litig.*, 249 F.R.D. 196, 210 (E.D. Pa. 2008), *aff'd*, 639 F.3d 623 (3d Cir. 2011).

[91] *Cammer*, 711 F. Supp. at 1293. *See also In re Winstar Commc'ns Sec. Litig.*, 2013 U.S. Dist. LEXIS 55800, at *27-28 (six market makers weighed toward a finding of efficiency).

[92] *In re Alstom*, 253 F.R.D. at 280.

because analyst reports would likely be "closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[93] CCME was followed by market analysts Northland Securities ("Northland") and Global Hunter Securities ("GH").[94] GH initiated coverage of CCME with a "buy" rating on July 1, 2010 and issued at least four additional reports prior to March 11, 2011. Northland initiated coverage with a "buy" rating on July 28, 2010 and issued at least two additional reports before the end of the Class Period. Jones Decl., ¶ 25. Additionally, analysts from Citron Research and Muddy Waters Research issued investigative reports during the Class Period. ¶¶ 82, 85.[95] CCME also made presentations at investor conferences hosted by brokerage firms Merrill Lynch, Rodman & Renshaw, Piper Jaffray and Roth Capital. Jones Decl., ¶ 28. The Company also hosted regular teleconferences for analysts and other investors in conjunction with the release of its quarterly financial results throughout the Class Period. Jones Decl., ¶ 27. As evidenced by the transcripts of these calls, on March 23, 2010, May 14, 2010, August 13, 2010, and November 8, 2010, numerous analysts participated in the Q&A sessions, posing questions regarding the Company's earnings momentum, strategy, exchange listing status, and plans for expansion, among others. Jones Decl., ¶ 27.

The rise of financial reporting website in the years since *Cammer* has also changed the landscape in this regard. Whereas analysts used to provide the bulk of publicly available information about a company, the numerous websites and financial blogs dedicated to financial reporting and company research have dramatically changed the ability of the market to obtain information about companies. Analysts and reporters from *Seeking Alpha* and other news sources routinely disseminated information about the Company that, in previous years, would have been

---

[93] *Cammer*, 711 F. Supp. at 1286.

[94] An analyst report authored by Global Hunter Securities was attached as Exhibit F to the Vasey Declaration in support of CCME's motion to dismiss, filed February 6, 2012 (Docket No. 96-6).

[95] *See also* Attachment A to the DTT March 3, 2011 letter (Am. Compl., Ex. A), which listed Citron and Muddy Waters reports as making allegations that DTT decided to investigate.

the exclusive providence of analyst research. More than 2,000 pages of articles where CCME was the subject of the article or mentioned in the article during the Class Period are available on Bloomberg and Dow Jones Factiva. Jones Decl., ¶ 48.

Although only two analysts initiated coverage in 2010, by the end of the Class Period, they were joined by Muddy Waters and Citron, and numerous other news sources, in addition to analyst participation in CCME presentations at numerous investor conferences and conference calls. Accordingly, this factor is indicative of market efficiency.[96]

### (f)    *Krogman* Factors.

In addition to the *Cammer* Factors, some courts have also referred to three additional factors (the "*Krogman* Factors")[97]: (i) the company's market capitalization; (ii) the relative size of the bid-ask spread for the security; and (iii) the company's float.[98]

Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.[99] CCME's market capitalization during the Class Period ranged from $292 million to $585 million, averaging approximately $422 million – placing it between the 8th and 9th deciles of public companies, similarly to companies such as, K-Swiss, RealNetworks, and Perry Ellis. Jones Decl., ¶¶ 36-37. As described in the Jones Declaration, 36.4% of all public companies are smaller than 9th decile companies, and 40% of all companies are larger than 8th decile companies. CCME's market capitalization was sufficiently large that it would not have been an impediment to attracting

---

[96] *Lehocky v. Tidel Techs., Inc*., 220 F.R.D. 491, 508 (S.D. Tex. 2004) (three analysts following a company was "relatively neutral" in terms of finding market efficiency); *Cheney v. Cyberguard Corp*., 213 F.R.D. 484, 499 (S.D. Fla. 2003) (two analysts "does not strongly weigh in support of Plaintiffs' position, but does not alone preclude a preliminary finding of efficiency"); *In re Xcelera.com Sec. Litig.,* 430 F.3d at 516 (one analyst issuing only one report was not sufficient to reverse lower court's determination that the market was efficient).

