```
                                        USDC SDNY
                                        DOCUMENT
UNITED STATES DISTRICT COURT            ELECTRONICALLY FILED
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X   DOC #: _____  8 / :
DANIEL McINTIRE,                    :   DATE FILED: 1/15/14
                                    :
                    Plaintiff,      :
                                    :
      -  against  -                 :
                                    :
CHINA MEDIAEXPRESS HOLDINGS,        :   11-cv-0804 (VM)
INC., et al.,                       :
                                    :   DECISION AND ORDER
                    Defendants.     :
------------------------------------X
                                    :
IN RE CHINA MEDIAEXPRESS HOLDINGS,  :
INC. SHAREHOLDER LITIGATION         :
                                    :
------------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

Lead Plaintiffs Irrevocable Trust FBO Lansing Davis and the Davis Partnership LP (collectively, "Plaintiffs") brought this action on behalf of a potential class (the "Proposed Class") of purchasers of common stock of China MediaExpress Holdings, Inc. ("CCME") between April 1, 2010 and March 11, 2011 (the "Class Period") against Defendants CCME, Deloitte Touche Tohmatsu in Hong Kong SAR ("DTT HK"), and other individuals and entities no longer party to this action. Plaintiffs assert claims under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs' allegations are detailed

1

more fully in the Court's prior opinion in this action, see McIntire v. China MediaExpress Holdings, Inc., 927 F. Supp. 2d 105 (S.D.N.Y. 2013), familiarity with which is presumed.

Pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), Plaintiffs now move to certify the Proposed Class, which is comprised of all those who, during the Class Period, suffered losses resulting from (1) purchases of shares of CCME common stock, (2) purchases of CCME call options, and (3) sales of CCME put options. (Dkt. No. 177.) Plaintiffs also move for the Court to appoint them and three other individual class members (the "Proposed Class Representatives") as class representatives and to appoint Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") (together, the "Proposed Class Counsel") as lead counsel and co-counsel, respectively, for the Proposed Class. (Id.) DTT HK opposes the motion and also moves to strike the testimony of Plaintiffs' market efficiency expert. (Dkt. No. 204.)

For the reasons discussed below, the Court finds that the Proposed Class satisfies all of the requirements of Rule 23(a) and the pertinent requirements of Rule 23(b). The Court also finds that appointment of the Proposed Class Representatives and the Proposed Class Counsel is

2

appropriate.   Plaintiffs' motion is thus GRANTED, and DTT HK's motion is DENIED.

## I.   <u>BACKGROUND</u>[1]

The Court more fully detailed the background of this case in its previous Decision and Order.  <u>See</u> <u>McIntire</u>, 927 F. Supp. 2d at 112-19.   The Court briefly restates here only those facts relevant to the pending motion for class certification.

Defendant DTT HK is a Hong Kong entity that is a member firm of Deloitte Touche Tohmatsu Limited.   It provides audit, accounting, and other financial consulting services to its clients.   DTT HK served as CCME's independent auditor from December 4, 2009 to March 11, 2011.   On March 31, 2010, CCME filed its Form 10-K annual report for the 2009 fiscal year with the SEC, which included an audit report from DTT HK certifying the financial statements contained in the Form 10-K report.

The integrity of CCME's financial condition was first called into doubt on January 31, 2011, when Citron Research ("Citron") published an analyst report (the "Citron Report") questioning multiple aspects of CCME's business operations and accounting practices.   Citron stated that it

---

[1] The Court has reviewed the parties' filings, including briefs and declarations in support.  (Dkt. Nos. 178, 179, 202, 203, 205, 206, 211, 212, 213, 214, 216, 218, 219, 220, 221, 222.)   Unless specifically quoted, no further citation to these documents will be made.

had uncovered information suggesting that CCME was committing fraud. Shortly thereafter, on February 3, 2011, Muddy Waters Research ("Muddy Waters") published an analyst report (the "Muddy Waters Report") on CCME, which questioned CCME's business model and accounting practices and highlighted multiple signs of fraud. Muddy Waters concluded that CCME was engaged in a massive fraud to artificially inflate the value of its stock. CCME's share price declined 14 percent following the Citron Report and an additional 33 percent following the Muddy Waters Report. CCME denied the allegations in the Citron Report and the Muddy Waters Report, and noted that its financial statements had been audited by, among others, DTT HK.

DTT HK subsequently sent CCME a letter dated March 3, 2011, which outlined enormous signs of fraud that DTT HK had encountered during its audit of CCME's 2010 financial statements. One week later, on March 11, 2011, DTT HK resigned as CCME's auditor because no progress had been made with respect to the issues raised in the March 3 letter. DTT HK informed CCME that it could no longer rely on management's representations of CCME's financial condition. DTT HK also withdrew its previous audit report.

After DTT HK's resignation, CCME requested that trading in its shares be suspended. When trading resumed

4

about two months later, CCME's share price immediately declined 81.8 percent.

Plaintiffs had purchased shares of CCME during the putative Class Period. They allege a common course of wrongful conduct by DTT HK during the Class Period, through which DTT HK artificially inflated the share price of CCME by issuing false and misleading statements in its audit report certifying CCME's 2009 financial statements and by stating that CCME's financials complied with generally accepted accounting principles ("GAAP"). Plaintiffs assert that CCME's share price had declined substantially from the Class Period high as a result of the market's recognition of CCME's fraud.

Plaintiffs commenced the first suit affiliated with this action on February 4, 2011. (Dkt. No. 1.) By Orders dated April 4, 2011 (Dkt. No. 4) and April 15, 2011 (Dkt. No. 28), the Court consolidated four separate actions under this docket. By Order dated June 7, 2011, the Court appointed Irrevocable Trust FBO Lansing Davis and the Davis Partnership LP as Lead Plaintiffs and approved the selection of Hagens Berman Sobol Shapiro LLP as Lead Counsel. (Dkt. No. 50.) Plaintiffs filed an amended and consolidated complaint on October 25, 2011. (Dkt. No. 63.)