[97] *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[98] *See, e.g*., *Billhofer*, 281 F.R.D. at 160.

[99] *Krogman*, 202 F.R.D. at 478.

- 20 -

investors and to a finding of market efficiency. Jones Decl., ¶ 38. This is another strong indicator that CCME traded in an efficient market.

The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares. A large bid-ask spread is indicative of an inefficient market.[100] CCME's bid-ask spread was about 0.27% during the Class Period. Jones Decl., ¶ 43. This compares favorably to a sample of 60 members of the NASDAQ composite market with similar capitalization to CCME that had an average bid-ask spread of 0.51%. Jones Decl., ¶ 44. CCME's narrow bid-ask spread is a strong indicator of an efficient market.[101]

The final *Krogman* Factor is the size of the public float (the degree to which shares of the security are held by the public, rather than insiders), which is somewhat duplicative of the S-3 requirement to show a $75 million float.[102] CCME's public float ranged from approximately $151 million to $360 million during the Class Period. The size of this public float was more than sufficient to assure an efficient market. CCME's "insiders," owned between 57 and 69 percent of the shares outstanding during the Class Period, or, inversely, the public float ranged from 31 to 43 percent. Jones Decl., ¶ 39.

The sophistication of these public shareholders is also relevant, with courts noting that a "substantial number of institutional investors" is consistent with market efficiency.[103] Here, CCME had more than 60 institutional shareholders, including such sophisticated investors as Merrill Lynch, Morgan Stanley, CALPERS and Vanguard. Jones Decl., ¶ 40. The public float of

---

[100] *Krogman*, 202 F.R.D. at 478.

[101] *In re Scientific-Atlanta, Inc. Secs. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (finding that a bid-ask spread that never exceeded 1.9% "weighed heavily" in favor of market efficiency). CCME's bid-ask spread was even smaller, never exceeding 1.3% during the Class Period. Jones Decl., Ex. I.

[102] *Billhofer*, 281 F.R.D. at 160; *Unger v. Amedisys Inc*., 401 F.3d 316, 323 (5th Cir. 2005) (citing *Krogman*, 202 F.R.D. at 477-78).

[103] *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 756 (S.D. Tex. 2006); *In re Alstom*, 253 F.R.D. at 280 (institutional investors facilitated the efficiency of the market).

between 10 million and 15 million shares, particularly in combination with the sophisticated institutional ownership, strongly suggests market efficiency. Jones Decl., ¶ 41.

### b.  Option purchasers are also entitled to the presumption of reliance.

Purchasers of call options and sellers of put options are equally entitled to the fraud-on-the-market presumption because the value of these derivative securities depends upon the value of CCME common stock.[104] Likewise, the Third Circuit concluded in *Deutschman v. Beneficial Corp.* that "[t]he market price for options is directly responsive, therefore, to changes in the market price of the underlying stock, and to information affecting that price."[105]

### 2.  A class action is superior to other available methods of adjudicating.

When certifying a proposed class in accordance with Rule 23(b)(3), courts must consider whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication.[106] Securities fraud class actions are generally found to be superior to individual actions.[107] Rule 23(b)(3) identifies several factors to consider in making this determination:

---

[104] *In re Enron Corp. Sec. Litig.*, 529 F. Supp. 2d at 754 (because "[t]he value of these derivative securities depended upon the value of Enron common stock" the evidence demonstrating that the market for Enron stock was efficient was "sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' § 10(b) claims based on the options").

[105] *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988). *See also In re Merck & Co. Sec. Derivative & ERISA Litig.*, 2013 U.S. Dist. LEXIS 13511, at *61 (D.N.J. Jan. 30, 2013) ("it is logical and appropriate to apply the same presumption of reliance to class members who exercised options that were derivatives of that stock. . ."); *In re Oxford Health Plans, Inc. Sec. Litig.*, 199 F.R.D. 119, 123-24 (S.D.N.Y. 2001) (options traders were typical and adequate Class Representatives); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 744 (S.D.N.Y. 1989) (purchasers of call options during the period in question have standing under § 10(b)); *Moskowitz v. Lopp*, 128 F.R.D. 624, 631 (E.D. Pa. 1989) (holding that plaintiff who used a variety of trading strategies, including options, could rely upon the fraud-on-the-market presumption and was an adequate class representative).