All defendants in this action moved to dismiss Plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, asserting that the amended complaint failed to state a claim upon which relief may be granted and to plead fraud with sufficient particularity. By Order dated February 28, 2013, the Court denied the motions to dismiss the case against CCME and DTT HK, but granted the motion as to the remaining defendants. McIntire, 927 F. Supp. 2d at 138-39. On January 17, 2014, the Court entered a default judgment against CCME (Dkt. No. 193), leaving DTT HK as the sole remaining defendant in this action.

## II. **LEGAL STANDARD**

To certify the Proposed Class, Plaintiffs must satisfy all four of the requirements of Rule 23(a) and one of the categories of Rule 23(b). See In re Livent, Inc. Noteholders Sec. Litig., 210 F.R.D. 512, 514 (S.D.N.Y. 2002) ("Livent"). To meet Rule 23(a)'s prerequisites, Plaintiffs must demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Plaintiffs seek certification under Rule 23(b)(3), which requires that they further demonstrate that common questions of law or fact predominate over any questions affecting individual members and that maintaining a class action is superior to other available methods of adjudication. See Fed. R. Civ. P. 23(b)(3).

Trial courts are given substantial discretion in determining whether to grant class certification because "'the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted.'" In re Nigeria Charter Flights Contract Litig., 233 F.R.D. 297, 301 (E.D.N.Y. 2006) (alteration in original) (quoting In re Sumitomo Copper Litig., 262 F.3d 134, 139 (2d Cir. 2001) ("Sumitomo III")). The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this one involving alleged manipulation of public markets, to maximize the benefits to the public provided by class actions. See In re Sumitomo Copper Litig., 182 F.R.D. 85, 89 (S.D.N.Y. 1998) ("Sumitomo I"); see also In re Sumitomo Copper Litig., 194 F.R.D. 480, 481 (S.D.N.Y.

2000) ("Sumitomo II").   As the Second Circuit stated in Green v. Wolf Corp., "if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require."   406 F.2d 291, 298 (2d Cir. 1968) (quoting Esplin v. Hirschi, 402 F.2d 94, 99 (10th Cir. 1968)) (internal quotation marks omitted).

## III. DISCUSSION

### A.   RULE 23(a) REQUIREMENTS

#### 1.   Numerosity

To meet the requirements of Rule 23(a)(1), "the class must be so large that joinder of all members would be impracticable" (the "Numerosity Requirement").   Sumitomo II, 194 F.R.D. at 482 (citing In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 290 (2d Cir. 1992)). Although precise calculation of the number of potential class members is not required, "the Second Circuit has observed that numerosity is presumed at a level of 40 members."   In re Vivendi Universal, S.A. Sec. Litig., 242 F.R.D. 76, 83 (S.D.N.Y. 2007) ("Vivendi") (internal quotation marks omitted).   "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a

large number of shares were outstanding and traded during the relevant period." Id. at 84 (internal quotation marks omitted); see also In re Natural Gas Commodities Litig., 231 F.R.D. 171, 179 (S.D.N.Y. 2005) (finding that a potential class of investors in publicly traded futures contracts over the course of two years satisfied the numerosity requirement).

CCME was a publicly traded company with more than 32.9 million shares outstanding and an average weekly trading volume of approximately 6 million shares during the Class Period. Given this trading volume, the size of the Proposed Class far exceeds 40 members. Plaintiffs have thus met the Numerosity Requirement. See, e.g., Vivendi, 242 F.R.D. at 84 ("With more than 107 million ADSs and approximately 1 billion ordinary shares outstanding during the relevant Class Period, Plaintiffs have established that joinder is impracticable and that the proposed class satisfies the numerosity requirement.").

    2.  Commonality

Rule 23(a)(2) requires Plaintiffs to demonstrate that common issues of law or fact affect all class members (the "Commonality Requirement"). This requirement has been characterized as a "'low hurdle.'" See Sumitomo II, 194 F.R.D. at 482 (quoting In re Prudential Sec. Litig., 163

9

F.R.D. 200, 206 n.8 (S.D.N.Y. 1995)). Where plaintiffs allege that class members have been injured by similar material misrepresentations and omissions, the Commonality Requirement is satisfied. See, e.g., Vivendi, 242 F.R.D. at 84.

Plaintiffs assert that members of the Proposed Class have suffered injury due to similar material misrepresentations and omissions by DTT HK. Additionally, they propose multiple common questions of law and fact including, but not limited to, whether the federal securities laws were violated by DTT HK's acts and whether statements made by DDT HK to the investing public during the Class Period misrepresented material facts about the business operations of CCME. DTT HK does not dispute that Plaintiffs have met the Commonality Requirement. As such, the Court is persuaded that Plaintiffs have satisfied the Commonality Requirement.

3.   Typicality

Rule 23(a)(3) requires that Plaintiffs' claims be typical of the class (the "Typicality Requirement"). The Typicality Requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. See Sumitomo I, 182 F.R.D. at

10

94.  On the other hand, "[a] court will deny class certification where a class representative may be subject to a unique defense that would 'pose an unacceptable risk of drawing attention away from the central issues in [the] litigation.'"  In re Pfizer Inc. Sec. Litig., 282 F.R.D. 38, 45 (S.D.N.Y. 2012) (quoting In re Omnicom Grp., Inc. Sec. Litig., No. 02 Civ. 4483, 2007 WL 1280640, at *5 (S.D.N.Y. Apr. 30, 2007)).