[106] *Anwar*, 289 F.R.D. at 114.

[107] *In re Blech*, 187 F.R.D. at 107 ("[i]n general, securities suits such as this easily satisfy the superiority requirement of Rule 23"). *See also In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. 2008); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 120 (S.D.N.Y. 2008).

- 22 -

> (A) The interest of members of the class in individually controlling the prosecution … of separate actions; (B) The extent and nature of any litigation concerning the controversy already commenced by … by members of the class; (C) The desirability … of concentrating the litigation of the claims in the particular forum; and (D) The difficulties likely to be encountered in the management of a class action.

In this case, a balancing of these factors demonstrates that a class action is the superior method of litigating securities fraud claims against CCME.

### a.   Any individual interest in controlling the prosecution of this action is minimal.

The sheer scope and complexity of this controversy would make individual litigation difficult for the vast majority of Class Members. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive, as this Court previously opined in *In re Livent*:

> [I]n the absence of class certification, not only would separate and scattered lawsuits be needlessly repetitive and inefficient given the pervasive parallels presented above, many putative class members – particularly, retail investors – would also be discouraged from even seeking legal relief as their potential recovery would be outweighed by the transaction costs of individual litigation.[108]

Further, given that the case has been pending for more than two years and the allegations of the Amended Complaint have already withstood a strongly contested motion to dismiss, it is unlikely that any other Class Member would wish to file their own action and re-litigate similar claims elsewhere.

### b.   Other related litigation will not protect the Class's interests.

The extent of other litigation concerning the same controversy overlaps with the first factor and also militates in favor of class certification. Fed. R. Civ. P. 23(b)(3)(B). Plaintiffs are

---

[108] *In re Livent,* 210 F.R.D. at 518. *See also Worldcom*, 219 F.R.D. at 304 (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail"); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30") (emphasis in original).

aware of only one other pending lawsuit against DTT related to their audit of CCME, an individual action brought in federal court in Delaware.[109] That case is bought on behalf of the individual plaintiff only (a purchaser of non-public securities that is not a member of the Class, and seeks no injunctive or other relief that would protect the interest of any Class Member).

### c.   Litigating all of the claims in this forum is the most just and efficient course of action.

The third superiority factor considers "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). This Court has presided over this action for over two years and is already deeply involved in the legal issues and the factual circumstances, having written a lengthy and complex opinion denying Defendant DTT's motion to dismiss.[110] Re-litigating these same issues would result in a "significant waste of judicial resources."[111] These factors weigh strongly in favor of litigating Plaintiffs' claims in this Court as a class action.

### d.   The Court can effectively manage this case as a class action.

The final factor asks the Court to consider "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). The failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and "should be the exception rather than the rule."[112] A class action "has to be unwieldy indeed before it can be pronounced an inferior alternative – no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied – to no litigation at all."[113] The Court has entered a case-management plan providing for the orderly progress of the case. Whatever complexities

---

[109] *Starr Investments Cayman II v. China MediaExpress Holdings, Inc.,* No. 1:11-cv-00233-RGA (D. Del.).

[110] *China MediaExpress*, 2013 U.S. Dist. LEXIS 28592.

[111] *Billhofer*, 281 F.R.D. at 164.

[112] *In re Visa Check*, 280 F.3d at 140.

[113] *Carnegie*, 376 F.3d at 661.

- 24 -

may arise in handling the claims in a single class action will be insignificant compared to the complexities of scores of individual lawsuits.

## IV.    CONCLUSION

For the reasons stated herein and in the accompanying supporting exhibits, the Class Representatives respectfully request that the Court issue an Order: (i) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (ii) appointing the Class Representatives as the representative parties; and (iii) appointing Hagens Berman Sobol Shapiro LLP as Lead Counsel and Cohen Milstein Sellers & Toll as Co-counsel for the Class.