DTT HK argues that the Proposed Class Representatives fail to meet the Typicality Requirement because they engaged in trades of CCME stock that post-dated the Citron Report and Muddy Waters Report.  DTT HK argues that these purchases defeat typicality because "a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative."  Rocco v. Nam Tai Elecs., Inc., 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (internal quotation marks omitted).  Here, DTT HK argues that the Proposed Class Representatives' trades that post-dated the Citron Report and Muddy Waters Report show that the Proposed Class Representatives did not rely on DTT HK's misstatements in purchasing CCME stock.  According to DTT HK, whether these

post-disclosure purchases defeat the element of reliance threatens to become the focus of the litigation.

The Court is not persuaded that the Proposed Class Representatives engaged in speculative trading such that unique non-reliance defenses would overshadow common questions of law and fact. The Citron Report and Muddy Waters Report both suggested signs of fraud, but did not conclusively reveal the fraud. See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 119 F.R.D. 344, 348 (S.D.N.Y. 1988) (disqualifying class representative because it purchased securities after learning conclusively of the fraud), aff'd, 903 F.2d 176 (2d Cir. 1990). Indeed, it is possible that those investors who purchased shares of CCME following the Citron Report and Muddy Waters Report may have done so precisely because they relied on DTT HK's audit of CCME's financial statements. This prospect raises a factual question that constitutes but one facet of the reliance issues which the trial of the case should resolve.

For the purposes of class certification, the Court is persuaded that Plaintiffs could reasonably have believed that DTT HK's audit was based on better information about CCME's corporate finances than the Citron Report and Muddy Waters Report, both of which were prepared by short sellers

with financial interest in causing CCME stock prices to decline. In this sense, purchases of CCME stock made after the Citron Report and Muddy Waters Report may amplify Plaintiffs' claims of reliance on DTT HK's statements, rather than defeating it. At the least, these issues do not threaten to become the focus of the litigation such that Plaintiffs would inadequately represent the class. See In re Natural Gas Commodities Litig., 231 F.R.D. at 184 (declining to find class representatives atypical based on issues that are "peripheral" and "do not threaten to overshadow the common questions of law and fact"). The Court is thus persuaded that Plaintiffs have met the Typicality Requirement.

### 4.   Adequacy

Rule 23(a)(4) requires that the representative of the parties will "fairly and adequately protect the interests of the class" (the "Adequacy Requirement"). To meet this requirement, the lead plaintiff's counsel must be "qualified, experienced, and generally able to conduct the proposed litigation," and the class representative must not have interests conflicting with the class. Livent, 210 F.R.D. at 517 (internal quotation marks omitted).

DTT HK argues that the Plaintiffs are rendered inadequate to serve as class representatives due to abusive

13

discovery practices.[2]   While the Court "may consider the
honesty   and   trustworthiness   of"   a   proposed   class
representative to determine adequacy, <u>Savino v. Computer
Credit, Inc.</u>, 164 F.3d 81, 87 (2d Cir. 1998), the Court is
not persuaded that any of the conduct that DTT HK alleges
the Proposed Class Representatives engaged in was serious
enough to render them inadequate to represent the Proposed
Class   and   compel   a   denial   of   Plaintiffs'   class
certification motion.   To the contrary, the evidence
presented to the Court suggests that the Proposed Class
Representatives have acted in good faith.   Moreover, none
of the alleged discovery abuses that DTT HK raises have
prejudiced either party.

The Court is also persuaded that the appointment of
the Proposed Class Counsel is appropriate.   Counsel have
vigorously pursued the Proposed Class's claims in this
litigation, including defeating DTT HK's motion to dismiss.
The Proposed Class Counsel have additionally provided the
Court with a list of their extensive experience and
resources in prosecuting claims of the type made here.

---

[2] Certain information relevant to these arguments is subject a
protective order stipulated to by the parties and entered by the Court.
(Dkt. No. 172.)  The parties have filed redacted copies of their papers
on the public docket and submitted unredacted copies to the Court.  The
Court has reviewed the unredacted papers and considered them in
reaching its decision.

B.   RULE 23(b) REQUIREMENTS

In addition to satisfying Rule 23(a), Plaintiffs must also establish that this action is maintainable as a class action under Rule 23(b). Here, Plaintiffs seek to certify the Proposed Class pursuant to Rule 23(b)(3), which provides that an action is maintainable as a class action if "questions of law or fact common to class members predominate over any questions affecting only individual members" (the "Predominance Requirement"), and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "Superiority Requirement"). Fed. R. Civ. P. 23(b)(3).[3]

DTT HK does not argue that Plaintiffs have failed to satisfy the Superiority Requirement. The Court is persuaded that Plaintiffs have met the Superiority Requirement. See, e.g., In re Blech Sec. Litig., 187 F.R.D. 97, 107 (S.D.N.Y. 1999) ("In general, securities suits such as this easily satisfy the superiority requirement of Rule 23.").

---

[3] "A class certified pursuant to Rule 23(b)(3) is sometimes referred to as an 'opt-out' class because Rule 23(c)(2) mandates that members of a class certified pursuant to Rule 23(b)(3) be afforded the opportunity to 'request exclusion' from that class." Vivendi, 242 F.R.D. at 90. Should the Court certify the Proposed Class, any investor -- foreign or domestic -- who does not opt out of the class is bound by the final disposition of the case. See id.

On the other hand, DTT HK contends that Plaintiffs have not met the Predominance Requirement for several reasons.    According to DTT HK, individualized questions about whether members of the Proposed Class actually relied on DTT HK's alleged misstatements and omissions when they purchased CCME stock predominate over class-wide questions of reliance.    Plaintiffs counter that the fraud-on-the-market presumption applies here.