DATED:  August 16, 2013                **HAGENS BERMAN SOBOL SHAPIRO LLP**

By   */s/ Karl P. Barth*
        Steve W. Berman
        Erin K. Flory
        Karl P. Barth
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
erin@hbsslaw.com
karlb@hbsslaw.com

Jason A. Zweig (JZ-8107)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Penn Plaza, 36th Floor
New York, NY 10119
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
jasonz@hbsslaw.com

Reed R. Kathrein
Peter E. Borkon
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

*Lead Counsel for the Proposed Class*

- 25 -

Michael Eisenkraft (ME-6974)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
meisenkraft@cohenmilstein.com

Steven J. Toll
Julie Goldsmith Reiser
S. Douglas Bunch (SB-3028)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005-3964
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
dbunch@cohenmilstein.com

*Co-counsel for the Proposed Class*

- 26 -

**CERTIFICATE OF SERVICE**

I hereby certify that I am the ECF User whose ID and password are being used to electronically file the foregoing with the Clerk of the Court using the CM/ECF system on August 16, 2013, which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*/s/ Karl P. Barth*
KARL P. BARTH

# Mailing Information for a Case 1:11-cv-00804-VM

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Karl P. Barth**
  karlb@hbsslaw.com

- **Gary Frederick Bendinger**
  gbendinger@sidley.com,nyefiling@sidley.com

- **Jeffrey A. Berens**
  jeff@dyerberens.com

- **Steve W. Berman**
  steve@hbsslaw.com,carrie@hbsslaw.com,jeniphr@hbsslaw.com

- **Jeniphr Breckenridge**
  jeniphr@hbsslaw.com

- **Stephen Douglas Bunch**
  dbunch@cohenmilstein.com,efilings@cohenmilstein.com

- **Donald Howard Chase**
  dchase@morrisoncohen.com,courtnotices@morrisoncohen.com

- **Marshall Pierce Dees**
  mdees@holzerlaw.com

- **Michael Benjamin Eisenkraft**
  meisenkraft@cohenmilstein.com,efilings@cohenmilstein.com

- **Robert Craig Finkel**
  rfinkel@wolfpopper.com,cdunleavy@wolfpopper.com,nmackiel@wolfpopper.com,TSHAPIRO@shulaw.com

- **Michael Ira Fistel , Jr**
  mfistel@holzerlaw.com,cyoung@holzerlaw.com,cmoore@holzerlaw.com

- **Savvas Antonios Foukas**
  foukas@hugheshubbard.com

- **Lionel Z. Glancy**
  lglancy@glancylaw.com,mmgoldberg@glancylaw.com,csadler@glancylaw.com,pbinkow@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com,cturner@glancylaw.com

- **Marc Ian Gross**
  migross@pomlaw.com

- **Jonathan Richard Horne**
  jhorne@rosenlegal.com

- **Jesse James**
  jamesj@hugheshubbard.com

- **Reed Richard Kathrein**
  reed@hbsslaw.com,peterb@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Eugene R. Licker**
  elicker@loeb.com,nydocket@loeb.com,tcummins@loeb.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,lpvega@pomlaw.com

- **William R. Maguire**
  maguire@hugheshubbard.com

- **Michael Edward Marr**
  mmarr@marrlaw.com

- **Kim Elaine Miller**
  kim.miller@ksfcounsel.com,kimmiller225@yahoo.com

- **David S. Nalven**
  davidn@hbsslaw.com,Seanh@hbsslaw.com

- **Julie Goldsmith Reiser**
  jreiser@cmht.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Miles Norman Ruthberg**
  miles.ruthberg@lw.com,jessica.bengels@lw.com,jason.grossman@lw.com

- **Gazeena Kaur Soni**
  gsoni@sidley.com,nyefiling@sidley.com,tnapolitano@sidley.com

- **Steven Jeffrey Toll**
  stoll@cohenmilstein.com,efilings@cohenmilstein.com

- **Laura Maines Vasey**
  lvasey@loeb.com,nydocket@loeb.com,tcummins@loeb.com

- **Jason Allen Zweig**
  jasonz@hbsslaw.com,peterb@hbsslaw.com,reed@hbsslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Patrick Vincent Dahlstrom**
Pomerantz Haudek Block Grossman & Gross LLP
100 Park Avenue, 26th Floor
New York, NY 10017

**Michael Goldberg**
Glancy Binkow & Goldberg, LLP (CA)
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067

**Howard G. Smith**
Smith & Smith
3070 Bristol Pike
Bensalem, PA 19020