The fraud-on-the-market presumption is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business," and thus, "[m]isleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988) (citation and internal quotation marks omitted).   To establish that the fraud-on-the-market presumption should apply, Plaintiffs must make "some showing beyond the complaint," DeMarco v. Robertson Stephens Inc., 228 F.R.D. 468, 470 (S.D.N.Y. 2005) (internal quotation marks omitted), that DTT HK's alleged misstatements and omissions forming the basis of Plaintiffs' claims were "public material misrepresentations" (the "Materiality Requirement") about a

16

stock traded on an "open and developed securities market" (the "Market Efficiency Requirement"). <u>Basic</u>, 485 U.S. at 241, 247.

If Plaintiffs meet their burden of demonstrating materiality and market efficiency, they are entitled to a rebuttable presumption that DTT HK's alleged misstatements and omissions affected the price of CCME securities on the open market and that all class members relied on the alleged misrepresentations or omissions. <u>See</u> <u>Hevesi v.</u> <u>Citigroup Inc.</u>, 366 F.3d 70, 77 (2d Cir. 2004) (stating that establishing the fraud-on-the-market doctrine "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value"); <u>In re Salomon Analyst Metromedia Litig.</u>, 236 F.R.D. 208, 220 (S.D.N.Y. 2006) (stating that once fraud-on-the-market presumption is established, Plaintiffs "will be entitled to a presumption that all class members relied on the alleged misrepresentations and that common issues of reliance predominate over individual issues for purposes of Rule 23(b)").

DTT HK focuses its arguments on the Market Efficiency Requirement. Plaintiffs have proffered the testimony of

Cynthia Jones, CFA ("Jones"), to demonstrate that CCME traded on an efficient market. According to Plaintiffs, Jones is an expert in market efficiency. Jones conducted an "event study," which "correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price." Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 207 (2d Cir. 2008). She concluded that CCME traded in an efficient market. DTT HK argues that (1) Jones is not qualified to be an expert under the standards laid out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny; and (2) Jones's conclusion that CCME traded in an efficient market is not supported by the evidence. DTT HK further argues that the absence of evidence that DTT HK's alleged misstatements impacted the price of CCME's stock defeats the fraud-on-the-market presumption. Finally, DTT HK argues that Plaintiffs cannot show predominance because their theory of liability does not align with their theory of damages. The Court considers these arguments in turn.

    1.   Daubert Motion

    a.   Legal Standard

A court must investigate the expert's compliance with the provision of Federal Rule of Evidence 702 ("Rule 702")

that requires an expert to be "qualified as an expert by knowledge, skill, experience, training or education." As the Second Circuit has noted, "[t]he initial question of whether a witness is qualified to be an 'expert' is important, among other reasons, because an 'expert' witness is permitted substantially more leeway than 'lay witnesses in testifying as to opinions that are not rationally based on [his or her] perception.'" Nimely v. City of New York, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting United States v. Garcia, 291 F.3d 127, 139 & n.8 (2d Cir. 2002)). Courts in the Second Circuit have liberally construed expert qualification requirements when determining whether a witness can be considered an expert. See United States v. Brown, 776 F.2d 397, 400 (2d Cir. 1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule"); In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.").

A trial court must also decide whether a qualified expert's testimony rests on a reliable foundation, or is

improperly based on "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. This inquiry tests "whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." Nimely, 414 F.3d at 396 (citing Daubert, 509 U.S. at 593-94).[4]

b.   Qualifications

DTT argues that Jones is insufficiently qualified to opine on market efficiency based on her lack of meaningful educational and practical expertise. The Court disagrees. Jones's academic training includes an MBA in Finance and a Chartered Financial Analyst (CFA) designation, and her 20 years of industry experience includes conducting event studies and other statistical analyses to assess the efficiency of markets and consulting on a variety of other economic topics germane to securities litigation. Plaintiffs submitted to the Court a list of 19 cases in which courts have accepted Jones as an expert on a variety

---

[4] Courts must also determine whether the proffered testimony would be helpful to the trier of fact in its determination of the question presented. See Nimely, 414 F.3d at 397. Here, there is no dispute that Jones's testimony would be helpful to the Court in its determination of whether CCME traded on an efficient market.

of matters pertaining to the economic analysis of issues relevant to securities law.  (Dkt. No. 179, Exh. A, at 35-37.)  The Court is persuaded that these credentials are sufficient to survive the Daubert motion.

The law does not require a witness to have substantial academic training and accreditation in order to be qualified as an expert under Rule 702.  Rather, an expert may earn his or her expertise "through knowledge, skill, experience, training, or education." Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 457, 458-59 (S.D.N.Y. 2007) (finding expert with substantial career survey experience to be qualified despite not having taken university-level courses in statistical sampling).  The Court is persuaded that Jones's combination of experience, training, and education qualifies her as an expert in market efficiency.

DTT HK leans strongly on IBEW Local 90 Pension Fund v. Deutsche Bank AG, No. 11 Civ. 4209, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013), where the court found a market-efficiency expert unqualified.  There, the court noted that "[s]everal of the flaws in [the expert's] analysis demonstrate[d] his lack of true qualifications." Id. at *14.  For reasons described later in this opinion, the Court has not found similarly fatal deficiencies in the

methodologies    underlying    Jones's    market-efficiency
analysis.

DTT HK also employs a theory of disqualification by
association: it notes that the expert disqualified in
Deutsche Bank, Michael Marek ("Marek"), is Jones's
supervisor.[5]  But the Court is reviewing and must pass on
Jones's qualifications, not Marek's.  The Court is
persuaded that Jones's qualifications are sufficient to
permit her to testify as an expert in market efficiency.

c.    Reliability

DTT HK suggests that Jones's analysis suffers from
flawed methodology and other errors that render her
opinions unreliable.  For the reasons explained below, the
Court is persuaded that DTT HK's objections go to the
weight, not the admissibility, of the testimony.  See Olin
Corp. v. Certain Underwriters at Lloyd's London, 468 F.3d
120, 133-34 (2d Cir. 2006) (affirming admission of expert
testimony where district court found weaknesses in analysis
"went to the weight, rather than admissibility of the

---

[5] Other courts have accepted Marek as an expert in market efficiency.
See, e.g., Billhofer v. Flamel Techs., S.A., 281 F.R.D. 150, 161-63
(S.D.N.Y. 2012) (crediting Marek's event study); In re Juniper Networks
Sec. Litig., 264 F.R.D. 584, 591 (N.D. Cal. 2009) (same); see also
Brown v. China Integrated Energy Inc., No. CV 11-02559 (C.D. Cal. Aug.
4, 2014) (finding Marek qualified, although discrediting event study
due to unreliable methodology).

testimony"). The Court thus rejects DTT HK's motion to strike Jones's testimony on these grounds.

DTT HK first argues that Jones's event study rests on a faulty cause-and-effect analysis. As part of her analysis, Jones classified days into two buckets: those days on which news potentially material to the market was released to the public ("News Days"), and those days on which non-material news or no news at all was released ("Non-News Days"). Jones began her study by searching databases at Bloomberg and Factiva for news articles on CCME during the relevant Class Period. She retrieved over 2000 pages of news articles which she compiled into an event chronology. Without taking into account the price movement of CCME share prices on those days listed in the chronology, Jones used the news articles that she collected to classify each day.

DTT HK argues that Jones failed to use defined, objective, and replicable standards in this classification process. In support of this argument, DTT HK submitted a declaration from its own expert, Rene Stulz ("Stulz"), who identified shortcomings in Jones's selection method and recommended more objective procedures. DTT HK also argues that Jones's methodology was circular because some of the stories she selected were written in response to changes in

CCME's stock price, rather than news items that subsequently affected the stock price. Finally, DTT HK claims that Jones failed to account for the directionality of CCME's share price movement in her analysis.

Plaintiffs respond that Jones's multi-step approach to selecting News Days effectively minimized the potential for bias. Plaintiffs also offer a declaration from Professor Stephen E. Christophe, Ph.D. ("Christophe"). Christophe incorporated some of the procedures urged by Stulz and yielded results that demonstrated market efficiency to an even greater degree than Jones's analysis did. Further, Plaintiffs claim that Jones's selection process did not take into account price movement of CCME stocks and thus was an adequate check against circularity, and Plaintiffs deny that Jones failed to consider directionality.

The Court notes that an expert who is conducting an event study necessarily must use his or her discretion to define selection criteria that are conducive to the execution of a meaningful multivariate regression analysis. Billhofer, 281 F.R.D. at 163 (determining selection criteria "necessarily requires a researcher to make an independent determination"). Put differently, "identifying news, categorizing which news is 'material,' and determining whether news should have a certain (albeit

rough) magnitude of positive or negative influence on price are all subjective determinations." In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586, 618 (C.D. Cal. 2009). Taking into account the necessity of expert discretion that accompanies the classification of trading days in an event study analysis and the law's aversion to rigid standards of expert opinion admissibility, see Daubert, 509 U.S. at 588-89, the Court is satisfied that Jones's methodology for categorizing News Days and Non-News Days was sufficiently reliable, objective, and consistent with scientific principles.

DTT HK next argues that Jones's test for market efficiency lacks sufficient marks of reliability.   Jones found the market for CCME stock to be efficient because she concluded that statistically significant changes in CCME's share price were six times more likely to occur on News Days than on Non-News Days.   DTT HK insists that a finding of market efficiency can occur only when the stock reacts at least 50 percent of the time to potentially material news, regardless of whether the stock price changes more often on News Days than on Non-News Days.   Plaintiffs respond that Jones's test is derived from a law-review article co-authored by accomplished economists and has been endorsed by courts in the past.

The Court is persuaded that the test Jones used to evaluate the results of her regression and to conclude that CCME stocks traded on an efficient market was sufficiently reliable. DTT HK's proposed alternative test suffers from a fatal flaw: it fails to account for the fact that Jones examined days with <u>potentially</u> material news. An efficient market can respond to potentially material news in one of two ways. First, if the market had anticipated the potentially material news, that news was already incorporated into the market price, and the share price would not change in response to the news. On the other hand, if the potentially material news was not anticipated by the market, the share price will change as the market adjusts to the news. Adopting DTT HK's test would account for only the second type of potentially material news, and not the first type. To require a stock to change on at least 50 percent of potentially material news days ignores that, in many circumstances, the absence of a price change on a potentially material news day is not inconsistent with an efficient market.

For that reason, courts have instead endorsed the comparison test that Jones used. <u>See</u>, <u>e.g.</u>, <u>In re Alstom SA Sec. Litig.</u>, 253 F.R.D. 266, 280 (S.D.N.Y. 2008). This test "involves comparing the percentage of days with news

26

that have a statistically significant price movement to the percentage of days without news that have a statistically significant price movement." Paul A. Ferrillo et al., The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases, 78 St. John's L. Rev. 81, 120 (2004). If the stock price is significantly more likely to change on News Days than on Non-News Days, that suggests a causal relationship between material news and the stock price. Id. The Court is thus persuaded that Jones's methodology has a sound basis and survives DTT HK's Daubert motion.[6]

DTT HK levels a host of other objections to Jones's methodology. The Court has reviewed these objections and finds them to be without merit for the purposes of a Daubert motion. While DTT HK has styled these arguments as part of a motion to strike expert testimony, its actual claim is that Jones's event study fails to prove that CCME stock traded on an efficient market. These issues are appropriately considered below as part of the Court's

---

[6] The cases that DTT HK cites to support its proposed test are distinguishable. In In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation, 280 F.R.D. 174 (S.D.N.Y. 2012), the plaintiff's expert failed to prove market efficiency because "the percentage of days with abnormal returns on news and non-news days was not different at a statistically significant level." Id. at 180. In George v. China Automotive Systems, Inc., No. 11 Civ. 7533, 2013 WL 3357170 (S.D.N.Y. July 3, 2013), the plaintiff's expert analyzed only "events . . . that were expected to impact the stock price," not news items that reflected events that could potentially impact the stock price. Id. at *11.

analysis of the merits of Plaintiffs' motion for class certification.   In other words, the objections that DTT HK raises go to the weight to be given to the event study, and not to its admissibility.   See Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd., 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) ("Questions over whether there is a sufficient factual basis for an expert's testimony may go to weight, not admissibility." (internal quotation marks omitted)).   The Court therefore denies DTT HK's Daubert motion.

    2.   Market Efficiency Requirement

    DTT HK argues that Plaintiffs have failed to establish that CCME stock traded on an efficient market.   When assessing the Market Efficiency Requirement, courts consider the factors laid out in Cammer v. Bloom, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989).   The Cammer factors are:

> (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

In re Alstom, 253 F.R.D. at 279-80 (quoting In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 303 n.162 (S.D.N.Y. 2005)).   Courts evaluating the Market Efficiency Requirement may also find guidance in the three factors

28

enumerated in Krogman v. Sterritt, 202 F.R.D. 467, 477–78
(N.D. Tex. 2001). Those factors are: (1) the company's
market capitalization; (2) the relative size of the bid-ask
spread for the security; and (3) the company's float, or
the degree to which shares of the security are held by the
public, rather than insiders. Id.

For the reasons explained below, after evaluating the
Cammer factors and the Krogman factors, the Court is
persuaded that Plaintiffs have presented sufficient
evidence to show that CCME traded in an efficient market.

a. Cammer Factors

The Court finds that the Plaintiffs have proffered
sufficient evidence establishing the Market Efficiency
Requirement under the Cammer analytical framework. Cammer
factors one and four are easily met here. First,
Plaintiffs' expert's finding of a 17 percent average weekly
volume provides a strong presumption of market efficiency.
Even if the figure is inflated to some degree, as DTT
argues, it is doubtful that the actual volume, in the event
that it can be more accurately measured, is below the 1 to
2 percent benchmark set forth in Cammer. See Cammer, 711 F.
Supp. at 1293 ("Turnover measured by average weekly trading
of 2% or more of the outstanding shares would justify a
strong presumption that the market for the security is an

efficient one."). Second, that CME was eligible to and did file multiple S-3 registration statements supports a finding of market efficiency. <u>Id.</u> at 1285 ("[T]he existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient.").

Plaintiffs' showing for the second <u>Cammer</u> factor -- the presence of analyst reports -- is less persuasive. This factor is commonly met where multiple large brokerage firms produce and disseminate analysis reports on the financial condition of a company for the entirety of a Class Period. <u>See</u>, <u>e.g.</u>, <u>In re Alstom</u>, 253 F.R.D. at 280. Plaintiffs concede that CCME was not covered by analysts during the first three months of the Class Period, and that subsequent analyst coverage of CCME was limited to Global Hunter Securities and Northland Securities, and to information contained in the Citron Report and Muddy Waters Report. However, Plaintiffs argue that non-traditional, online publications such as Seeking Alpha, which disseminated 32 reports about CCME during the Class Period, should be considered when analyzing a stock under the second <u>Cammer</u> factor.

The Court finds that the Plaintiffs have not made a strong showing with respect to the second <u>Cammer</u> factor.

30

However, the Court does not find this deficiency to be fatal to Plaintiffs' motion for class certification, given the strength of the Plaintiffs' showings toward the other measures of market efficiency. Indeed, the Cammer factors are meant to be an analytical tool to assist in the evaluation of market efficiency, not a rigid checklist. See In re Freddie Mac, 281 F.R.D. at 181 (citing Teamsters, 546 F.3d at 210). The Court has found nothing indicating that every factor be established, or that the list is necessarily exclusive.

The third Cammer factor concerns the ability of investors to act as arbitrageurs and to facilitate the efficiency of the market. Plaintiffs have submitted the testimony of Jones, who identified more than 200 market makers from a list taken from Bloomberg, and of Christophe, who determined that CCME had an average of 20 market makers throughout the Class Period based on an analysis of data taken directly from NASDAQ-OMX. DTT HK disputes that the number of market makers is an accurate measure of market efficiency, and instead posits that significant short-selling constraints identified by Stulz limited arbitrage opportunities, delinked actual stock prices from prices implied by options, and corrupted the market's overall efficiency. DTT HK also asserts that Plaintiffs' experts

31

failed to assess the existence and effects of short-selling constraints, which undermines their opinions that CCME shares traded in an efficient market.

The Court disagrees. Christophe, using NASDAQ's definition, identified an average of 20 registered market makers for CCME during the Class Period. He observed that during no week in the Class Period did CCME have fewer than 14 market makers, which is the average for a typical NASDAQ-listed stock. The Court is satisfied that CCME's 20-market-maker average supports a presumption of market efficiency. See In re Winstar Commc'ns Sec. Litig., 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (showing of six large banks acting as market makers was sufficient evidence of market efficiency); In re Initial Pub. Offering Sec. Litig., 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (14 market makers sufficient to establish market efficiency); Cammer, 711 F. Supp. at 1287 (10 market makers sufficient for a showing of market efficiency).

The Court is not persuaded that short-selling constraints had a sufficiently corrosive effect on the market for CCME shares as to render it inefficient. While DTT HK relies on Deutsche Bank, the short-selling constraints in that case were much more pervasive, including three short-sale bans by the United States and

German governments.  See Deutsche Bank, 2013 WL 5815472, at
*15.  By comparison, the constraints identified by Stulz in
this case are impactful to a lesser degree and did not
include any outright bans on short sales.  The Court also
rejects DTT HK's reliance on In re PolyMedica Corp. Sec.
Litig., 453 F. Supp. 2d 260 (D. Mass. 2006), because that
decision rested primarily on the plaintiff's woefully
deficient event study.  See id. at 269-70.

Both parties acknowledge that the fifth Cammer factor,
which requires evidence tending to demonstrate that
unexpected corporate events or financial releases cause an
immediate response in the price of a security, is the most
important indicator of market efficiency.  See Teamsters,
546 F.3d at 207.  Plaintiffs offer the expert testimony of
Jones, whose event study found that CCME stock had
statistically meaningful reactions on 11 of the 26 days
classified as News Days, or 42 percent of the time.  Jones
also found that CCME's share price changed in a
statistically meaningful way on 12 of the 212 days
classified as Non-News Days, or 7 percent of the time.
From these results, Jones concluded that it was six times
more likely for CCME's share price to change on News Days
than on Non-News Days.  DTT HK expert Stulz responds that
Jones's event study is methodologically flawed, and that

the actual percentage of share price movement on News Days
is 27 percent.   Plaintiffs offer a rebuttal from
Christophe, who concluded that it was eight times more
likely for CCME's share price to see a statistically
significant change on News Days than on Non-News Days.

The Court finds that Plaintiffs have proffered
sufficient evidence to satisfy the fifth and most important
Cammer factor.   As noted above, the Court credits the test
used by both Jones and Christophe, which compares the
frequency of statistically significant CCME share price
reactions on News Days versus Non-News Days.   See Ferrillo
et al., 78 St. John's L. Rev. at 120.   The Court concludes
that because CCME's stock price was six to eight times more
likely to change on News Days than on Non-News Days,
Plaintiffs have satisfied the fifth Cammer factor.   See In
re Alstom, 253 F.R.D. at 280 (finding fifth Cammer factor
satisfied where "Alstom was over 6 times more likely to
have a statistically significant stock return on a day with
news than on a day with no news" (internal quotation marks
omitted)).

　　　　b.   Krogman Factors

The Court is also persuaded that Plaintiffs, based on
Jones's report, have satisfied the three Krogman factors.
As to the first factor -- the firm's capitalization --

34

Jones found specifically that CCME's market capitalization ranged from $292 million to $585 million during the Class Period, which was consistent with other mid-sized publically traded companies. For the second factor -- the bid-ask spread -- Jones determined that CCME's spread was .27 percent, which is relatively large and indicative of an efficient market. Finally, with respect to the third factor -- the company's public float -- Jones found that CCME "insiders" owned between 57 percent and 69 percent of the shares outstanding during the Class Period, which was consistent with a finding of market efficiency. The Court credits Jones's analysis and is persuaded that the three Krogman factors weigh in favor of its conclusion that the market for CCME stock was efficient. See, e.g., Billhofer, 281 F.R.D. at 160 (S.D.N.Y. 2012) ("[S]ubstantial market capitalization with a narrow bid-ask spread, and a large public float . . . strongly indicate . . . an efficient market such that the Basic presumption is appropriate.").

   3.   Options Traders

   Plaintiffs also seek to include options traders as part of the Proposed Class. In general, "[t]he market price for options is directly responsive . . . to changes in the market price of the underlying stock, and to information affecting that price." Deutschman v.

35

Beneficial Corp., 841 F.2d 502, 504 (3d Cir. 1988). Accordingly, where a court finds the Market Efficiency Requirement satisfied, "[o]ption traders . . . may use the fraud-on-the-market presumption of reliance absent special circumstances compelling a different result." In re Priceline.com Inc., 236 F.R.D. 89, 99 (D. Conn. 2006); see also, e.g., In re Enron Corp. Litig., 529 F. Supp. 2d 644, 754 (S.D. Tex. 2006) (finding fraud-on-the-market presumption satisfied for derivatives purchasers). The Court has found that the market for CCME stock was efficient and is not persuaded that there are any special circumstances that would preclude applying the fraud-on-the-market presumption to options traders.

### 4. Price Impact

DTT HK argues that, even if CCME stock traded on an efficient market, the fraud-on-the-market presumption is rebutted because DTT HK's alleged misstatements did not impact CCME's stock price.

The United States Supreme Court recently held that a securities-fraud defendant can "defeat the [fraud-on-the-market] presumption at the class certification stage through evidence that the misrepresentation did not in fact affect the stock price." Haliburton Co. v. Erica P. John Fund, Inc. (Haliburton II), 134 S. Ct. 2398, 2414 (2014).

Haliburton II did not change Second Circuit case law, which already permitted a securities-fraud defendant "to rebut the presumption, prior to class certification, by showing, for example, the absence of a price impact." In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 484 (2d Cir. 2008); see also In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig., 281 F.R.D. 134, 142-43 (S.D.N.Y. 2012). The defendant bears the burden to prove a lack of price impact. See Haliburton II, 134 S. Ct. at 2417 (Ginsburg, J., concurring) ("[T]he Court recognizes that it is incumbent upon the defendant to show the absence of price impact."); In re Salomon, 544 F.3d at 483 ("[T]he burden of showing that there was no price impact is properly placed on defendants at the rebuttal stage.").

DTT HK correctly notes that on the day after it released its 2009 audit opinion -- which contains the misstatements that Plaintiffs allege to be actionable -- CCME's stock price did not increase, and in fact decreased slightly.[7] DTT HK thus concludes that it has shown the absence of any price impact from its material misstatements. But this simple line of reasoning is flawed. A material misstatement can impact a stock's value either by improperly causing the value to increase or by

---

[7] Both Jones and Christophe concluded, however, that the price decrease was not statistically significant.

improperly maintaining the existing stock price.   See, e.g., In re Pfizer Inc. Sec. Litig., 936 F. Supp. 2d 252, 264 (S.D.N.Y. 2013) ("[A] misstatement may cause inflation simply by maintaining existing market expectations, even if it does not actually cause the inflation in the stock price to increase on the day the statement is made."). Misstatements by an auditor confirming the accuracy of a company's (inaccurate) financial statements may be particularly likely to maintain an already-inflated stock price because the market likely expects an auditor to issue such an opinion.

The Court is not persuaded that DTT HK has met its burden to prove that its alleged misstatements did not improperly maintain CCME's already-inflated stock price. Indeed, the evidence suggests quite the contrary.   Only days before DTT HK issued its audit opinion, CCME's stock price increased based on its release of unaudited financial statements.   It is reasonable to infer that this increase included the market's expectation that DTT HK's audit opinion would later confirm the accuracy of CCME's financial statements.   DTT HK has presented no evidence to suggest otherwise.   Moreover, as further evidence of the market's awareness of and responsiveness to DTT HK's audits, when DTT HK eventually did withdraw its audit

opinion, CCME's stock price plummeted.  This again cuts against DTT HK's argument that the original audit opinion had no impact on CCME's stock price.[8]  See <u>In re Bank of Am. Corp.</u>, 281 F.R.D. at 143 (finding that stock price's negative reaction to corrective disclosure served to defeat defendant's argument of lack of price impact).

     5.   <u>Damages Theory</u>

DTT HK argues that Plaintiffs fail to show that their theory of damages is sufficiently linked to their theory of liability.  See <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1432-33 (2013).  "In <u>Comcast</u>, the Supreme Court held that courts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis."  <u>In re U.S. Foodservice Inc. Pricing Litig.</u>, 729 F.3d 108, 123 n.8 (2d Cir. 2013).  The Court is persuaded that Plaintiffs have satisfied their obligations under <u>Comcast</u>.

In entering a default judgment against CCME, the Court accepted Jones's analysis of the classwide damages that

---

[8] This observation should not be construed as relieving Plaintiffs from proving loss causation at the merits stage of this litigation.  While the price impact of DTT HK's withdrawal of its audit opinion tends to disprove that the original audit opinion had no impact on CCME's stock price, Plaintiffs must do more to prove loss causation.  See <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 342-43 (2005) (noting that stock price decline after misrepresentation is revealed is insufficient to prove loss causation without additional evidence).

CCME's misrepresentations caused.   (Dkt. No. 192, Exh. 6.)

Plaintiffs' theory of liability is that DTT HK's

misrepresentations caused losses of the same kind: the

artificial inflation of CCME's share price.   The Complaint

alleges that DTT HK knowingly violated the securities laws.

(See Compl. ¶ 156, Dkt. No. 63.)   Consequently, if a

factfinder agrees, under the PSLRA DTT HK would be jointly

and severally liable for the damages caused by CCME.   See

15 U.S.C. § 78u-4(f)(2)(A).   Thus, the same damages report

used to determine classwide damages against CCME can be

used to determine classwide damages against DTT HK.

Plaintiffs have therefore met their burden under Comcast.[9]

DTT HK argues that Jones's damages model cannot be

used against DTT HK because the model attributes all of

Plaintiffs' damages to CCME.   The Court is not persuaded

that DTT HK reads Jones's damages model properly.   Jones's

model calculates the full loss attributable to all of the

misstatements alleged in this action, but does not seek to

apportion responsibility for the damages among the various

speakers.   While the Court's default judgment against CCME

---

[9] Whether Jones's damages report accurately describes the damages
suffered by the Proposed Class is an issue to be considered at the
merits stage of this litigation.   For the purposes of class
certification, all Plaintiffs must show is a "proposed damages
methodology" to measure classwide damages.   In re U.S. Foodservice
Inc., 729 F.3d at 123 n.8 (emphasis added).   DTT HK will have an
opportunity to challenge the application of that methodology if and
when it chooses to contest the amount of damages Plaintiffs seek.

held it liable for the full amount of the damages that Jones calculated, that was only because the Court found that CCME knowingly violated the securities laws and thus was jointly and severally liable for those damages. (See Dkt. No. 193.)   The same theory of liability -- and, accordingly, the same theory of damages -- applies to DTT HK.

A factfinder could also conclude that DTT HK violated the securities laws but did not do so knowingly.   In that case, the factfinder would have to apportion liability to DTT HK according to its responsibility for the damages. See 15 U.S.C. § 78u-4(f)(2)(B)(i), (f)(3).   Whether under those circumstances Jones's damages model would suffice to make out a classwide measure of damages as required under Comcast can be considered at the appropriate time.   Should such a course then be warranted, it may be initiated by DTT HK in the form of a motion to decertify the class.   See Sumitomo III, 262 F.3d at 139.

## IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Dkt. No. 177) of Lead Plaintiffs Irrevocable Trust FBO Lansing Davis and the Davis Partnership LP and additional plaintiffs John Haughton, Ethan Lamar Pierce and John Shaffer for class certification is **GRANTED**; and it is further

**ORDERED** that the motion (Dkt. No. 204) of defendant Deloitte Touche Tohmatsu in Hong Kong SAR to strike the opinions of Cynthia L. Jones is **DENIED**.

**SO ORDERED.**
Dated:     New York, New York
           15 August 2014

Victor Marrero
U.S.D.J.

42